UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JEFFREY KESWIN,

                Plaintiff,                        District Court Index No 16-1585

                -against-

                                              Supreme Court – New York
FINGER LAKES CAPITAL PARTNERS, LLC,      Index No. 156356/2015
V. ZUBIN MEHTA and GREGOARY SHALOV,

                Defendants.

-----------------------------------------------------------------X
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re,

                                           Chapter 11
FINGER LAKES CAPITAL PARTNERS, LLP,      Case No. 11211 (RDD)

                Debtor.
-----------------------------------------------------------------X

## NOTICE OF REMOVAL

**TO THE HONORABLE DISTRICT COURT JUDGE
ASSIGNED TO THESE PROCEEDINGS:**

      Finger Lakes Capital Partners LLC (the "Movant" or the "Debtor"), by its attorneys

DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, respectfully provides notice to this

Court of removal of the above-captioned action from the Supreme Court of the State of New

York, County of New York, to the United States District Court for the Southern District of New

York, and respectfully represents as follows:

      1.      On June 24, 2015, Plaintiff, JEFFREY KESWIN ("Plaintiff") filed a Motion for

Summary Judgment in Lieu of Complaint (the "Complaint") against, *inter alia,* the Debtor in

Supreme Court, New York County ("New York Supreme"), Index Number 156356/2015 (the "New York Supreme Action"). Annexed hereto as **Exhibit "1"** is a copy of the Motion for Summary Judgment in Lieu of Complaint.

2.    On or about August 25, 2015, the Debtor, V. ZUBIN MEHTA and GREGORY SHALOV, (together with the Debtor, the "Defendants") filed a (i) Opposition to Plaintiff's Motion for Summary Judgment in Lieu of Complaint; and (ii) Cross-Motion to Dismiss or Stay the New York Supreme Action.  (the "Opposition and Cross-Motion"). Annexed hereto as **Exhibit "2"** is a copy of Opposition and Cross-Motion.

3.    On or about September 1, 2015, Plaintiff filed Opposition to the Cross-Motion to Dismiss or Stay the New York Supreme Action (the "Opposition"). Annexed hereto as **Exhibit "3"** is a copy of Opposition.

4.    On October 13, 2015, Hon. Barry R. Ostrager, J.S.C. issued a decision (the "Stay Decision") staying the New York Supreme Action pending disposition of an action pending in the State of Delaware (the "Delaware Chancery Action"), *Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition LLC and Lyrical Opportunity Partners, L.P.*, Chancery Court of the State of Delaware, C.A. No. 9742-VCL.  Annexed hereto as **Exhibit "4"** is a copy of the Stay Decision.

5.    Thereafter, a disposition was reached in the Delaware Chancery Action; (i) on October 26, 2015, a memorandum opinion (the "Memorandum Opinion") was entered; (ii) on November 28, 2015, an order granting in part and denying in part the parties' cross-motions for reargument was entered (the "Reargument Order"); and (iii) on January 22, 2016, a final order and judgment was entered (the "Final Order and Judgment").

6.    As a result of the disposition in the Delaware Chancery Action, the stay was

vacated in the New York Supreme Action.  On December 2, 2015, the Honorable Barry R.

Ostrager, J.S.C., issued a decision (the "Decision") denying Plaintiff's motion and denying

Defendants' cross-motion based on the existence of issues of fact.  Annexed hereto as **Exhibit**

**"5"** is a copy of Decision.

       7.      On January 28, 2016, Defendants filed a Notice of Appeal from the Delaware

Chancery Action's Memorandum Opinion, Reargument Order and Final Order and Judgment.

## THE BANKRUPTCY FILING

       8.      On January 29, 2016, the Debtor filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of

New York, Chapter 11 case number 16-11211 (RDD).   The Debtor has continued in possession

of their property and management of its affairs as debtor-in-possession pursuant to Sections 1107

and 1108 of the Bankruptcy Code.  No committee or examiner has been appointed.

       9.      The Debtor is an asset management company.

      10.      This Notice of Removal is being timely filed pursuant to Rule 9027 of the Federal

Rules of Bankruptcy Procedure.

      11.      Section 1452(a) of Title 28 of the U.S. Code grants a very broad right to parties to

civil parties to remove "any claim or cause of action" to the district court (and by referral to the

bankruptcy court) provided that bankruptcy jurisdiction exists under 28 U.S.C. § 1334. This

United States District Court for the Southern District of New York has subject matter jurisdiction

over the New York Supreme Action because it is a civil proceeding that arises in or is related to

a case under title 11 -- the Chapter 11 case of the Debtor. The New York Supreme Action alleges

significant claims which constitute property of the Debtors' bankruptcy estates.

      12.      This action is a "core proceeding" within the meaning of 28 U.S.C §157(b)(2)(A),

(B) and (O) in that the action concerns (i) the disposition of property of the estate; (ii) allowance

or disallowance of claims against the Estate; and (iii) the ability of the Debtor to timely proceed

in its attempt to reorganize under Chapter 11 of the Bankruptcy Code.

13.     Bankruptcy Court determination of these issues is crucial. Specifically, ability of

the Debtor to reorganize is based upon the ability to create unencumbered assets in which the

Estates have an interest.  It is essential that the Bankruptcy Court be in a position to adjudicate

the claims between the parties, as they are critical to the Debtors' ability to reorganize under

Chapter 11.

14.     This action is a civil action of which this Court has original jurisdiction under the

provisions of 28 U.S.C. Section 1334, and is one which may be removed to this Court by the

Debtors pursuant to the provisions of 28 U.S.C. Section 1452, in that the matter in controversy is

a civil action related to a bankruptcy case.

15.     Upon removal the Debtors will promptly seek to transfer venue of this action

pursuant to 28 U.S.C. § 1404 to the Court where the Chapter 11 proceedings are pending, the

United States District Court for the Southern District of New York, for its ultimate referral to the

Bankruptcy Court.

Dated: White Plains, New York
       February 8, 2016

                   DELBELLO DONNELLAN WEINGARTEN
                   WISE & WIEDERKEHR, LLP
                   *Proposed Attorneys for the Debtor*
                   One North Lexington Avenue, 11th Floor
                   White Plains, New York 10601
                   (914) 681-0200

                   */s/ Jonathan S. Pasternak*
         By:_____
                   Jonathan S. Pasternak

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x
                                          :

JEFFREY KESWIN,                      :   Index No. _____

                                          :

             Plaintiff,        :

                                          :        **NOTICE OF MOTION FOR**

          -against-         :    **SUMMARY JUDGMENT IN LIEU**

                                          :        **OF COMPLAINT**

FINGER LAKES CAPITAL PARTNERS, LLC, V. :
ZUBIN MEHTA, and GREGORY SHALOV,  :

                                          :

            Defendants.     :

------------------------------------------------------------- x

**PLEASE TAKE NOTICE** that, upon the annexed Affidavit of Jeffrey Keswin sworn to on June 22, 2015, the exhibits thereto, and all prior proceedings had herein, Plaintiff Jeffrey Keswin, by his undersigned attorneys, will move this Court before the New York Supreme Court, 60 Centre Street, New York, New York on July 29, 2015, at 9:30 a.m. or as soon thereafter as counsel can be heard, for an order pursuant to C.P.L.R. §3213 directing the entry of judgment in favor of Jeffrey Keswin and against Defendants Finger Lakes Capital Partners LLC, V. Zubin Mehta, and Gregory Shalov in the amount of $400,000.00, with interest accruing thereon at the rate of twenty percent (20%) per annum from August 1, 2006, and for such other and further relief as this Court may deem just and proper.

The above-entitled action is for the nonpayment of one promissory note, and is based upon an instrument for the payment of money only which is presently payable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to C.P.L.R. §3213, answering

affidavits, if any, are required to be served on the undersigned on or before July 20, 2015.


Dated: New York, New York
       June 24, 2015

                             **STORCH AMINI & MUNVES PC**


                    By:    /s/ Bijan Amini
                          Bijan Amini
                          Jaime Leggett
                          2 Grand Central Tower
                          140 East 45th Street, 25th Floor
                          New York, NY 10017
                          (212) 490-4100

                          *Attorneys for Plaintiff*

TO:

Finger Lakes Capital Partners, LLC
Attn: Zubin Mehta and Gregory Shalov, Co-Managing Directors and Members
168A Irving Street
Port Chester, New York 10573

Gregory Shalov
168A Irving Street
Port Chester, New York 10573

V. Zubin Mehta
168A Irving Street
Port Chester, New York 10573

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------- x

JEFFREY KESWIN,                          :
                                         :
                    Plaintiff,           :     Index No. _____
                                         :
           -against-                     :
                                         :
FINGER LAKES CAPITAL PARTNERS, LLC,      :
   V. ZUBIN MEHTA, and GREGORY SHALOV,   :     **AFFIDAVIT OF**
                                         :     **JEFFREY KESWIN**
                    Defendants.          :
                                         :

------------------------------------------------------------- x

STATE OF COLORADO        )
                         )    ss.:
COUNTY OF PITKIN         )

JEFFREY KESWIN, being duly sworn, deposes and says:

1.     I am the Plaintiff in this action and submit this Affidavit in support of my Motion

for Summary Judgment in Lieu of Complaint against Defendants Finger Lakes Capital Partners,

LLC ("FLCP"), V. Zubin Mehta, and Gregory Shalov (collectively, "Defendants"). This action is

brought to recover a loan of $400,000, with interest, against FLCP that was guaranteed by its two

named principals.

2.     I have, since at least 2004, managed Lyrical Opportunity Partners, L.P. in my

capacity as the managing member of both its general partner and the management company that

oversees it.

3.     In April 2004, Lyrical Opportunity Partners agreed to seed certain investments by

FLCP.  In return, FLCP would earn, among other things, "carried interest," its share of

distributions for having managed the investments.  Over the next four years, myself, Lyrical

Opportunity Partners, and a related entity provided over $20 million to FLCP to acquire and

manage five separate investments.

4.       In or about July 2006, Mehta and Shalov asked me for a loan of up to $1,000,000

in connection with one of the five investments. Thereafter, on August 1, 2006, I caused $400,000

to be wired to FLCP as a loan.

5.       This action is brought to recover that principal amount of $400,000.00, plus the

accrued contractual interest of twenty percent (20%) per annum on the promissory note issued in

connection with that loan dated August 1, 2006 (the "Note"). A true and correct copy of the

Note is attached hereto as Exhibit A.

6.       Mehta and Shalov, the principals of FLCP, personally guaranteed FLCP's

obligations under the Note, "including, but not limited to, the repayment of all principal and the

payment of all interest hereunder."

7.       The Note also provides that Defendants waive "demand, presentment, notice of

dishonor, notice of intent to demand or accelerate payment hereof, . . . and agree to one or more

extensions for any period or periods of time and partial payments, before or after maturity,

without prejudice to [Plaintiff]."

8.       The Note was due and payable on July 31, 2007.

9.       Defendants did not have the funds with which to repay the Note, and would not

have such funds prior to a return from one of their investments. In the Note, Defendants

assigned as collateral "any assets held by Issuer [FLCP], its Principals [Mehta and Shalov],

affiliates, and assigns, including, but not limited to, Issuer's $23,531.87 investment in Seneca

Lake Acquisition LLC, its $50,000 investment in Keuka Lake Acquisition LLC, its $100,000

investment in Honeoye [Lake] Acquisition LLC, and its right to receive a carried interest on any

investments. . . ." (those three investments were the ones Defendants had acquired by that date

with Lyrical's funding). The Note provides that: "In the event of a sale, distribution, or

liquidation of any or all of the Collateral, all proceeds will go directly to [Plaintiff] until this note

has been repaid in full and all accrued interest has been paid."

10.     On November 21, 2006, I received an email from Mehta on which Shalov was

copied in which Mehta wrote:

> The $400k loan was indeed something that you . . . gave to us personally . . . and
> as a result is indeed something we have to make up via our carried interest. . . .
> We were clear about this and we all agree here. . . . I do want you to know that we
> will pay you back (regardless of what happens now or eventually) and
> unfortunately while we can only give you our word, I hope that it stands for
> something.

A true and correct copy of the email is attached hereto as Exhibit B.

11.     In connection with these investments, on October 20, 2009, Mehta wrote an

email, with a copy to his partner Shalov, to Lyrical Partners' Chief Financial Officer, Ted Gage.

In that email, Mehta attached a spreadsheet listing the monies advanced to FLCP in connection

with these investments that included the $400,000 obligation evidenced by the Note.  The

spreadsheet included a footnote (e) providing: "Loan to GS/ZM [Shalov/Mehta] from Jeff

Keswin . . . is due back to JK from GS and ZM out of their carried interest from FLCP

Investment Portfolio."  In the body of the email, Mehta wrote:

> while [Lyrical Opportunity Partners] and Jeff [Keswin] are disappointed by
> FLCP's current results and our investment portfolio's performance, we believe
> strongly that we'll be able to provide a strong overall return to [Lyrical
> Opportunity Partners]. . . . As a further basis for this, please see the attached
> spreadsheet that describes our current portfolio.  Lastly, if you could please
> confirm receipt and that this works for you and [Lyrical Opportunity Partners],
> that would be great – short of that, we are going to do everything in our power to
> ensure we get [Lyrical Opportunity Partners] and Jeff [Keswin] a strong overall
> return on the FLCP Investment portfolio.

A true and correct copy of the email is attached hereto as Exhibit C.

12.    On May 24, 2010, Mehta forwarded that October 20, 2009 email along with an attached spreadsheet to Daniel DeSerio, Lyrical Partners' then-assistant controller, containing the same recitation in footnote (e) that the $400,000 "is due back to JK from GS and ZM out of their carried interest from FLCP Investment Portfolio." A true and correct copy of that email is attached hereto as Exhibit D.

13.    To date, Defendants have failed to make payment of any of the principal and any accrued interest under the Note. Accordingly, as of the date of this Affidavit, the aggregate principal sum of $400,000 is past due and payable under the Note and the accrued interest on said Note since August 1, 2006 is also past due and payable.

14.    In March 2014, Honeoye Lake Acquisition LLC, one of FLCP's five investment vehicles created to acquire the investments, sold its assets at a substantial profit. This was the first successful sale of any of FLCP's Lyrical-funded investments, the principal source from which Defendants agreed they would repay the Note.

15.    The distribution of proceeds from the sale of Honeoye Lake Acquisition is presently the subject of another action commenced by Defendant FLCP on June 9, 2014, entitled Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC, and Lyrical Opportunity Partners, L.P., C.A. No. 9742-VCL (Del. Ch.) (the "Delaware Action"). I am not personally a party to that action, though some of my personal investments are the subject thereof.

16.    In the Delaware Action, FLCP seeks payment of its share of any distribution from Honeoye Lake Acquisition LLC. On January 28, 2015, the Delaware Chancery Court orally awarded an interlocutory judgment to FLCP for its carried interest deriving from Honeoye Lake Acquisition, and set down for trial, among other things, whether Lyrical Opportunity Partners

4

had certain setoffs and recoupments against the payment of such distributions.  Among those

asserted by Lyrical Opportunity Partners was a claim for amounts due under the Note.

      17.    A trial in the Delaware Action was conducted last week.  Despite acknowledging

their debt under the Note, Defendants raised, among other defenses, that Plaintiff is not present

as a party in the Delaware Action.  Accordingly, this action is filed to address that defense.  No

post-trial decision in the Delaware Action has been issued. Lyrical Opportunity Partners intends

to advise the court in the Delaware Action of the pendency of this action in its post-trial briefing.

      18.    There is no defense to Defendants' failure to comply with their obligation to

repay me the principal and all accrued interest past due under the Note from any carried interest

earned on the subject investments. In addition to their written undertakings, both Shalov and

Mehta have affirmed their obligation to repay the Note with interest in testimony given in the

Delaware Action, excerpts from which are attached as set forth below.

      19.    On April 27, 2015, Shalov testified under oath at his deposition in the Delaware

Action.  A true and correct copy of the relevant portions of his deposition transcript is attached

hereto as Exhibit E.

      20.    On April 28, 2015, Mehta testified under oath at his deposition in the Delaware

Action.  A true and correct copy of the relevant portions of his deposition transcript is attached

hereto as Exhibit F.

      21.    On June 15, 2015, Mehta testified under oath at the trial in the Delaware Action.

A true and correct copy of the relevant portions of the trial transcript is attached hereto as Exhibit

G.

22.      On June 16, 2015, Shalov testified under oath at the trial in the Delaware Action.
A true and correct copy of the relevant portions of the trial transcript is attached hereto as Exhibit
H.

23.      Other than as described above in connection with the Delaware Action, no
previous application for the relief prayed for herein has been made.

WHEREFORE, Plaintiff Jeffrey Keswin respectfully requests an order granting summary judgment in his favor and against Defendants FLCP, Mehta, and Shalov in the sum of $400,000.00, with interest thereon at the rate of twenty percent (20%) per annum from August 1, 2006 on the Note.

_____
JEFFREY KESWIN

Sworn to before me this
22 day of June, 2015.

_____
Notary

LISA M. GEISHART
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID #20104045188
My Commission Expires October 20, 2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------- x
                                                    :
JEFFREY KESWIN,                                     :
                                                    :    Index No. _____
                              Plaintiff,            :
                                                    :
                   -against-                        :
                                                    :
FINGER LAKES CAPITAL PARTNERS, LLC, V. :
ZUBIN MEHTA, and GREGORY SHALOV,                    :
                                                    :
                              Defendants.           :
--------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

Plaintiff Jeffrey Keswin ("Plaintiff" or "Keswin"), by and through counsel, submits this memorandum of law in support of his motion for summary judgment in lieu of complaint against defendants Finger Lakes Capital Partners, LLC ("FLCP"), V. Zubin Mehta, and Gregory Shalov (collectively, "Defendants") to recover a loan of $400,000, with interest, to FLCP that was guaranteed by its principals, Mehta and Shalov.

## STATEMENT OF FACTS

Since at least 2004, Keswin has managed Lyrical Opportunity Partners, L.P. in his capacity as the managing member of both its general partner and the management company that oversees it. Affidavit of Jeffrey Keswin dated June 22, 2015 ("Keswin Aff.") at ¶2. In April 2004, Lyrical Opportunity Partners agreed to seed certain investments by FLCP. *Id.* FLCP would earn from these investments, among other things, "carried interest," or its share of distributions for having managed the investments. *Id.* at ¶3. Over the next four years, Keswin, Lyrical Opportunity

Partners, and a related entity provided over $20 million to FLCP to acquire and manage five separate investments. *Id.*

In or about July 2006, Mehta and Shalov asked Keswin to loan FLCP up to $1,000,000 in connection with one of the five investments. Keswin Aff. at ¶4. FLCP executed a promissory note on August 1, 2006 for $1,000,000 (the "Note") in favor of Keswin. *Id.* at ¶5, Ex. A. FLCP borrowed $400,000 of that amount from Keswin on that same date, and on August 1, 2006, Keswin wired $400,000 to FLCP. *Id.* at ¶¶4, 5, Ex. A. Mehta and Shalov, the principals of FLCP, both provided personal guarantees of FLCP's performance under the Note, and signed the Note personally. *Id.* at ¶6, Ex. A*; id.* at ¶19, Ex. E at 260:7-24; *id.* at ¶20, Ex. F at 153:2-4. In the Note, which was fully due and payable on July 31, 2007, FLCP promised to pay the principal of the Note plus interest at the rate of twenty percent (20%) per annum. *Id.* at ¶¶5, 8, Ex. A. Under the note, Defendants waived "demand, presentment, notice of dishonor, notice of intent to demand or accelerate payment hereof, . . . and agree to one or more extensions for any period or periods of time and partial payments, before or after maturity, without prejudice to [Keswin]." *Id.* at ¶7, Ex. A.

Defendants admittedly did not have the funds with which to repay the Note, and would not have such funds prior to a return from one of their investments. *Id.* at ¶9. In the Note, Keswin received as collateral "any assets held by Issuer [FLCP], its Principals [Mehta and Shalov], affiliates, and assigns, including, but not limited to, Issuer's $23,531.87 investment in Seneca Lake Acquisition LLC, its $50,000 investment in Keuka Lake Acquisition LLC, its $100,000 investment in Honeoye [Lake] Acquisition LLC, and its right to receive a carried interest on any investments. . . ." (those three investments were the ones Defendants had acquired by that date with Lyrical's funding). Keswin Aff. at ¶9, Ex. A. The Note provides that: "In the event of a sale, distribution,

or liquidation of any or all of the Collateral, all proceeds will go directly to [Keswin] until this

note has been repaid in full and all accrued interest has been paid." *Id.* at ¶9, Ex. A.

On November 21, 2006, Mehta sent Keswin an email (on which Shalov was copied) in

which he agreed that Mehta and Shalov would be required to repay Keswin once they had carried

interest:

> The $400k loan was indeed something that you . . . gave to us personally . . . and
> as a result is indeed something we have to make up via our carried interest. . . . We
> were clear about this and we all agree here. . . . I do want you to know that we will
> pay you back (regardless of what happens now or eventually) and unfortunately
> while we can only give you our word, I hope that it stands for something.

*Id.* at ¶10, Ex. B.

In connection with one of these investments, on October 20, 2009, Mehta wrote an email,

with a copy to his partner Shalov, to Lyrical Partners' Chief Financial Officer, Ted Gage, about

the capital invested by Lyrical Opportunity Partners and Keswin in FLCP. *Id.* at ¶11, Ex. C. The

email attached a spreadsheet listing the monies advanced to FLCP in connection with these

investments, including the $400,000 obligation to Keswin evidenced by the Note. *Id.* at ¶11, Ex.

C. The spreadsheet also included a footnote (e) affirming that: "Loan to GS/ZM [Shalov/Mehta]

from Jeff Keswin . . . is due back to JK from GS and ZM out of their carried interest from FLCP

Investment Portfolio." *Id.* The text of Mehta's email likewise provided:

> while [Lyrical Opportunity Partners] and Jeff [Keswin] are disappointed by FLCP's
> current results and our investment portfolio's performance, we believe strongly that
> we'll be able to provide a strong overall return to [Lyrical Opportunity Partners]. .
> . . As a further basis for this, please see the attached spreadsheet that describes our
> current portfolio. Lastly, if you could please confirm receipt and that this works
> for you and [Lyrical Opportunity Partners], that would be great – short of that, we
> are going to do everything in our power to ensure we get [Lyrical Opportunity
> Partners] and Jeff [Keswin] a strong overall return on the FLCP Investment
> portfolio.

Keswin Aff. at ¶11, Ex. C. On May 24, 2010, Mehta forwarded the October 20, 2009 email to

Daniel DeSerio, Lyrical Partners' then-assistant controller, containing the same recitation in

footnote (e) that the $400,000 "is due back to JK from GS and ZM out of their carried interest from FLCP Investment Portfolio." *Id.* at ¶12, Ex. D.

In March 2014, Honeoye Lake Acquisition LLC, one of FLCP's five investment vehicles created to acquire the investments, sold its assets at a substantial profit, which was the first successful sale of any of FLCP's Lyrical-funded investments (the principal source from which Defendants agreed they would repay the Note). Keswin Aff. at ¶13. The distribution of proceeds from the sale of Honeoye Lake Acquisition is presently the subject of another action commenced by Defendant FLCP on June 9, 2014, entitled <u>Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC, and Lyrical Opportunity Partners, L.P.</u>, C.A. No. 9742-VCL (Del. Ch.) (the "<u>Delaware Action</u>"). *Id.* at ¶15. Keswin is not personally a party to that action, though some of his personal investments are the subject thereof.

On January 28, 2015, the Delaware Chancery Court orally awarded an interlocutory judgment to FLCP in the Delaware Action for its carried interest deriving from Honeoye Lake Acquisition, and set down for trial, among other things, whether Lyrical Opportunity Partners had certain setoffs and recoupments against the payment of such distributions. *Id.* at ¶16. Among those setoffs and recoupments asserted by Lyrical Opportunity Partners was a claim for amounts due under the Note. *Id.* A trial in the Delaware Action was conducted last week. Keswin Aff. at ¶17. Despite acknowledging their debt under the Note, Defendants raised, among other defenses, that Plaintiff is not present as a party in the Delaware Action. *Id.* Accordingly, this action is filed to address that defense. No post-trial decision in the Delaware Action has been issued, and Lyrical Opportunity Partners intends to advise the court in the Delaware Action of the pendency of this action in its post-trial briefing. *Id.* at ¶17.

In the Delaware Action, Shalov has testified under oath that he always intended to repay the loan to Keswin from his carried interest received by FLCP from Honeoye Lake Acquisition. *Id.* at ¶19, Ex. E at 269:5-17; *id.* at ¶22, Ex. H at 531:23-532:3. Also in that Action, Mehta similarly has testified under oath that Defendants intended to repay the Note from the FLCP's carried interest from the portfolio investments but for the operation of the statute of limitations. Keswin Aff. at ¶21, Ex. G at 291:14-293:3.

To date, FLCP has failed to honor the Note, and Mehta and Shalov have failed to honor their guarantees for the Note. *Id.* at ¶¶ 13, 19, Ex. E at 260:25-261:3; *id.* at ¶20, Ex. F at 153:5-6. As of the date of this filing, the current outstanding balance on the Note is $400,000, not including interest, and the maturity date has passed. Keswin Aff. at ¶¶8, 13. Accordingly, the Note is now fully due, with interest thereon at the rate of twenty percent (20%) per annum, and any such carried interest must be used to repay Keswin. Interest has accrued at this rate from August 1, 2006. There is no defense to FLCP's failure to honor the Note. Furthermore, given FLCP's failure to honor the note, Mehta and Shalov are liable under the terms of their guarantees for $400,000.00, plus interest thereon at the rate of twenty percent (20%) per annum.

## **ARGUMENT**

### **Summary Judgment Is Warranted**

A.    The Note and Guarantees Are Instruments Under CPLR §3213

C.P.L.R. §3213 provides, in pertinent part, "When an action is based upon an instrument for the payment of money only . . . , the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint." NY C.P.L.R. §3213. In order to proceed under C.P.L.R. §3213, a party must rely upon a written unconditional instrument demonstrating an obligation to pay a sum certain at a specified date or in installments. *Maglich v.*

*Saxe, Bacon & Bolan, P.C.*, 97 A.D.2d 19, 22 (1st Dep't 1983).  In other words, a document is

encompassed by C.P.L.R. §3213 "if a *prima facie* case would be made out by the instrument and

a failure to make the payments called for by its terms."  *Weissman v. Sinorm Deli, Inc.*, 88 N.Y.2d

437, 444 (1996) (internal quotation omitted).

The Note and guarantees clearly qualify for C.P.L.R. §3123 proceedings.  *See*, *e.g.*, *Bank*

*of America, N.A. v. Solow*, 59 A.D.3d 304, 304-05 (1st Dep't 2009) (ruling that the guaranty "was

an instrument for the payment of money only" and granting summary judgment) (internal

quotation and citation omitted); *Verela v. Citrus Lake Development, Inc.*, 53 A.D.3d 574, 575 (2d

Dep't 2008) (awarding summary judgment on a promissory note); *Boland v. Indah Kiat Finance*

*(IV) Mauritius*, 291 A.D.2d 342, 342-43 (1st Dep't 2002) (granting summary judgment pursuant

to C.P.L.R. §3213 on promissory note issued as part of indenture).  As detailed below, the statute

of limitations has been tolled and proceeding by summary judgment in lieu of complaint is

appropriate.  *See Anonymous v. Anonymous*, 172 A.D.2d 285, 286-87 (1st Dep't 1991) (overruling

trial court and granting summary judgment in lieu of complaint where debtor had issued "IOU's"

tolling the statute of limitations).

B.    Keswin Has Submitted Simple Proof of Nonpayment

Once it is established that a document qualifies under C.P.L.R. §3213, a party may prevail

on its claim on a promissory note by making a *prima facie* showing of (i) the existence of a note

and (ii) the defendant's failure to make payments.  *Verela*, 53 A.D.3d at 574; *see also Bank of*

*America*, 59 A.D.3d at 304 (Plaintiff demonstrated entitlement to summary judgment "by

establishing the existence of a guaranty and submitting an affidavit of nonpayment.").  Here, the

existence of the Note, its terms, and FLCP's failure to pay the Note is established by the Keswin

Affidavit.  Accordingly, Keswin has established a *prima facie* case against FLCP.  Furthermore,

the existence of the guarantees is also established by the Keswin Affidavit.  Coupled with the proof

of non-payment, this establishes the liability of Mehta and Shalov under the guarantees.  As such,

Keswin has also established a *prima facie* case against Mehta and Shalov.

Where, as here, a *prima facie* case is established, the defendant must "come forward with

evidentiary proof sufficient to raise an issue as to the defenses" to payment.  *Seaman-Andwall

Corp. v. Wright Machine Corp.*, 31 A.D.2d 136, 137-38 (1st Dep't 1968), *aff'd*, 29 N.Y.2d 617

(1971).  In the instant matter, FLCP has no defense to its failure to pay the Note, much less any

evidentiary proof in admissible form that would raise an issue of fact precluding summary

judgment in Keswin's favor.

Moreover, Mehta and Shalov have no defense to their liability arising from FLCP's failure

to pay the Note.  On October 20, 2009, Mehta, on behalf of FLCP and Shalov, sent a written and

signed reaffirmation of the Note listing its amount and stating that Defendants would "do

everything in [their] power to ensure we get [Lyrical Opportunity Partners] and Jeff [Keswin] a

strong overall return on the FLCP Investment Portfolio."  *See* NY Gen. Oblig. Law § 17-101 ("An

acknowledgment or promise contained in a writing signed by the party to be charged thereby is

the only competent evidence of a new or continuing contract whereby to take an action out of the

operation of the provisions of limitations of time for commencing actions. . . .");  *Faulkner v. Arista

Records LLC*, 602 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) ("To toll effectively or restart the running

of the statute of limitations under § 17–101, an acknowledgment or promise must be in writing, be

signed by the debtor party, recognize an existing debt and contain nothing inconsistent with an

intention on the part of the debtor to pay it.") (internal quotations and citation omitted).  The

reaffirmation can be made before or after the statute of limitations has run.  *Koeben v. Altchek*,

1997 WL 83290, *3 (S.D.N.Y. Feb. 26, 1997) ("Such a promise revives the debt, whether the

promise is made before or after the statute of limitations has expired.") (*citing Anonymous*, 172
A.D.2d at 287).

This reaffirmation – along with the reaffirmations on November 21, 2006 and May 24,
2010 – further provided that Mehta and Shalov would repay Keswin once they had carried interest
from which to do so, effectively tolling the statute of limitations until such carried interest came
into existence (which has now happened).  *See Lorenzo v. Bussin*, 7 N.Y.2d 1039 (1960) (letter in
which mortgagor said "as long as I live I will have to pay the debt" construed as promise to pay
which effectively tolled statute of limitations for period of debtor's lifetime); *Flynn v. Flynn*, 175
A.D.2d 51, 52 (1st Dep't 1991) ("While an express promise to pay conditioned upon the debtor's
future ability has been held sufficient to start the statute of limitations running anew, the burden is
on the creditor to show that the condition has been performed.") (citation omitted); *Faulkner*, 602
F. Supp. 2d at 479 ("If any condition must be satisfied prior to payment being made, the creditor
must show that the condition has been satisfied before application of the toll embodied in § 17–
101.") (citation and quotation omitted).

Thus, this is precisely the type of situation that C.P.L.R. §3213 is designed to remedy, and
Keswin's motion for summary judgment in lieu of complaint should be granted.

C.      If the Motion Is Denied, the Court Should Treat the Moving Papers as a Complaint

C.P.L.R. §3213 provides that "[i]f the motion is denied, the moving and answering papers
shall be deemed the complaint and answer, respectively, unless the court orders otherwise."  N.Y.
C.P.L.R. §3213; *see Comtec Trading Corp. v. Mutual Mktg. Assocs., Inc.*, 56 A.D.2d 803, 804 (1st
Dep't 1977) (denying plaintiff's C.P.L.R. §3213 motion and deeming motion papers a complaint).
Whether a motion pursuant to C.P.L.R. §3213 should be treated as a complaint lies within the
discretion of the Court.  *Schulz v. Barrows*, 94 N.Y.2d 624, 628-29 (2000).  Although Plaintiff

believes it is entitled to summary judgment, in the event that the Court denies the C.P.L.R. §3213

motion, Keswin desires to litigate this matter on the merits.

## <u>CONCLUSION</u>

For the foregoing reasons, Keswin respectfully requests that his motion for summary

judgment in lieu of complaint be granted or, if such relief is denied, that its motion for summary

judgment in lieu of complaint be converted into a complaint pursuant to C.P.L.R. §3213.


Dated: New York, New York
       June 24, 2015

                                **STORCH AMINI & MUNVES PC**


                                By:    /s/ Bijan Amini
                                       Bijan Amini
                                       Jaime Leggett
                                       2 Grand Central Tower
                                       140 East 45th Street, 25th Floor
                                       New York, NY 10017
                                       (212) 490-4100

                                       *Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEFFREY KESWIN,                                  :

                                                 :    Index No. 156356/2015
                    Plaintiff,                   :
                                                 :    Motions #001 and #002
          -against-                              :
                                                 :
FINGER LAKES CAPITAL PARTNERS, LLC,              :
V. ZUBIN MEHTA, and GREGORY SHALOV,              :
                                                 :
                    Defendants.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF V. ZUBIN MEHTA

**STATE OF NEW YORK**          :
                               :   **ss.**
**COUNTY OF WESTCHESTER**      :

        V. ZUBIN MEHTA, being duly sworn, deposes and says:

        1.      I am a Managing Partner of Defendant Finger Lakes Capital Partners, LLC ("Finger

Lakes").  I am also named individually as a Defendant in the above-captioned action.  I make this

Affidavit, based upon my personal knowledge, in opposition to the motion for summary judgment

in lieu of complaint (the "Motion") filed by plaintiff Jeffrey Keswin ("Keswin" or "Plaintiff") and

in support of Defendants' cross-motion to dismiss or stay this action (the "Cross-Motion").

## RELEVANT FACTS

### A.  The Note

        2.      On August 1, 2006, Finger Lakes delivered to Keswin a Secured Promissory Note

in the face amount of $1 million, bearing interest at twenty percent (20%) per annum (the "Note").

        3.      Although the face of the Note is for $1 million, Keswin never loaned Finger Lakes

that amount.

**B.  The Emails and Spreadsheet**

4.      On October 20, 2009, Finger Lakes sent an email (the "October 2009 Email) to Ted

Gage ("Gage") in his capacity as Chief Financial Officer of Lyrical Opportunity Partners, L.P.

("Lyrical").  A true copy of the October 2009 Email is attached to the Affidavit of Jeffrey Keswin

dated June 24, 2015 [Doc. 4] ("Keswin Aff.") as Exhibit C.

5.      Among other things, the October 2009 Email refers to an attached spreadsheet

setting forth, inter alia, Finger Lakes' understanding of certain agreements regarding investments

made by Lyrical or its affiliates (the "Spreadsheet").

6.      The Spreadsheet is underlined unsigned, and the reference to the Spreadsheet contained in the

October 2009 Email is in the form of a request for confirmation of Finger Lakes' understanding

of those agreements.  In relevant part, the October 2009 Email states: "As a further basis for this,

please see the attached spreadsheet that describes our current portfolio.  Lastly, if you could please

confirm receipt and that this works for you and [Lyrical], that would be great."

7.      The Spreadsheet included, under the caption "Other," a reference to a $400,000

loan from Keswin to me and Shalov (not to Finger Lakes); more specifically, that section of the

Spreadsheet refers to "Jeff Keswin Loan to GS/ZM."  This description does not match the loan

made pursuant to the Note that Keswin seeks to enforce through this action, which was a loan from

Keswin to Finger Lakes.

8.      The Spreadsheet also included, in footnote (*e*), a further statement that the "Loan

to GS/ZM from Jeff Keswin is not included in the [Finger Lakes] Investment Portfolio Clawback

and is due back to JK from GS and ZM out of their carried interest from [Finger Lakes] Investment

Portfolio."  In other words, footnote (*e*) indicates that the loan to me and Shalov from Keswin was

due back to Keswin from me and Shalov (not Finger Lakes) out of our "carried interest from

2

[Finger Lakes] Investment Portfolio." Again, this description does not match the loan made pursuant to the Note that Keswin seeks to enforce through this action, which was a loan <u>from Keswin to Finger Lakes</u>.

9.     In any event, neither Gage nor Lyrical ever confirmed that Finger Lakes' understanding of the agreements, as described in the Spreadsheet "work[ed]" for Gage or Lyrical (much less for Keswin personally).

10.     Moreover, the language in footnote (*e*) is not an acknowledgement that there was a debt due and owing under any circumstances; instead, it reflects Finger Lakes' understanding that the "Loan to GS/ZM . . . is due back to JK from GS and ZM out of their carried interest in [Finger Lakes] Investment Portfolio."

11.     In the private equity world, "carried interest" is a term of art, which refers to the interest that the manager of an investment receives in the investment by an investor as compensation for locating and managing the investment. At the time that the October 2009 Email and Spreadsheet were sent, Shalov and I were the Managing Partners of Finger Lakes, which itself was the managing member of various limited liability companies in which Lyrical had made investments and which constituted the "Finger Lakes Investment Portfolio." Under provisions concerning the "Common Sharing Percentage" and "Distributions of Profits and Losses" in the relevant operating agreements, Finger Lakes had carried interest in the limited liability companies of between fifteen percent (15%) and twenty-five percent (25%) of the investment proceeds after return of invested capital and a "preferred return" of six percent (6%). A copy of the operating agreement for one such limited liability company, Honeoye Lake Acquisition, LLC ("HLA"), is annexed hereto as **Exhibit A**.

12.    Shalov and I, by contrast, do not *personally* have any carried interest in the Finger

Lakes Investment Portfolio and never will – only the entity, Finger Lakes, has a carried interest.

13.    I did not request that Gage forward the October 2009 Email (or the Spreadsheet) to

Keswin.

14.    By email dated May 24, 2010 (the "May 2010 Email"), Finger Lakes forwarded a

copy of the October 2009 Email (including the unsigned Spreadsheet) to Lyrical's former assistant

controller Daniel DeSerio ("DeSerio") with a one-line message, stating "Dan – See the attached

schedule which'll clear up the overall situation for you."  A true copy of the May 2010 Email is

attached to the Keswin Aff. as Exhibit D.

15.    I sent the May 2010 Email to DeSerio at his request and in his capacity as assistant

controller for Lyrical.  I did not request that DeSerio forward the May 2010 Email (or the

Spreadsheet) to Keswin.

**C.  The Delaware Action**

16.    In June 2014, Finger Lakes commenced an action against Lyrical and HLA (one of

the five investment vehicles managed by Finger Lakes) in the Court of Chancery of the State of

Delaware (the "Delaware Action").

17.    Lyrical, which is an entity which Keswin has managed since at least 2004 in his

capacity as the sole managing member of both its general partner and the management company

that oversees it, asserted counterclaims against Finger Lakes for, among other things, "amounts

due under the Note."  *See* Keswin Aff. ¶¶ 2, 16.

18.    Thereafter, Lyrical sought and conducted pre-trial discovery regarding the Note

(among other issues).  Lyrical then sought and conducted a two-day trial in the Delaware Action

4

before Vice Chancellor Laster of the Delaware Chancery Court, which took place on June 15 and 16, 2015.

19.     In its Third Supplemental Objections and Responses to Keswin's Second Set of Interrogatories and Requests for the Production of Documents dated May 1, 2015 (the "Discovery Responses"), and through Gage's deposition testimony, Lyrical took the position that the Note that Keswin seeks to enforce in this action was part of the "Clawback" agreement between Lyrical, Keswin, and Finger Lakes, meaning that Lyrical would be entitled to clawback the amount of the Note for its own account (<u>and Keswin could not collect it</u>).    A true copy of the Discovery Responses is attached hereto as **Exhibit B**, and true copies of the relevant excerpts from Gage's deposition transcript are attached collectively hereto as **Exhibit C.**

20.     Keswin testified at trial in the Delaware Action that he never read the footnotes contained in the Spreadsheet and that, if he had, he would not have agreed to them.    True copies of the relevant excerpts of Keswin's trial transcript are attached collectively hereto as **Exhibit D.**

21.     More specifically, Keswin testified:

A. So what I was going to say is this e-mail, this schedule, is a copy of the previous one, except in this case, Finger Lakes – or I'll say Zubin – has inserted all of these footnotes that weren't extant in the first one.

Q. Uh-huh. Right.

A. So I know that I never saw these footnotes or reviewed these footnotes prior to this litigation.

***

Q. Both you and --

A. I did not -- I never saw these notes, and I never agreed to these notes.

*See* Exhibit D, pp. 102-103.

5

22.    In its Opening Pre-Trial Brief, Lyrical argued that Finger Lakes owed Lyrical (<u>not</u> <u>Keswin</u>) the principal amount of the Note that Keswin seeks to enforce in this action and agreed (along with Keswin) to forgive interest under the Note.  A true copy of the relevant portion of Lyrical's Opening Pre-Trial Brief dated May 15, 2015 is attached hereto as **Exhibit E.**

23.    More specifically, Lyrical noted that "Keswin will execute any reasonable documentation to confirm that payment to Lyrical will be deemed payment to him so that Finger Lakes and its guarantors will not face a double exposure" and that "[a]s with the Lyrical debt investments directly subject to the Clawback Agreement, no claim is made for the very substantial amount of unpaid interest in arrears, only the lost principal amount of the loan."  *See* Exhibit E, pp. 64-65 n.14.

24.    Finally, in its Pre-Trial Reply Brief, and through Gage's trial testimony and demonstrative exhibit, Lyrical asserted that Finger Lakes owed <u>Lyrical</u> (<u>not Keswin</u>) not only the principal amount of the Note that Keswin seeks to enforce in this action, but also accrued interest. A true copy of the relevant portion of Lyrical's Pre-Trial Reply Brief dated June 8, 2015 is annexed hereto as **Exhibit F**, true copies of the relevant excerpts from Gage's trial testimony transcript are attached collectively hereto as **Exhibit G**, and the above-referenced demonstrative exhibit is attached hereto as **Exhibit H.**

25.    In the demonstrative exhibit, Lyrical claimed a direct and complete right to payment under the Note, calling the alleged $1,106,666.62 "Liability of [Finger Lakes], Mehta and Shalov to Keswin (Loan Plus Interest)" a "[Finger Lakes] Liability to Lyrical."

26.    Finger Lakes noted in a footnote in its own Pre-Trial Brief (prior to the submission of Lyrical's Pre-Trial Reply Brief and/or arguments at trial) that Keswin was not a party to the

Delaware Action and that, in any event, enforcement of the Note was time-barred under Delaware law.

27.    After trial, Lyrical attempted unilaterally to withdraw its claim on the Note in the Delaware Action without prejudice.  A true copy of the relevant portion of Lyrical's Opening Post-Trial Brief dated July 2, 2015 is attached hereto as **Exhibit I.**

28.    Finger Lakes has opposed Lyrical's unilateral attempt to withdraw its claim on the Note and seeks a determination by the Delaware Court on the merits of that claim.  A true copy of the relevant portion of Finger Lakes' Answering Post-Trial Brief dated July 20, 2015 is attached hereto as **Exhibit J.**

29.    As of the date of this Affidavit, Lyrical's claim on the Note remains *sub judice* in the Delaware Action.

30.    For the sake of clarity, neither this Affidavit nor any attachment hereto should be construed as an "acknowledgment or promise" by Finger Lakes, myself, or Shalov under New York General Obligations Law § 17-101.  Any action on the Note by Keswin is time-barred under New York's statute of limitations and, therefore, Finger Lakes has no intention of paying any alleged debt under the Note, and neither myself nor Shalov have any intention of paying any alleged debt under the individual guaranties.

I declare, under penalty of perjury, that the foregoing is true and correct.


*[Signatures on Following Page]*

_____

X̶. Zubin Mehta
Managing Partner
Finger Lakes Capital Partners LLC

Sworn and subscribed to
before me this _25th_ day
of August, 2015,

_____
Notary Public

MARCO ESTRELLA
Notary Public, State of New York
Qualified in Westchester County
No. 01ES6153853
My Commission Expires 10/16/20 _18_

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 31 of 282

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------- x

JEFFREY KESWIN,                                    :
                                                   :
                            Plaintiff,             :    Index No. 156356/2015
                                                   :
                    -against-                      :    Mot. Seq. Nos. 001, 002
                                                   :
FINGER LAKES CAPITAL PARTNERS, LLC,                :
    V. ZUBIN MEHTA, and GREGORY SHALOV,            :    **AFFIDAVIT OF**
                                                   :    **BIJAN AMINI**
                            Defendants.            :
                                                   :
                                                   :

-------------------------------------------------------------- x

STATE OF NEW YORK          )
                           )    ss.:
COUNTY OF NEW YORK         )

        BIJAN AMINI, being duly sworn, deposes and says:

        1.      I am an executive officer of the law firm Storch Amini & Munves PC, attorneys

for plaintiff Jeffrey Keswin in the above-captioned action.  Based upon my personal knowledge

and my review of the files in this action, I have knowledge of the facts and circumstances set

forth herein.  I respectfully submit this affirmation in support of Keswin's Reply in Support of

Plaintiff's Motion for Summary Judgment in Lieu of Complaint against Defendants Finger Lakes

Capital Partners, LLC ("FLCP"), V. Zubin Mehta, and Gregory Shalov (collectively,

"Defendants"), and specifically to submit materials that rebut certain new factual allegations

raised by the Defendants.

        2.      Attached to this affidavit as exhibit A is a true and correct copy of excerpts from

FLCP's Pre-Trial Answering Brief in the proceeding entitled Finger Lakes Capital Partners, LLC

<u>v. Honeoye Lake Acquisition, LLC, and Lyrical Opportunity Partners, L.P.</u>, C.A. No. 9742-VCL

(Del. Ch.) (the "<u>Delaware Action</u>").

3.    Attached to this affidavit as exhibit B is a true and correct copy of excerpts from

Lyrical Opportunity Partners, L.P.'s Pre-Trial Opening Brief in the Delaware Action.

4.    Attached to this affidavit as exhibit C is a true and correct copy of excerpts of

from Lyrical Opportunity Partners, L.P.'s Post-Trial Reply Brief in the Delaware Action.

5.    On January 28, 2015, the court in the Delaware Action held a hearing on FLCP's

motion for judgment on the pleadings.   A true and correct copy of the relevant portions of the

hearing transcript is attached hereto as Exhibit D.

6.    On April 27, 2015, Shalov testified under oath at his deposition in the Delaware

Action.   A true and correct copy of the relevant portions of the trial transcript is attached hereto

as Exhibit E.

7.    On June 15, 2015, Keswin testified under oath at the trial in the Delaware Action.

A true and correct copy of the relevant portions of the trial transcript is attached hereto as Exhibit

F.

8.    On June 15, 2015, Mehta testified under oath at the trial in the Delaware Action.

A true and correct copy of the relevant portions of the trial transcript is attached hereto as Exhibit

G.

9.    On June 16, 2015, Shalov testified under oath at the trial in the Delaware Action.

A true and correct copy of the relevant portions of the trial transcript is attached hereto as Exhibit

H.

11.    On June 16, 2015, Shalov testified under oath at the trial in the Delaware Action.
A true and correct copy of the relevant portions of the trial transcript is attached hereto as Exhibit
J.

12.    On July 1, 2015, FLCP submitted a proposed order on its motion for judgment on
the pleadings in the Delaware Action.  A true and correct copy of that proposed order is attached
hereto as Exhibit K.

13.    On July 13, 2015, Lyrical submitted a proposed order on its motion for judgment
on the pleadings in the Delaware Action.  A true and correct copy of that proposed order is
attached hereto as Exhibit L.

_____
BIJAN AMINI

Sworn to before me this
1st day of September, 2015.

_____
Notary

JAIME LEGGETT
Notary Public, State of New York
No. 02LE6304464
Qualified in New York County
Commission Expires 05/27/2018

3

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  **BARRY R. OSTRAGER**                          PART _6/_
_____ JSC
                              *Justice*

_____

Jeffrey Keswin

- v -

Finger Lakes Capital, et al.

INDEX NO. _156356/15_

MOTION DATE _____

MOTION SEQ. NO. _001_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits … | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:  ☒ Yes   ☐ No**

**Upon the foregoing papers, it is ordered that this motion** and cross-motion
are denied without prejudice based
on issues of fact in accordance with
the decision on the record on
December 2, 2015. A preliminary
conference order was issued on
this date. Counsel shall appear for a
compliance conference on April 19, 2016
at 9:30 a.m. This decision supplements
the October 13, 2015 decision staying the
motion pending a determination of a related Delaware action.

Dated: _December 2, 2015_                          _Barry Ostrager_
                                                    **BARRY R. OSTRAGER** J.S.C.
                                                              JSC

**Check one:  ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION**

**Check if appropriate:  ☐ DO NOT POST        ☐ REFERENCE**

☐ **SUBMIT ORDER/ JUDG.**            ☐ **SETTLE ORDER/ JUDG.**

*MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):*

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  LARRY E. OSTRAGER                            PART  61
_____ JSC _____
                        Justice

Index Number : 156356/2015                    INDEX NO. _____
KESWIN, JEFFREY
                                              MOTION DATE _____
vs
FINGER LAKES CAPITAL                          MOTION SEQ. NO. _____
Sequence Number : 001
SUMMARY JUDGMENT LIEU COMPLAINT

The following papers, numbered 1 to _____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits  _____   | No(s). _____

Answering Affidavits — Exhibits _____   | No(s). _____

Replying Affidavits _____   | No(s). _____

Upon the foregoing papers, it is ordered that this motion is and the action as a whole are stayed in accordance with the decision on the record on October 13, 2015 pending the disposition of the action pending in Delaware. A status conference is set for January 12, 2016, and counsel shall report by letter on that date or before as to the status of the Delaware action.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____
FOR THE FOLLOWING REASON(S):

Dated: October 13, 2015

                                        BARRY R. OSTRAGER , J.S.C.
                                                      JSC

1. CHECK ONE: ............................................... [ ] CASE DISPOSED    [X] NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ..........................MOTION IS: [ ] GRANTED  [ ] DENIED  [ ] GRANTED IN PART  [X] OTHER
3. CHECK IF APPROPRIATE: ............................................... [ ] SETTLE ORDER    [ ] SUBMIT ORDER
                                        [ ] DO NOT POST   [ ] FIDUCIARY APPOINTMENT   [ ] REFERENCE

against any Member or Manager with respect to any such competing business or activity or the income or profits therefrom.

Finger Lakes Capital Partners LLC agrees that so long as it is a Member of the Company and for a period twelve months after ceasing to be a Member of the Company, neither Gregory Shalov nor Zubin Mehta will (i) engage in duties or provide services to a Competitor which are substantially similar to those that they provide to the Company or Maestro, in any capacity, within North America, or (ii) own more than a 5% ownership interest in any such Competitor. The term "Competitor" means another business primarily engaged in manufacturing, selling and servicing portable cofferdam, water diversion or fluid retention systems.

### SECTION 4.7. Tax Matters Partner

The Manager shall be designated the Company's "tax matters partner" under Section 6231 of the Code and is authorized to take such actions and to execute and file such statements and forms on behalf of the Company as are permitted or required by applicable provisions of the Code or Treasury Regulations issued thereunder, and the Members will take all other action that may be necessary or appropriate to effect such designation. All expenses incurred by the tax matters partner shall be expenses of the Company and shall be paid or reimbursed to the tax matters partner from Company funds. The tax matters partner shall prepare and timely file all federal, state and local income and other tax returns and reports as may be required as a result of the business of the Company. The tax matters partner shall promptly notify the Members if any tax return or report of the Company is to be audited or if any adjustments thereto have been proposed by any governmental body. In the event of an audit of the Company's federal income tax returns by the Internal Revenue Service, the tax matters partner shall be Finger Lakes Capital Partners LLC, who may, at the expense of the Company, retain accountants and other professionals to participate in the audit. In addition, the tax matters partner shall furnish to the Members all notices concerning administrative or judicial proceedings relating to federal income tax matters as required under the Code. During the pendency of any such administrative or judicial proceeding, the tax matters partner shall furnish to the Members periodic reports, not less often than annually, concerning the status of any such proceeding.

### ARTICLE V.

### MEETINGS OF MEMBERS; RIGHTS OF MEMBERS; RESTRICTIONS ON INTERESTS

### SECTION 5.1. Place of Meetings

All meetings of the Members shall be held at such place within or without the State of Delaware as may be determined by the Manager and set forth in the respective notice or waivers of notice of such meeting.

### SECTION 5.2. Meetings of Members

Meetings of the Members may be called by any Member or the Manager.

### SECTION 5.3.  Notice of Meetings of Members

Written or printed notice stating the place, day and hour of any meeting of Members shall be delivered not less than five (5) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or Member calling the meeting, to each Member of record.

### SECTION 5.4.  Quorum

A Majority in Interest of the Members of the Members holding Class B Membership Interests shall constitute a quorum at all meetings of the Members, except as otherwise provided by Law.  Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting.  If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a Majority in Interest of the Members holding Class B Membership Interests shall be present or represented.

### SECTION 5.5.  Attendance and Waiver of Notice

Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the sole purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at nor the purpose of any regular or special meeting of the Members need be specified in the notice or waiver of notice of such meeting.

### SECTION 5.6.  Voting on Matters

(a)     Except to the extent otherwise provided in this Agreement or by Applicable Law, at any meeting of the Members at which a quorum is present, the vote of a majority of the Class B Membership Interests represented at such meeting shall be the act of the Members, unless the vote of a greater number is required by this Agreement or by law.

(b)     The following actions shall not be taken, approved or effective unless such actions are approved by a vote of a Majority in Interest of the Members holding Class B Membership Interests:

(i)     the sale, exchange, lease or other transfer of all or materially all of the assets of the Company;

(ii)     any liquidation or dissolution of the Company, or any merger or consolidation involving the Company, or the making of any agreement to do so;

(iii)     the commencement of any bankruptcy, insolvency or reorganization proceeding with respect to the Company or the making of any assignment for the benefit of creditors of the Company; and

(iv)    except as otherwise provided in this Agreement, the admission of an additional Member or Substituted Member in the Company.

(c)    The following actions shall not be taken, approved or effective unless such actions are approved by a vote of a Majority in Interest of the Members holding Class A Membership Interests:

(i)    do any act in contravention of this Agreement;

(ii)    do any act which would make it impossible to carry on the ordinary business of the Company, except (A) as otherwise provided in this Agreement, or (B) pursuant to the exercise of the Company's rights under any applicable bankruptcy, insolvency, debtor protection or similar law;

(iii)    amend this Agreement or the Certificate of Formation;

(iv)    issue Membership Interests, securities, rights, options or warrants;

(v)    enter into any borrowing arrangement or guarantee or pledge of assets; provided that the Manager may, without the approval of the Class A Membership Interests approve a guarantee, provide a letter of credit or enter into a similar transaction in connection with borrowings or other indebtedness by Maestro;

(vi)    vote, in its capacity as a shareholder of Maestro, in favor of any merger of Maestro with or into another entity or any sale or other transfer of any material portion of the assets of Maestro;

(vii)    vote, in its capacity as a shareholder of Maestro, to approve any single capital expenditure at Maestro in excess of $150,000;

(viii)    enter into any contract with respect to activities not related to its capacity as a shareholder of Maestro involving any payment by the Company of funds over the life of the contract in excess of $5,000;

(ix)    to the extent within its capacity as a shareholder of Maestro, vote to materially modify Maestro's business activities;

(x)    extend loans or other credit not in connection with its capacity as a shareholder of Maestro;

(xi)    make a material distribution to a Member other than in accordance with this Agreement;

(xii)    enter into any joint venture, partnership or similar arrangement; and

17

(xiii)   use the Company name, credit or property for other than a Company purpose.

### SECTION 5.7.  List of Members Entitled to Vote

The Manager shall make, at least three (3) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment of such meeting, arranged in alphabetical order, with the address of and the Class B Sharing Ratio and Class A Sharing Ratio held by each, which list, for a period of three (3) days prior to such meeting, shall be kept on file at the principal office of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to inspection by any Member during the whole time of the meeting.  However, failure to comply with the requirements of this Section 5.7 shall not affect the validity of any action taken at such meeting.

### SECTION 5.8.  Registered Members

The Company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact of such Membership Interest for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person, whether or not it shall have express or other notice of such claim or interest, except as expressly required by this Agreement or the laws of the State of Delaware.

### SECTION 5.9.  Actions With or Without a Meeting and Telephone Meetings

Notwithstanding any provision contained in this Article V, all actions of the Members provided for herein shall be taken either at a meeting and evidenced by written minutes thereof executed by an authorized Member or a Manager or by written consent without a meeting.  Any meeting of the Members may be held by means of a telephone conference.  Any action which may be taken by the Members without a meeting shall be effective only if the written consent (or consents) sets forth the action so taken, and is signed by Members having the required percentage of Membership Interests.

### SECTION 5.10.  Restrictions on Disposition

(a)   Restrictions on Disposition.  Except as expressly provided in Sections 5.10(b) hereof or on the unanimous written consent of all the Members of the Company, Members of the Company may not, directly or indirectly, voluntarily or involuntarily, sell, transfer, negotiate, pledge, assign or otherwise dispose of (collectively, "**Dispose of**" or a "**Disposition**") any Membership Interests now owned or hereafter acquired by him or it or any part thereof either during such Member's corporate or other existence or lifetime, as the case may be, or upon its dissolution or liquidation or his death, as the case may be.

(b)   Exceptions to Restrictions on Disposition.  The restrictions set forth in Sections 5.10(a) hereof shall not apply to any of the following Dispositions: (i) any repurchase or redemption by the Company from a Member of any Membership Interests, provided such repurchase or redemption is effectuated in accordance with the terms of

18

the Act and this Agreement; (ii) in the case of a Member who is a natural person, to such Member's spouse, children, sisters or brothers (collectively, **"Family Members"** and, individually, a **"Family Member"**) or to any trust primarily for the benefit of such Member and his Family Members; (iii) in the case of a Member who is not a nature al person, to any other Member or to any partner, member, parent, subsidiary or Affiliate of such Member; provided, that the transferee shall have entered into a Joinder Agreement in substantially the form attached hereto as Exhibit A; and providing, further, that all Membership Interests, so transferred shall continue to be subject to all provisions of this Agreement as if such Membership Interests were still held by such Member.

## ARTICLE VI.

## BOOKS AND RECORDS

### SECTION 6.1.  Books and Records

At all times during the existence of the Company, the Manager shall keep or cause to be kept at the Company's principal office true and complete books of account in accordance with generally accepted accounting principles, including: (a) a current list of the full name and business address of each Member; (b) a copy of the Certificate of Formation and all certificates of amendment thereto; (c) copies of the Company's federal, state and local income tax returns and reports; (d) copies of this Agreement and any financial statements of the Company for the three most recent years; and (e) all documents and information required to be kept by the Company under the Act.  The Manager shall at all times maintain such books and records separate and apart from the records of the Manager.  Such books and records shall be available for examination at such office by any Member or its duly authorized representatives during regular business hours for any purpose reasonably related to the Member's interest as a member of the Company.  Any Member, at its own expense, may cause an audit of the books and records of the Company during regular business hours and shall furnish a written report thereof to the other Members.

### SECTION 6.2.  Accounting Basis for Tax Reporting Purposes; Fiscal Year

The books and records of the Company shall be kept on the accrual method of reporting for tax and financial reporting purposes.  The Fiscal Year of the Company shall be the calendar year, ending December 31.

### SECTION 6.3.  Reports

(a)     Within one hundred twenty (120) days after the end of each Fiscal Year, the Manager shall cause the Company to send to each Member unaudited financial statements (including a balance sheet and profit and loss statement) for the Fiscal Year then ended.

(b)     As soon as practicable after the end of each Fiscal Year, the Manager shall cause the Company to send to each Member a copy of each federal and, if applicable, state income tax return of the Company for the Fiscal Year then ended, together with

such other tax information as shall be reasonably necessary for the preparation by each Member of its federal and state income tax return.

### SECTION 6.4. Returns and Other Elections

The tax matters partner (as designated pursuant to Section 4.8 hereof shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. All elections permitted to be made by the Company under federal or state tax laws shall be made by the tax matters partner.

## ARTICLE VII.

## ALLOCATIONS AND DISTRIBUTIONS

### SECTION 7.1. Distributions of Profits and Losses

Distributions of available cash of the Company shall be made to the Members as follows:

(a)    Return of Capital: First, one hundred percent (100%) to the Members holding Class A and Class B Membership Interests, pro rata in proportion to the amount of Class A and Class B Membership Interests held by each Member, until the cumulative amount of all distributions to each Member holding Class A and Class B Membership Interests pursuant to this Section 7.1(a) is equal to the sum of the Capital Contributions made by Members holding Class A and Class B Membership Interests;

(b)    Preferred Return: Second, one hundred percent (100%) to the Members holding Class A and Class B Membership Interests, pro rata in proportion to the amount of Class A and Class B Membership Interests held by each Member, until the cumulative amount of all distributions to each Class A and Class B Member pursuant to this Section 7.1(b) is sufficient to provide each such Member holding Class A and Class B Membership Interests with a rate of return equal to six percent (6%) per annum compounded annually on the Capital Contributions of such Member holding Class A and Class B Membership Interest computed from the dates the Capital Contributions were made by such Members;

(c)    Common Return: Third, to the Members in accordance with the Common Sharing Percentage.

### SECTION 7.2. Allocations of Net Profits and Net Losses

The items of Net Profit and Net Loss of the Membership for each fiscal year or other relevant fiscal period (including, without limitation, each period ending immediately prior to a distribution shall be allocated among the Members in accordance with each Member's economic interest in the respective item, as determined by the General Member pursuant to Sections 704(b) and 704(c) of the Code and related Treasury Regulations, so that the balance in the Member's Capital Account immediately after making all allocations required for the relevant fiscal period

20

is, as nearly as possible, equal (proportionately) to the Member's Hypothetical Liquidation Amount.

### SECTION 7.3. Limitations on Distributions

Notwithstanding any provision to the contrary contained in this Agreement, no distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

### SECTION 7.4. Member Acknowledgement

The Members agree to be bound by the provisions of this Article VII in reporting their shares of Company income and loss for income tax purposes.

### SECTION 7.5. Code Section 754 Election

Upon the request of the tax matters partner, the Company shall make the election provided by Code Section 754.

## ARTICLE VIII.

## LIQUIDATION AND DISSOLUTION OF THE COMPANY

### SECTION 8.1. Events of Dissolution

The Company shall be dissolved upon the happening of any of the following events:

(a)     when the period fixed for its duration in Section 2.4 of this Agreement has expired;

(b)     upon the unanimous written agreement of all of the Members holding Class B Membership Interests;

(c)     upon the occurrence of an event as set forth in Section 18-801(4) of the Act unless the remaining Members holding Class B Membership Interests, within ninety days after the occurrence of such event, unanimously elect to continue the business of the Company pursuant to the terms of this Agreement and to appoint, if necessary or desired, effective as of the date of such event, one or more additional members of the Company;

(d)     the entry of a judgment, order or decree of a court of competent jurisdiction adjudicating the Company to be a bankrupt, and the expiration without appeal of the period, if any, allowed by Applicable Law in which to appeal therefrom; or

(e)     the entry of a decree of judicial dissolution under Section 18-802 of the Act.

21

## SECTION 8.2. Method of Liquidation

Upon the happening of any event specified in Section 8.1, with respect to which the Company is not continued and its business and affairs are discontinued, the Manager shall immediately commence to wind up the Company's affairs and shall liquidate the assets of the Company as promptly as possible, unless the Manager, or other liquidator, as the case may be, shall determine that an immediate sale of Company assets would cause undue loss to the Company, in which event (i) the liquidation may be deferred for a reasonable time, and/or (ii) all or part of the Company's assets may be distributed in kind. Members shall continue to share distributions and Profits and Losses during the period of liquidation in the same proportions as before dissolution. During the liquidation period, the Manager shall have the right to continue to operate and otherwise deal with Company property to the same extent the Manager has such right before the dissolution of the Company. The proceeds from liquidation of the Company, including repayment of any debts of Members owed to the Company, shall be applied in the order of priority as follows:

(a)     to repayment of creditors of the Company, including the Manager and Members if they are creditors to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for Payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to Members and former Members under Section 18-601 or 18-604 of the Act; and then

(b)     to the repayment of any unpaid Company debts or obligations, other than the Capital Accounts, to any Manager or Member; and then

(c)     to payment to the Members of the remaining credit balances in their respective Capital Accounts in proportion to the amounts in such accounts, after giving effect to all contributions, distributions, and allocations for all periods. Any such distribution to a Member in liquidation of the Company shall be made by the later of the end of the taxable year in which the liquidation occurs or ninety (90) days after the date of such liquidation.

## SECTION 8.3. Date of Termination

The Company shall be terminated when all the cash or property available for application and distribution under Section 8.2 shall have been applied and distributed in accordance therewith and a Certificate of Cancellation shall have been filed pursuant to Section 8.5.

## SECTION 8.4. Waiver of Partition

Each Member hereby irrevocably waives any right or power it may possess to compel a partition or sale of any asset of the Company or to compel a dissolution of the Company other than as expressly set forth in this Agreement.

**SECTION 8.5. Certificate of Cancellation**

Upon the dissolution and the completion of the winding up of the Company, the Manager shall cause to be filed with the Office of the Secretary of State of the State of Delaware a Certificate of Cancellation, pursuant to the requirements of the Act, canceling the Certificate of Formation.

## ARTICLE IX.

## MISCELLANEOUS

**SECTION 9.1. Notice**

Any notice required under this Agreement shall be in writing and shall be given to each Member at the address set forth for such Member on Schedule A hereto or at such other address as such Member may hereafter specify in writing. Such notices may be delivered by hand, or by telegram or telecopy, or may be mailed, postage prepaid, by certified or registered mail, by a deposit in a depository for the receipt of mail regularly maintained by the United States Postal Service. All notices which are hand delivered or given by telegram or telecopy shall be deemed given on the date of delivery. All notices which are mailed in the manner provided above shall be deemed to have been received by the addressee three (3) days after being mailed.

**SECTION 9.2. Application of Delaware Law**

This Agreement and the application or interpretation hereof shall be governed exclusively by the laws of the State of Delaware, and specifically the Act, without regard to principles of conflict of laws.

**SECTION 9.3. Jurisdiction and Venue**

Any process against any Member or the Manager in, or in connection with, any suit, action or proceeding arising out of or relating to this Agreement or any Member's or the Manager's performance hereof may be served personally by serving such Member's or the Manager's registered agent or, to the extent permitted by law, by certified mail at the address set forth in Schedule A hereto with the same effect as though served on such Member or the Manager personally. The Members and the Manager hereby irrevocably submit in any suit, action nor proceeding arising out of or relating to this Agreement or any Member's or the Manager's performance hereof to the jurisdiction of the Delaware Court of Chancery and waive any and all objections to jurisdiction that such Member or the Manager may have under the laws of the State of Delaware or the United States.

**SECTION 9.4. No State-Law Partnership**

The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture by reason of this Agreement, and that neither any Member nor any Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

23

### SECTION 9.5. Effect of Agreement

This Agreement shall be binding upon all Members, their respective assigns and respective spouses, heirs, successors, executors and administrators, if applicable.

### SECTION 9.6. Entire Agreement

This Agreement and the schedules and exhibits hereto, if any, contain all of the understandings and agreements of whatsoever kind and nature existing between the Members with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, whether written or oral, with respect thereto.

### SECTION 9.7. Amendment

Except as otherwise expressly set forth in this Agreement, this Agreement may be amended, supplemented or restated only by a written agreement executed by each of the Members.

### SECTION 9.8. Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed to be an original and shall be binding upon the Member who executed the same, but all of such counterparts shall constitute one and the same agreement.

### SECTION 9.9. Captions

The title and captions contained herein are for convenience only and shall not be deemed part of the context of this Agreement.

### SECTION 9.10. Severability

Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the reminder of this Agreement and that provision shall be deemed modified to a provision which constitutes that provision which, although not illegal or invalid, is closest to the intent of the original provision.

### SECTION 9.11. Numbers and Gender

Where the context so indicates, the masculine shall include feminine and neuter, and the singular shall include the plural.

### SECTION 9.12. Additional Documents and Acts

In connection with this Agreement, as well as all transactions contemplated by this Agreement, the Members agree to execute such additional documents and papers, and to perform and do such additional acts, as may be necessary and proper to effectuate and carry out all of the provisions of this Agreement.

24

## SECTION 9.13. Confidentiality

(a)  The terms of this Agreement, the identity of any person with whom the Company may be holding discussions with respect to any investment, acquisition or other transaction or in whom the Company may invest directly or indirectly, and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company and/or Maestro or the relative or absolute rights or interests of any of the Members (collectively, the "Information") that has not been publicly disclosed with the consent of the Members is confidential and proprietary information of the Company the disclosure of which would cause irreparable harm to the Company and the Members. Accordingly, each Member represents that it has not and agrees that it will not and will direct its shareholders, partners, members, directors, managers, officers, agents, advisors (including without limitation any appraiser selected by or on behalf of it, or by or on behalf of any appraiser selected by it) and Affiliates not to, disclose to any person any Information or confirm any statement made by third persons regarding Information unless the Members consent thereto or until the Company has publicly disclosed the Information and has notified each Member that it has done so.

(b)  The covenants contained in this Section 9.13 will survive the Disposition of the interest in the Company of any Member and the termination of the Company.

(c)  Notwithstanding anything to the contrary contained in this Section 9.13, any Member may, without breach of the covenants set forth in this Section 9.13 and without notice to or consent of the Members, disclose any Information in any filing required of such Member with any securities commission or other regulatory agency, or as may otherwise be required by Applicable Law.

(d)  Notwithstanding anything to the contrary contained in this Section 9.13, any Member may, without breach of the covenants set forth in this Section 9.13, disclose Information with the prior consent of the Manager (such consent not to be unreasonably withheld) if such disclosing Member discloses to the Manager (i) the purpose, nature, content and form of proposed disclosure, and (ii) the relationship to the parties to whom such disclosure is to be made. Any permitted disclosure that is made in a manner that is materially different from the proposed disclosure as consented to and approved by the Manger shall be deemed a breach of the covenants set forth in this Section 9.13.

## SECTION 9.14. Creditors Not Benefited

No creditor or other third party having dealings with any Member shall have the right to enforce the right or obligation of any Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and assigns (and, in the case of Section 4.4 hereof, the other Indemnitees). None of the rights or obligations of the Members herein set forth to make capital contributions or loans to the Company shall be deemed an asset of the Company for any purpose by any creditor or other third Party, nor may such rights or obligations be sold, transferred or assigned by the Company or pledged or encumbered by the Company to secure

25

any debt or other obligation of the Company or of any of the Members. In addition, it is the intent of the parties hereto that no distribution to any Member shall be deemed a return of money or other property in violation of the Act.

### SECTION 9.15. Sections

Unless the context requires otherwise, all references in this Agreement to Sections or Articles shall be deemed to mean and refer to Sections or Articles of this Agreement.

### SECTION 9.16. No Waiver

No waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a waiver of any other breach or default under this Agreement. Failure on the part of any Member to complain of any act or omission of any other Member, or to declare such other Member in default irrespective of how long such failure continues, shall not constitute a waiver hereunder. No notice to or demand on a defaulting Member shall entitle such defaulting Member to any other or further notice or demand in similar or other circumstances.

### SECTION 9.17. Remedies Not Exclusive

The remedies provided for herein are cumulative and not exclusive of any other rights, powers, privileges or remedies provided by law or under this Agreement. The exercise by any party hereto of any one or more remedies shall not constitute a waiver of, or otherwise prohibit, the exercise of other remedies provided herein or by law at the same or other times.

### SECTION 9.18. U.S. Dollars

All references in this Agreement to dollar amounts shall refer to United States currency.

### SECTION 9.19. Approvals

Except where otherwise indicated in this Agreement, all approval, consent and other similar rights of the Manager or of the Members pursuant to this Agreement may be exercised by such parties, and such approvals and consents may be granted or denied by such parties, in their sole and absolute discretion.

[SIGNATURE PAGE FOLLOWS]

26

02/16/2008 19:13 FAX   12126975880                                    ☑002/004

**IN WITNESS WHEREOF,** this Limited Liability Company Agreement has been executed as of the _15_ day of _Oct._, 2005 .

**HONEOYE LAKE ACQUISITION LLC**

By: FINGER LAKES CAPITAL PARTNERS LLC, its Manager

By:_____
    Name:  Greg Shalov
    Title:   Authorized Person

**MEMBERS**

FINGER LAKES CAPITAL PARTNERS LLC

By:_____
    Name:  Greg Shalov
    Title:   Authorized Person

LYRICAL OPPORTUNITY PARTNERS, L.P.

By: Lyrical Opportunity Partners G.P., L.P.

    By:    Lyrical Corp. II, LLC

    By:_____
    Name:   Jeffrey Keswin
    Title:    Authorized Person

27

## Schedule A

Members Name, addresses, initial capital contribution, Classes or Membership interests

| Names and Addresses | Initial Capital Contribution | Class A Membership Interest | Class A Sharing Ratio | Class B Membership Interest | Class B Sharing Ratio |
|---|---|---|---|---|---|
| Finger Lakes Capital Partners LLC 400 West 22nd Street, Suite 2R New York, NY 10011 Fax: 201-221-8224 | $25,000.00 | 0 | 0 | 1 | 100% |
| Lyrical Opportunity Partners, L.P. 280 Park Avenue West Tower, 21st Floor New York, New York 10017 | $1,975,000.00 | 79 | 100% | 0 | 0 |

## EXHIBIT A

### Form of Joinder Agreement

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Operating Agreement (the "Agreement") dated as of *OCT. 15*, 2005, by and among Honeoye Lake Acquisition LLC (the "Company") and the parties named therein and for all purposes of the Agreement, the undersigned shall be included within the term "Member" (as defined in the Agreement). The undersigned further confirms that the representations and warranties contained in the Agreement are true and correct as to the undersigned as of the date hereof. The address and facsimile number to which notices may be sent to the undersigned is as follows:

Facsimile No. *212 697 5660* .

By:

[NAME OF UNDERSIGNED]

Lyrical Opportunity Partners, L.P.
By: Lyrical Opportunity Partners G.P., L.P.
By: Lyrical Corp. II, LLC

2

**IN WITNESS WHEREOF,** this Limited Liability Company Agreement has been executed as of the _____ day of _____, 2005

**HONEOYE LAKE ACQUISITION LLC**

By: FINGER LAKES CAPITAL PARTNERS LLC, its Manager

By: _____
    Name:  Greg Shalov
    Title:  Authorized Person

**MEMBERS**

FINGER LAKES CAPITAL PARTNERS LLC

By: _____
    Name:  Greg Shalov
    Title:  Authorized Person

LYRICAL OPPORTUNITY PARTNERS, L.P.

By: Lyrical Opportunity Partners G.P., L.P.

    By:   Lyrical Corp. II, LLC

        By: _____
        Name:   Jeffrey Keswin
        Title:   Authorized Person

## Schedule A

Members Name, addresses, initial capital contribution, Classes or Membership interests

| Names and Addresses | Initial Capital Contribution | Class A Membership Interest | Class A Sharing Ratio | Class B Membership Interest | Class B Sharing Ratio |
|---|---|---|---|---|---|
| Finger Lakes Capital Partners LLC<br>400 West 22nd Street, Suite 2R<br>New York, NY 10011<br>Fax: 201-221-8224 | $25,000.00 | 0 | 0 | 1 | 100% |
| Lyrical Opportunity Partners, L.P.<br>280 Park Avenue<br>West Tower, 21st Floor<br>New York, New York 10017 | $1,975,000.00 | 79 | 100% | 0 | 0 |

## EXHIBIT A

### Form of Joinder Agreement

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Operating Agreement (the "Agreement") dated as of _____, 2005, by and among Honeoye Lake Acquisition LLC (the "Company") and the parties named therein and for all purposes of the Agreement, the undersigned shall be included within the term "Member" (as defined in the Agreement). The undersigned further confirms that the representations and warranties contained in the Agreement are true and correct as to the undersigned as of the date hereof. The address and facsimile number to which notices may be sent to the undersigned is as follows:

Facsimile No._____.

_____
[NAME OF UNDERSIGNED]

# Exhibit A

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

### HONEOYE LAKE ACQUISITION LLC
(A Delaware Limited Liability Company)

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ........................................................................................................1

ARTICLE II. FORMATION OF THE COMPANY ......................................................................5

ARTICLE III. MEMBERSHIP INTERESTS AND CAPITAL ......................................................7

ARTICLE IV. RIGHTS, POWERS AND DUTIES OF THE MANAGER................................11

ARTICLE V. MEETINGS OF MEMBERS; RIGHTS OF MEMBERS;
          RESTRICTIONS ON INTERESTS ............................................................15

ARTICLE VI. BOOKS AND RECORDS....................................................................................19

ARTICLE VII. ALLOCATIONS AND DISTRIBUTIONS .........................................................20

ARTICLE VIII. LIQUIDATION AND DISSOLUTION OF THE COMPANY..........................21

ARTICLE IX. MISCELLANEOUS .............................................................................................23

Schedule A – Notices, Capital Contributions, Sharing Ratios, etc.

## LIMITED LIABILITY
## COMPANY OPERATING AGREEMENT

### OF

### HONEOYE LAKE ACQUISITION LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT of HONEOYE LAKE ACQUISITION, LLC, a Delaware limited liability company, is hereby duly adopted, approved, ratified and confirmed by each of FINGER LAKES CAPITAL PARTNERS, LLC, a Delaware limited liability company, LYRICAL OPPORTUNITY PARTNERS, L.P., a Delaware limited partnership and any other individual or entity who from time to time becomes party to this Agreement by execution of a signature page hereto (collectively, the "Members").

In consideration of the mutual promises made herein, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

The capitalized terms used but not otherwise defined in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, et seq., as amended from time to time, or any successor statute thereto.

"Additional Capital Contribution" means, with respect to any Member, any amount contributed or deemed to be contributed to the capital of the Company by such Member pursuant to Section 3.4 of this Agreement.

"Affiliate" means, with respect to any Member or Manager, any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person to whom reference is made. The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power (a) to vote five percent (5%) or more of the outstanding voting securities of or voting interest in a Person, or (b) otherwise to direct the management policies of such Person by contract or otherwise.

"Agreement" means this Limited Liability Company Operating Agreement, including the schedules hereto, as amended, supplemented or otherwise modified from time to time.

"Applicable Law" or "Law" means any laws, statutes, treaties, rules, codes, ordinances, regulations, certificates, orders, official interpretations, licenses and permits of any applicable Governmental Authority and any judgments, decrees, injunctions, writs, orders or like actions of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction.

"Book Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except that (a) the initial Book Value of any asset contributed by a Member to the Company shall be the fair market value of such asset, as agreed by the Members; (b) the Book Value of all Company assets shall be adjusted in the event of a revaluation as provided in Section 3.5(d); (c) the Book Value of any Company asset distributed to any Member shall be the fair market value of such asset on the date of distribution as agreed by the Members; and (d) such Book Value shall be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

"Capital Contributions" means, with respect to any Member, the total of all Capital contributions made by such Member to the Company pursuant to this Agreement, including, but not limited to, Initial Capital Contributions and Additional Capital Contributions.

"Certificate of Formation" means the certificate of formation of the Company filed with the Office of the Delaware Secretary of State on July 13, 2005 pursuant to the Act.

"Class A IRR" shall mean the annual internal rate of return, on the basis of annual compounding, of the Class A Membership Interests as of the date of determination, based on the actual amounts of and actual dates on which Members holding Class A Membership Interests made Capital Contributions to the Company and received distributions from the Company.

"Class A Sharing Ratio" means the Sharing Ratio of each Member holding Class A Membership Interests, as set forth opposite since Members name on Schedule A hereto.

"Class A Membership Interests" means the non-voting Class A Membership Interests of the Company as set forth in Section 3.1 of this Agreement.

"Class B Membership Interests" means the voting Class B Membership Interests of the Company as set forth in Section 3.1 of this Agreement.

"Class B Sharing Ratio" means the Sharing Ratio of each Member holding Class B Membership Interests, as set forth opposite since Members name on Schedule A hereto.

"Closing Date" means the date hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, together with all rules and regulations promulgated thereunder and interpretations thereof by the Internal Revenue Service, or any successor federal statute.

"Common Sharing Percentage" shall mean the following:

    (a)    if at the time of any distribution to Members such distribution would result in a Class A IRR to Members holding Class A Membership Interests that is less than 15%; such distribution shall be allocated 85% to Members holding Class A Membership Interests and 15% to Members holding Class B Membership Interests, pro rata within

each Class, based on the proportionate Membership Interests held by each Member within each Class; and

(b)   if at the time of any distribution to Members such distribution would result in a Class A IRR to Members holding Class A Membership Interests that is equal to or greater than 15%; such distribution shall be allocated 75% to Members holding Class A Membership Interests and 25% to Members holding Class B Membership Interests, pro rata within each Class, based on the proportionate Membership Interests held by each Member within each Class

"Closing Date" means the date hereof.

"Company" means Honeoye Lake Acquisition LLC, a Delaware limited liability company.

"Depreciation" means, with respect to any asset for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to such asset for such Fiscal Year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period (as a result of property contributions or adjustments to such values), Depreciation shall be adjusted as necessary so as to be an amount which bears the same ratio to such asset's beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such asset's beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction with respect to such asset for such Fiscal Year or other period is zero, Depreciation for such Fiscal Year or other period shall be determined with reference to such asset's beginning Book Value using any reasonable method selected by the Manager.

"Dispose of" or "Disposition" has the meaning assigned to it in Section 5.10(a) hereof.

"EBITDA" means, with respect to Maestro, its earnings before interest, taxes, depreciation and amortization, the components of which being calculated in accordance with GAAP on a basis consistent with Maestro's past practice.

"Family Member" has the meaning assigned to it in Section 5.10(b) hereof.

"Fiscal Year" means each fiscal year of the Company.

"Governmental Authority" means the government of any federal, state, municipal or other political subdivision, including all agencies and instrumentalities of such government or political subdivision.

"Hypothetical Liquidation Amount" shall mean, as to each Member, an amount equal to (a) the distributions that would be made to the Member if the Company were dissolved, its affairs wound up, and all of its other assets sold for cash equal to their respective fair market values, all Membership liabilities were satisfied (limited with respect to each nonrecourse liability to the fair market value of the assets securing the liability), and the net assets of the

3

Membership were distributed in accordance with Section 8.2 to the Members immediately after making the allocation.

"Indemnitee" has the meaning assigned to it in Section 4.4(a) hereof.

"Information" has the meaning assigned to it Section 9.13(g).

"Initial Capital Contribution" means, as to any Member, any amount contributed to the capital of the Company by such Member pursuant to Section 3.3.

"Maestro" shall mean collectively, and on a consolidated basis with respect to financial reporting, Maestrolabs, Inc. and Revolabs, Inc., each Delaware corporations, and each successors to the all of the business assets and liabilities (allocated between them) of Maestro Inc., a Delaware "S" corporation.

"Majority in Interest" means with respect to a class of Membership Interests a combination of Members or a single Member having in the aggregate more than 50% of such class of Membership Interests in the Company.

"Manager" means the Person designated as the "manager" (within the meaning of the Act) of the Company from time to time pursuant to Section 4.1.

"Members" means the members of the Company as of the date hereof as described in the introductory paragraph of this Agreement and any Substituted Members, in each case so long as such Person shall hold any Membership Interest. The Members shall constitute the "members" (as that term is defined in the Act) of the Company.

"Membership Interest" means the entire limited liability company interest of a Member in the Company at any particular time, including, without limitation, the rights and obligations of such Member under this Agreement and the Act. There shall be two classes of Membership Interests: non-voting Class A Membership Interests and voting Class B Membership Interests.

"Person" or "person" means an individual, a corporation, a sole proprietorship, a general or limited partnership, a limited liability company or partnership, an association, a trust, a joint venture or any other entity or organization of any kind, including a Governmental Authority.

"Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations

4

Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)      gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from such Book Value; and

(d)      in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" herein.

"Sellers" has the meaning assigned to it in Section 5.11 hereof.

"Substituted Members" means Persons who have acquired Membership Interests from other Members, and who are identified on Schedule A attached hereto (as amended to reflect such acquisition) and who have become parties to this Agreement either by executing this Agreement or by entering into a joinder agreement satisfactory to the Manager.

"Treasury Regulation" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE II.

## FORMATION OF THE COMPANY

### SECTION 2.1.  Name and Formation

The name of the Company is Honeoye Lake Acquisition LLC.  The Certificate of Formation of the Company was filed on July 13, 2005 (the "**Formation Date**") by an authorized person, and the Company was formed pursuant to the Act.  The rights and liabilities of the Members shall be as provided in the Act, except as otherwise set forth herein.  In the event that any provision in this Agreement conflicts with the Act, such provision in this Agreement shall control and govern to the extent permitted by Applicable Law.  The Members intend that the Company shall be (a) classified as a partnership for federal and state tax purposes and (b) subject to all federal tax laws governing partnership and limited liability companies.  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture for any purposes other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

### SECTION 2.2.  Assumed Name

The Company shall do business under the name set forth in Section 2.1 or under any other name or names which the Manager shall deem advisable and in the best interests of the Company.

## SECTION 2.3. Registered Office and Registered Agent

The address of the Company's registered office in the State of Delaware shall be United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, DE 19904, Kent County.

## SECTION 2.4. Term

The term of the Company commenced on the Formation Date and shall terminate 30 years from such date, unless sooner terminated in accordance with either the provisions of this Agreement or the Act or unless the same is extended for additional periods of five (5) years by the Manager.

## SECTION 2.5. Purposes

The purposes and character of the business of the Company shall be to conduct the business of the Company and to conduct any and all other activities for which limited liability companies may be organized under the Act. Without limiting the foregoing, the initial purposes of the Company shall include:

      (a)    Investing in Maestro;

      (b)    exercising its rights as a shareholder over the business and operations of Maestro; and

      (c)    managing and otherwise realizing upon the value of the Company's ownership of the Preferred Stock, through distributions from Maestro or the ultimate sale or disposition of its interests in Maestro.

## SECTION 2.6. Powers of the Company

In furtherance of the purposes and business of the Company, but subject to Section 5.6 hereof, the Company shall have the power:

      (a)    to purchase stock or other equity interests in any entity in connection with the acquisition of the assets and the business of Maestro;

      (b)    to hold legal title to any Company property in the name of the Company or a nominee designated by the Manager;

      (c)    to enter into, perform and carry out contracts and agreements incidental to the purposes of the Company;

      (d)    to acquire property incidental to the purposes of the Company;

      (e)    to borrow money and incur indebtedness, to issue evidences of indebtedness in connection therewith, and to secure the same by guaranty, letter of credit, mortgage, deed of trust, pledge, security agreement, assignment or any other lien or encumbrance (or any combination thereof), and to refinance such borrowings and

indebtedness from time to time as any of the above relate to the purposes of the Company; and

(f)     to take any action or carry on any other activity necessary or desirable in the discretion of the Manager or the requisite Members to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act. The Company shall carry out the foregoing activities pursuant to the arrangements set forth in this Agreement.

**SECTION 2.7.  Admission of Members**

Upon the execution of this Agreement or a counterpart of this Agreement, each of the parties hereto (other than the Company) shall be admitted to the Company as a Member. Except as otherwise provided in this Agreement, the admission of any additional Member shall require the unanimous written consent of the then existing Members.

## ARTICLE III.

## MEMBERSHIP INTERESTS AND CAPITAL

**SECTION 3.1.  Classes of Membership Interests**

(a)     The interests of the Members in the Company shall be divided into the following two classes of interests: (i) 79 Class A Membership Interests and (ii) 1 Class B Membership Interests. The class of Membership Interest of each Member shall be set forth opposite such Member's name on Schedule A attached hereto.

(b)     The Member or Members holding the Class B Membership Interests shall be entitled to vote on all matters submitted to a vote of the Members as provided in Section 5.6.

(c)     Except as expressly otherwise provided in this Agreement or required under the Act, the Member or Members holding the Class A Membership Interests shall have no voting rights.

**SECTION 3.2.  Capital of the Company**

The capital of the Company shall be the aggregate amount of cash and property contributed to the Company in the manner hereinafter set forth in this Article III.

**SECTION 3.3.  Initial Capital Contributions**

The initial capital contribution in respect of each Membership Interest shall be twenty-five thousand dollars ($25,000).  Upon execution of this Agreement, each Member shall contribute the capital to the Company, in immediately available funds, the amount set forth opposite its name under the heading "Initial Capital Contribution" on Schedule A hereto. Each such contribution made by a Member pursuant to this Section 3.3 shall be the Initial Capital Contribution of such Member and, upon making such contribution in the amount set forth

7

opposite its name under the heading "Initial Capital Contribution" on Schedule A hereto, such Member shall receive (i) that number of Class A Membership Interests or Class B Membership Interests (as applicable) which is equal to such amount and (ii) such Member's Class A Sharing Ratio and/or Class B Sharing Ratio, as applicable.

### SECTION 3.4. Additional Capital Contributions

In addition to the Initial Capital Contributions, the Members holding Class B Membership Interests, by unanimous written consent, may determine from time to time that additional capital contributions are needed to enable the Company to conduct its business. Upon such Class B Members' making of such a determination, the Company shall give notice to all Members in writing at least ten (10) business days prior to the date on which such contribution is due, such notice shall set forth the amount of additional contributions needed, the purpose for which the contributions are needed, and the date by which the Members may contribute. Each Member shall be entitled to contribute a proportionate share of such additional contributions, in accordance with its Class B and/or Class A Sharing Ratio, respectively. No Member shall be obligated to make any such additional contributions. In the event any one or more Members do not make their additional contributions, the other Members shall be given the opportunity to make the contributions. Any additional contributions by a Member pursuant to this Section 3.4 shall be credited to such Member's Capital Account in accordance with Section 3.5(b).

### SECTION 3.5. Capital Accounts

(a)     A Capital Account shall be established and maintained by the Company for each Member in accordance with this Section 3.5.

(b)     Each Member's Capital Account shall be credited with (i) the amount of the Initial Capital Contribution made by such Member pursuant to Section 3.3 hereof, (ii) the amount of any Additional Capital Contribution, (iii) such Member's allocable share of Profits, income and gain in accordance with Article VII and (iv) the amount of any Company liabilities that are expressly assumed by such Member or that are secured by any Company property distributed to such Member.

(c)     A Member's Capital Account shall be debited by (i) the amount of cash and the Book Value of any Company property distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's allocable share of Losses, deductions and other losses in accordance with Article VII and (iii) the amount of any liabilities of such Member that are expressly assumed by the Company or that are secured by any property contributed by such Member to the Company.

(d)     Upon the occurrence of certain events described in Treasury Regulations Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(4) and 1.704-2, the Manager shall increase or decrease the Capital Accounts of the Members to reflect a revaluation of Company property on the Company's books to its fair market value (as determined by all the Members holding Class B Membership Interests and taking into account Section 7701(g) of the Code).

(e)     The Capital Account of each Member shall be determined after giving effect to all transactions which have been effected prior to the time when such determination is made giving rise to the allocation of income, gain, Profits, Losses, deductions and other expenses and to all contributions and distributions theretofore made to or by the Company. Any person who acquires a Membership Interest directly from a Member shall have a Capital Account which includes the Capital Account balance attributable the amount of the Membership Interest so acquired or transferred.

(f)     In the event that any Member makes a loan to the Company, such loan shall not be considered a contribution to the capital of the Company and shall not increase the Capital Account of the lending Member. Repayment of such loans shall not be deemed withdrawals from the capital of the Company and shall not decrease the Capital Account of the Member being repaid.

(g)     Any fees, interest or similar compensation payable to a Member pursuant to this Agreement shall be deemed a guaranteed payment for federal income tax purposes and not a distribution to such Member for such purposes. Such payments to a Member shall not reduce the Capital Account of such Member, except to the extent of its distributive share of any Company Losses or other downward capital adjustment resulting from such payment.

(h)     From time to time the Manager may make such modifications to the manner in which the Capital Accounts are computed as it deems necessary or advisable to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 provided that such modification is not likely to have a material effect on the amounts distributable to any Member pursuant to this Agreement.

(i)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(j)     No Member with a deficit balance in its Capital Account shall have any obligation to the Company or any other Member to restore such deficit balance. In addition, no venturer, partner or shareholder in any Member shall have any liability to the Company or any other Member for any deficit balance in such venturer's, partner's or shareholder's capital account in the Member in which it is a partner, venturer or shareholder. Furthermore, a deficit Capital Account balance of a Member (or a deficit capital account balance of a partner, venturer or shareholder in a Member) shall not be deemed to be a Company asset or Company property.

**SECTION 3.6. Company Capital**

(a)     Except as may be otherwise specifically provided in this Agreement, no Member shall be paid interest on any Capital Contribution to the Company.

9

(b)     No Member shall have the right to withdraw all or any part of its Capital Contributions or to receive any return on any portion of its Capital Contributions, except as may be otherwise specifically provided in this Agreement.

(c)     Under the circumstances involving a return of any Capital Contribution, no Member shall have the right to receive property other than cash.

## SECTION 3.7.  Liability of Members and the Manager

(a)     Except as otherwise required by any non-waivable provision of the Act or of any other Applicable Law: (i) no Member or Manager shall be personally liable in any manner whatsoever for any debt, liability or other obligation of the Company, whether such debt, liability or other obligation arises in contract, tort, or otherwise; and (ii) no Member shall in any event have any liability whatsoever in excess of, without duplication, (w) the amount of its required (but unpaid) Capital Contributions under Sections 3.3 and 3.4, (x) its share of any assets and undistributed profits of the Company, (y) the amount of any unconditional obligation of such Member to make additional Capital Contributions to the Company pursuant to this Agreement, and (z) the amount of any wrongful distribution to such Member, if, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of Section 18-607 of the Act.

(b)     Neither any Member nor the Manager shall be required to contribute to the capital of, or loan any funds to, the Company other than as expressly required in this Agreement.

(c)     The Manager shall not be liable for the return of all or any portion of the Capital Contributions of any Member.

(d)     Except as otherwise expressly provided herein, no Member shall have any priority over any other Member as to the return of its Capital Contributions or as to compensation by way of income.

## SECTION 3.8.  Loans by Members or Affiliates

Subject to obtaining any approvals required under this Agreement for the Company to borrow funds, any Member or its Affiliate may (but shall not be obligated to) at any time, upon obtaining the consent of the Manager, loan money or guarantee a loan to the Company to finance Company operations, to finance or refinance any assets of the Company, to pay the debts and obligations of the Company, or for any other Company purpose. If any Member or its Affiliate lends funds or guarantees a loan of funds to the Company, such Member or Affiliate shall be entitled to receive interest on such loan or a fee for guaranteeing any such loan, at an interest rate equal to at least two percent (2%) over and above the "prime rate" or "base rate'' of Citibank, N.A., or any successor thereof, changing as and when such "prime rate" or "base rate" shall change, provided that in no event shall the interest rate exceed the maximum interest rate permitted by law, or at such other interest rate or fee as may be agreed upon by all Members.

## ARTICLE IV.

## RIGHTS, POWERS AND DUTIES OF THE MANAGER

### SECTION 4.1. Management of Company Business

(a)     The Members agree that the "Manager" of the Company (within the meaning of the Act) shall initially be Finger Lakes Capital Partners LLC. A Majority In Interest of the Members holding Class B Membership Interests shall at all times from and after the date hereof have the right to designate, remove and redesignate the Manager; provided, however that in the event that either of Gregory Shalov or Zubin Mehta is no longer a manager of the Manager (or are unable to perform their duties as such due to death or disability), a Majority in Interest of the Members holding Class A Membership Interests shall then have the right to designate, remove and redesignate the Manager.

(b)     Whenever any Manager vacancy (whether occurring by reason of resignation, removal or otherwise) is to be filled, a Majority in Interest of the Members holding Class B Membership Interests shall be entitled to designate a successor Manager to fill such vacancy (unless the proviso in clause (a) above applies, in which case the holders of Class A Membership Interests will fill such vacancy).

(c)     Class A Membership Interests shall have full voting power on a per Membership Interest basis on all matters of the Company on par with Class B Membership Interests under this Agreement upon the occurrence of any of the following events:

> (i)     If at any time after four years from the date hereof, Maestro's trailing twelve month EBITDA times 4 less the then outstanding Indebtedness for Borrowed Money is less than the then outstanding value of the Preferred Stock;

> (ii)    Upon the fourth anniversary of the date hereof; or

> (iii)   At such time as either Gregory Shalov or Zubin Mehta deliver to the Members a Dispute Notice (as defined herein).

In the event that Class A Membership Interests are given full voting rights in accordance with this Section 4.1(c), all references in this Agreement to the rights of holders of Class B Membership Interests for all purposes shall apply to holders of Class A Membership Interests.

(d)     So long as Finger Lakes Capital Partners LLC is Manager of the Company, it shall provide a notice (a "**Dispute Notice**") to the Members of any dispute between Gregory Shalov or Zubin Mehta relating to the Company or Maestro. Such Dispute Notice shall be delivered to the Members no later than 2 days after the existence of such dispute.

11

## SECTION 4.2.  Powers of the Manager

To the fullest extent permitted by the Act and this Agreement, and except as otherwise provided in Section 5.6(b) and consistent with the stated purposes of the Company, the Manager shall have the right, power, authority and obligation to manage, control, administer and operate the business and affairs of the Company in accordance with this Agreement, and shall have the right, power and authority to make the following decisions on behalf of the Company in accordance with this Agreement and the Act:

(a)     to supervise or arrange for the supervision of day-to-day operations of the Company;

(b)     to enter into, perform and carry out contracts and agreements in the ordinary course of the Company's business, including all rights and obligations with respect to the Company's ownership and/or equity interests in the assets and the business of Maestro;

(c)     to collect all payments due and owing to the Company and to distribute such payments;

(d)     to incur and pay trade payables and other debts, expenses and obligations of the Company in the ordinary course of the Company's business;

(e)     to borrow money on behalf of the Company and to renew, extend, modify, rearrange, increase or refinance Company borrowings from time to time;

(f)     to acquire, lease, develop, hold, sell or improve any personal property or any interest therein on behalf of the Company;

(g)     to execute and deliver such documents on behalf of the Company as the Manager may deem necessary, desirable, convenient or incidental for the Company's purposes and business;

(h)     to perform, or cause to be performed, all of the Company's obligations and to exercise or cause to be exercised all of the Company's rights under any agreement to which the Company or any nominee of the Company is a party, except to the extent such obligations may be inconsistent with other obligations of the Manager under this Agreement;

(i)     to hire and terminate attorneys, consultants, accountants or other independent contractors on behalf of the Company, to the extent that such professional services are required, in the Manager's judgment, during the term of the Company;

(j)     to institute, prosecute, defend and settle any legal, arbitration or administrative actions or proceedings on behalf of or against the Company;

12

(k)     to pay all taxes, assessments, rents and other impositions applicable to
Company assets and undertake, when appropriate in its judgment, any action or
proceeding seeking to reduce such taxes, assessments, rents or other imposition;

(l)     to determine the timing and amount of distributions pursuant to Article
VII hereof and proceeds of liquidation, all in accordance with the terms of this
Agreement;

(m)    to open and maintain bank accounts for the deposit of Company funds,
with withdrawals to be made upon such signature or signatures as the Manager may
designate;

(n)     to cause all Company activities to be performed in accordance with
Applicable Law;

(o)     to make such elections as, in the Manager's judgment, are necessary or
desirable pursuant to the Code and applicable Treasury Regulations; and

(p)     to do any act which is necessary, desirable, convenient or incidental to
conduct the business and affairs of the Company.

## SECTION 4.3. Delegation of Authority

The Manager may from time to time delegate to one or more agents such authority as the
Manager may deem advisable.

## SECTION 4.4. Indemnification and Exculpation

(a)     To the fullest extent allowed by the Act and by other Applicable Law, the
Company shall indemnify, defend against and hold harmless the Manager, in its capacity
as manager of the Company, each Member, and the Manager's and each such Member's
Affiliates (and the Manager's, such Member's and such Affiliate's successors, assigns,
directors, managers, officers, employees, agents, representatives, parent corporations,
subsidiary corporations, partners, members and Affiliates) (which Affiliates, for purposes
of this Section 4.4(a), shall not include the Company) (each, each, an "Indemnitee")
from, any expenses (including reasonable attorneys' fees and court costs), liabilities,
claims, causes of action, losses or damages actually incurred by any such Indemnitee in
connection with (i) any proceeding to which such Indemnitee is made a party or which
such Indemnitee otherwise becomes involved in because such Indemnitee is or was a
Manager or a Member of the Company, or (ii) any act or omission performed or omitted
by such Indemnitee in good faith in a manner it believed to be in, or not contrary to, the
best interests of the Company. The Company shall not be required to indemnify any
Indemnitee for any costs, liabilities, claims, causes of action, losses or damages under
this Section 4.4(a) to the extent the same arise from such Indemnitee's gross negligence
or willful misconduct. The termination of an action, suit or proceeding by judgment,
order or settlement, or upon a plea of nolo contenders or its equivalent, shall not, in and
of itself, create a presumption or otherwise constitute evidence that an Indemnitee acted
in a manner that would render it ineligible for indemnification under this Section 4.4(a).

13

The satisfaction of any indemnification obligation under this Section 4.4(a) shall be from and limited to Company assets, including insurance proceeds, if any, and neither any Member nor any Manager shall have any personal liability on account thereof. In no event may any Manager or Member subject any other Manager or Member to personal liability by reason of this indemnification provision.

(b)     Expenses incurred by an Indemnitee in defending any claim, demand, cause of action, suit or proceeding subject to this Section 4.4 shall be advanced by the Company prior to the final disposition of such claim, demand, cause of action, suit, or proceeding upon receipt by the Company of a written commitment by or on behalf of the Indemnitee to repay such amount if it shall be determined that such Indemnitee is not entitled to be indemnified under this Section 4.4.

(c)     For purposes of this Section 4.4, an Indemnitee may rely and shall incur no liability in acting or refraining from acting upon (i) any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, (ii) a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and (iii) an opinion of counsel selected by such Indemnitee with respect to legal matters, unless such acts are in bad faith.

(d)     Neither the Manager nor any of its Affiliates nor any of the Manager's or such Affiliate's successors, assigns, directors, managers, officers, employees, agents, representatives, parent corporation, subsidiary corporations, partners, members or Affiliates shall be liable to the Company or to a Member for any losses sustained or liabilities incurred as a result of any act or omission of the Manager or any such other Person if the act or failure to act of the Manager or such other Person (i) did not constitute gross negligence or willful misconduct and (ii) was taken in good faith in a manner it believed to be in, or not contrary to, the best interest of the Company.

**SECTION 4.5.  Devotion of Time**

The Manager shall devote such time, services and efforts as may be reasonably necessary for the proper furtherance, management, operation, maintenance and care of the Company's business as contemplated by this Agreement.

**SECTION 4.6.  Rights of Competition**

(a)     Except as provided in Section 4.6(b), each Member and each Manager, their respective principals and Affiliates, and each such Affiliate's officers, employees, agents and representatives, shall be free to engage in, conduct or participate in any business or activity whatsoever, without any accountability, liability, or obligation whatsoever to the Company or to any other Member or Manager. Any competing business or activity of a Member, a Manager or any such other Person may be undertaken with or without notice to or participation therein by any other Member or Manager. Each Member, each Manager and the Company hereby waives any right or claim it may have

# EXHIBIT A

*This Promissory Note (this "Note") has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state. Neither this Note nor any interest therein may be sold, transferred, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act and such registration or qualification as may be necessary under the securities laws of any jurisdiction or pursuant to a written opinion of counsel (which counsel and opinion shall be reasonably satisfactory to the Debtor) that such registration or qualification is not required.*

## SECURED PROMISSORY NOTE

**August 1, 2006**                                                             **$1,000,000**

FINGER LAKES CAPITAL PARTNERS, LLC, a Delaware Limited Liability Company ("Issuer" or the "Debtor"), for value received, hereby promises to pay in accordance with the provisions hereof to Jeffrey Keswin (the "Holder") or its permitted assigns the principal amount of ONE MILLION ($1,000,000) on the dates specified herein, with interest as specified herein. Gregory Shalov and Zubin Mehta (together, the "Principals") hereby personally guarantee Issuer's performance under this Note, including, but not limited to, the repayment of all principal and the payment of all interest hereunder.

This Note is subject to the following additional provisions, terms and conditions:

### ARTICLE 1.  DEFINITIONS.

1.1    Certain Definitions.

"Collateral" means any assets held by Issuer, its Principals, affiliates, and assigns, including, but not limited to, Issuer's $23,531.87 investment in Seneca Lake Acquisition LLC, its $50,000 investment in Keuka Lake Acquisition LLC, its $100,000 investment in Honeoye Acquisition LLC, and its right to receive a carried interest on any investments, whether made by Holder or any other party (the "Stock").

"Holder" has the meaning given to such term in the first paragraph of this Note.

"Maturity Date" means July 31, 2007.

"Maximum Rate" means the maximum nonusurious interest rate permitted under applicable law.

"Note" means this Secured Promissory Note made by the Debtor payable to the Holder, together with all amendments and supplements hereto, all substitutions and replacements herefor,

and all renewals, extensions, increases, restatements, modifications, rearrangements and waivers hereof from time to time.

## ARTICLE 2.  BASIC TERMS.

2.1    Principal.

(a)    Scheduled Repayment. The principal of this Note plus accrued interest shall be due and payable on the Maturity Date in an aggregate amount of One Million Two Hundred Thousand Dollars ($1,200,000) (the "Final Payment Amount").

(b)    Right to Prepay. The Debtor shall have the right to prepay this Note in full or in part without penalty.

2.2    Interest.

(a)    Interest will accrue on this Note from the date hereof (the "Issue Date") and will be payable in cash. The Debtor agrees to pay interest in respect of the unpaid principal amount of this Note at a rate per annum equal to the lesser of 20% and the Maximum Rate.

(b)    Interest on the principal of this Note shall be due and payable (i) on the Maturity Date, (ii) upon the payment or prepayment, in full, of the principal of this Note, and (iii) after maturity (whether by acceleration or otherwise), on demand.

2.3    Use of Proceeds.

(a)    The Principals represent and warrant that the proceeds of this Note will be used solely to satisfy existing debt obligations of Performance Trailers, Inc., unless otherwise agreed to in writing by Holder.

## ARTICLE 3.  COLLATERAL.

3.1    Generally. As security for the payment of the indebtedness evidenced under this Note ( the "Obligation"), Debtor hereby assigns and grants to Holder, to the extent permitted by applicable law, a continuing first priority lien on and security interest in, upon, and to the Collateral. For so long as any amount remains payable under this Note, Debtor will not sell, pledge or otherwise grant a security interest in the Stock. In the event of a sale, distribution, or liquidation of any or all of the Collateral, all proceeds will go directly to the Holder until this note has been repaid in full and all accrued interest has been paid.

3.2    Lien Documents.  As Holder deems necessary in its sole discretion, Debtor shall execute and deliver to Holder, or have executed and delivered (all in form and substance satisfactory to Holder in its sole discretion): any other agreements, documents, instruments, and writings deemed necessary by Holder or as Holder may otherwise request from time to time in its

reasonable discretion to evidence, perfect, or protect Holder's lien and security interest in the Collateral required hereunder.

3.3     Power of Attorney. Upon the failure of Debtor to pay the Final Payment Amount on the Maturity Date, Holder is hereby irrevocably made, constituted and appointed the true and lawful attorney for Debtor (without requiring any of them to act as such) with full power of substitution to do the following: (i) execute in the name of Debtor any financing statements, schedules, assignments, instruments, documents, and statements that Debtor is obligated to give Holder hereunder; and (ii) do such other and further acts and deeds in the name of Debtor that may be reasonably necessary or desirable to enforce any Collateral or perfect Holder's security interest or lien in any Collateral, including, without limitation, causing the Stock to be transferred to an account of Holder.

## ARTICLE 4.   MISCELLANEOUS.

4.1     Amendment. This Note may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof and thereof may be waived only by a written instrument executed by the Debtor and the Holder.

4.2     Successors and Assigns.

(a)     The rights and obligations of the Debtor and the Holder under this Note shall be binding upon, and inure to the benefit of, and be enforceable by, the Debtor and the Holder, and their respective permitted successors and assigns.

(b)     The registered owner of this Note may be treated as the owner of this Note for all purposes.

4.3     **GOVERNING LAW. THIS NOTE AND THE VALIDITY AND ENFORCEABILITY HEREOF SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO CONFLICT OF LAWS RULES OR CHOICE OF LAWS RULES THEREOF EXCEPT SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

4.4     Waivers. Except as may be otherwise provided herein, the makers, signers, sureties, guarantors and endorsers of this Note severally waive demand, presentment, notice of dishonor, notice of intent to demand or accelerate payment hereof, notice of acceleration, diligence in collecting, grace, notice, and protest, and agree to one or more extensions for any period or periods of time and partial payments, before or after maturity, without prejudice to the Holder.

4.5     No Waiver by Holder. No failure or delay on the part of the Holder in exercising any right, power or privilege hereunder and no course of dealing between the Debtor and the Holder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

3

013026.0003 DALLAS 396902 v1

4.6    Limitation on Interest. Notwithstanding any other provision of this Note, interest on the indebtedness evidenced by this Note is expressly limited so that in no contingency or event whatsoever, whether by acceleration of the maturity of this Note or otherwise, shall the interest contracted for, charged or received by the Holder exceed the maximum amount permissible under applicable law. If from any circumstances whatsoever fulfillment of any provisions of this Note or of any other document evidencing, securing or pertaining to the indebtedness evidenced hereby, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstances the Holder shall ever receive anything of value as interest or deemed interest by applicable law under this Note or any other document evidencing, securing or pertaining to the indebtedness evidenced hereby or otherwise an amount that would exceed the highest lawful rate, such amount that would be excessive interest shall be applied to the reduction of the principal amount owing under this Note or on account of any other indebtedness of the Debtor to the Holder, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal of this Note and such other indebtedness, such excess shall be refunded to the Debtor. In determining whether or not the interest paid or payable with respect to any indebtedness of the Debtor to the Holder, under any specific contingency, exceeds the highest lawful rate, the Debtor and the Holder shall, to the maximum extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, (c) amortize, prorate, allocate and spread the total amount of interest throughout the term of such indebtedness so that the actual rate of interest on account of such indebtedness does not exceed the maximum amount permitted by applicable law, and/or (d) allocate interest between portions of such indebtedness, to the end that no such portion shall bear interest at a rate greater than that permitted by applicable law. The terms and provisions of this paragraph shall control and supersede every other conflicting provision of this Note and all other agreements between the Debtor and the Holder.

EXECUTED as of the date first written above.

_____

Finger Lakes Capital Partners, LLC
By:   Greg Shalov
       Managing Partner

_____

Greg Shalov

_____

Zubin Mehta

citigroup
private bank

SORT 2505
NEW YORK, N.Y. 10043

JEFFREY KESWIN
C/O LYRICAL PARTNERS
152 WEST 57TH ST, 33RD FL
NEW YORK NY                    10019
10019

## WIRE TRANSFER DEBIT ADVICE

VALUE DATE:AUGUST 1, 2006
TRANSACTION AMOUNT US$:      400,000.00     FED REFERENCE #: 20060801B1Q8023C007597
DEBIT ACCOUNT #:  41430082                  RECEIVING BANK #: 026009593
DEBIT NAME:                                 RECEIVING BANK NAME:
JEFFREY KESWIN                              BANK OF AMERICA N.A.

BENEFICIARY INFO:                           THIRD PARTY:
004433916013                                NATIONS BANK
FINGER LAKES CAPITAL                        063100277
PARTNERS LLC

DETAILS OF PAYMENT:
REF: JEFFREY KESWIN

BBI:

FOR INQUIRIES RELATED TO THIS PAYMENT, CALL YOUR SERVICE OFFICER.

BTK#: 947031071804     GLOBAL ID#: G0062133750301

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 77 of 282

# EXHIBIT A

EFiled:  Jun 05 2015 04:12PM EDT
Transaction ID 57344857
Case No. 9742-VCL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff and counterclaim defendant, | ) ) ) ) | **REDACTED VERSION –** Filed: June 5, 2015 |
| v. | ) ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) | |
| Defendants and counterclaim plaintiffs. | ) ) ) ) | |

## PLAINTIFF'S ANSWERING PRETRIAL BRIEF

OF COUNSEL:
Stuart Kagen (*pro hac vice*)
Daniel A. Cohen (*pro hac vice*)
KAGEN LAW FIRM
570 Lexington Avenue, 16th Floor
New York, NY 10022
(212) 880-2045

Dated:  May 29, 2015

ASHBY & GEDDES
Andrew D. Cordo (#4534)
Toni-Ann Platia (#5051)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19801
 (302) 654-1888

*Attorneys for Plaintiff Finger Lakes Capital Partners LLC*

was worthless, but because Lyrical did not want to devote the time and effort

reasonably necessary to recoup its investment.[6]

    *Third*, Lyrical seeks a clawback for Keswin's personal loan to FLCP.  On

August 1, 2006, FLCP executed a promissory note in favor of Keswin, which

Mehta and Shalov guaranteed.  (LOP 6382-6385).  While the face amount of the

note is $1 million, the parties agree that FLCP only drew down $400,000.  (*See*

*also* FLCP 894, top entry).  The note matured on July 31, 2007.  FLCP nowhere

---

    [6] Portadam owns modular, rental equipment used both to divert water for in-water construction projects, and store water for oil and gas (fracking) projects. (Orthwein Tr. 11:10 – 12:4; Spring Dep. Ex. 1). At the peak of an oil and gas price boom in 2012, FLCP received a $30 million purchase offer, which fell through when prices receded. (Orthwein Tr. 15:24 – 16:11; Gatta Tr. 54:8 – 55:10).

    Lyrical assumed Portadam's management in April 2014. Spring Capital, which held $4 million in subordinated debt, offered to work with Lyrical to help achieve a return on its investment. Lyrical, however, was determined to exit the investment as quickly as possible, even though none of its creditors were threatening Portadam. Lyrical declined Spring Capital's offer, handing over the equity instead in a restructuring and redemption agreement made in October 2014. (Orthwein Tr. 43:12 – 47:23; Gatta Tr. 61:3 – 61:24, 71:25 – 74:15; Spring Dep. Ex. 4).

    Lyrical's walk-away was premature. Portadam has a positive balance sheet (after adjusting for artificial GAAP-required on depreciation its re-usable inventory) of $3.1 to $3.2 million, cash in the bank of $1 million, and over $1 million in annual EBITDA. (Orthwein Tr. 82:9-25). Its 2014 results were distorted by unusually severe weather that affected its business, and it is running well ahead of projections in 2015. (*Id.* at 110:8 – 112:1). Spring Capital's witness, Peter Orthwein, testified that should gas and oil prices pick up, Portadam would have excellent prospects. (*Id.* at 78:24 – 79:16). He stated that an $11 million enterprise value would be sufficient both to clear Portadam's existing debts and the $4 million that Lyrical had invested, an achievable result. (*Id.* at 62:17 – 65:1).

agreed to this as part of a clawback, as its October 21, 2009 email (and Gage's

March 21, 2014 "waterfall" email) make clear.[7]

*Fourth*, Lyrical seeks a clawback for two investments in Debt Partners.

Debt Partners offers *debt*, not equity, to portfolio companies. Lyrical made a

$250,000 capital contribution to Debt Partners. A separate entity named Lyrical

Multi-Manager Offshore Fund ("LMMO") loaned Debt Partners $3.4 million

pursuant to a note. (Mehta Dep. Ex. 31). LMMO has received over $3.7 million in

interest payments on its note. Thus, whether or not LMMO receives another dime,

it cannot deny having received payments in excess of the loan's face amount, even

if it terms them interest and not principal payments. (Shalov Tr. 47:12 – 49:17).

The latter two "Clawback" claims, moreover, are thirteenth-hour

afterthoughts, apparently asserted purely for *in terrorem* effect. Neither Lyrical's

Answer and Counterclaim nor Lyrical's April 13, 2015 Interrogatory Responses

(*see* Response to Interrogatory No. 12) claim that the Keswin personal loan or

moneys paid to Debt Partners form any part of the Clawback. Lyrical added this

claim on May 1, 2015, despite the fact that Keswin, the only Lyrical witness with

---

[7] Two separate reasons bar enforcement of Keswin's personal loan in this
action: (1) the lender and note holder, Keswin, is not a party; and (2) any action on
the note is time-barred. While Lyrical claims that Mehta's October 21, 2009 email
somehow reaffirmed the note after the limitations period had passed, that argument
fails, among other reasons, because Keswin could have sued on the note in New
York at any time up to July 31, 2013.

FILED: NEW YORK COUNTY CLERK 08/25/2015 05:33 PM
INDEX NO. 156356/2015
NYSCEF DOC. NO. 29
RECEIVED NYSCEF: 08/25/2015

# Exhibit B

E-SERVICE
57171535
May 01 2015
05:16PM
File & ServeXpress

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9742-VCL |
| | ) | |
| HONEOYE LAKE ACQUISITION, LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S THIRD SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES AND REQUESTS FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Court of Chancery Rules 26, 33 and 34, Defendant Lyrical Opportunity Partners, L.P. ("Lyrical") submits the following objections and responses to Plaintiff's Second Set of Interrogatories and Requests for the Production of Documents ("Discovery Requests").

## GENERAL OBJECTIONS

1.    Defendants object to the definitions and instructions to the extent they purport to impose requirements different from or in addition to those provided by the Court of Chancery Rules.

2.    Defendants object to the Discovery Requests to the extent they seek information protected by the attorney-client privilege, the work-product doctrine,

and/or any other applicable privileges or immunities. Defendants do not intend to waive any rights or privileges through the inadvertent disclosure of any information or documents that are protected by the attorney-client privilege, the work-product doctrine, and/or any other applicable privilege.

3.    Defendants' agreement to produce documents in its possession, custody or control in response to the Discovery Requests is not a representation that any such documents exist. Instead, it is a representation that, to the extent such documents exist and are located after a reasonable diligent search, they will be produced.

4.    Defendants reserve the right to amend or supplement these objections and responses.

## SUPPLEMENTAL OBJECTIONS AND RESPONSES TO THE INTERROGATORIES

8.    Identify any consideration provided for the Clawback Agreement and state when such consideration was provided.

**ANSWER:**

The consideration was Lyrical's willingness to provide further funds to FLCP, which would not have been provided had FCLP not accepted the terms of the Clawback Agreement. In addition, Lyrical forbore from declaring defaults

under multiple notes, copies of which have been produced. Lyrical made the
following investments in the following FLCP Portfolio Companies in or after July
2005, as a result of the Clawback Agreement:

| FLCP Portfolio Company | Amount Invested | Date |
|---|---|---|
| Performance Trailers, Inc. | $300,000 | July 28, 2005 |
| Revolabs, Inc. | $800,000 | August 2, 2005 |
| Performance Trailers, Inc. | $750,000 | September 21, 2005 |
| Revolabs, Inc. | $600,000 | November 15, 2005 |
| Portadam, Inc. | $500,000 | February 2, 2006 |
| Revolabs, Inc. | $550,000 | March 7, 2006 |
| Finger Lakes Debt Partners ("FLDP") | $3,000,000 | March 10, 2006 |
| FLDP | $250,000 | March 13, 2006 |
| Revolabs, Inc. | $450,000 | June 30, 2006 |
| FLDP | $400,000 | July 1, 2006 |
| Revolabs, Inc. | $1,000,000 | December 14, 2006 |
| Portadam, Inc. | $300,000 | April 16, 2007 |
| Tiber Industries, Inc. | $250,000 | March 28, 2007 |
| Tiber Industries, Inc. | $250,000 | May 22, 2007 |
| Portadam, Inc. | $200,000 | June 14, 2007 |

| Revolabs, Inc. | $1,200,000 | February 21, 2008 |
| Rethink Autism, Inc. | $1,949,000 | April 9, 2008 |

FLDP was managed by FLCP and provided loans to some of the other FLCP

Portfolio Companies. In addition, in July 2006, Keswin lent $400,000 to Shalov

and Mehta personally.


12.    Provide a computation of all losses that Lyrical contends are
subject to the Clawback Agreement, including, for each such loss, (a) the date of
any investment, (b) the amount of the investment, (c) the investment vehicle, (d)
the amount of the loss, and (e) when and under what circumstances the loss was
realized.

**ANSWER:**

The following losses have been or will be realized and are subject to the

Clawback Agreement:

| FLCP Portfolio Company | Date(s) of Investment | Amount of Investment | Investment Vehicle | Amount of Loss | Circumstances of Loss |
|---|---|---|---|---|---|
| Performance Trailers, Inc. | April 13, 2004 | $1,975,000 | Canandaigua Lake Acquisition LLC | $1,975,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | October 19, 2004 | $475,000 | Canandaigua Lake Acquisition LLC | $475,000 | Equity value reduced to zero through bankruptcy |

4

| FLCP Portfolio Company | Date(s) of Investment | Amount of Investment | Investment Vehicle | Amount of Loss | Circumstances of Loss |
|---|---|---|---|---|---|
| Performance Trailers, Inc. | January 19, 2005 | $100,000 | Canandaigua Lake Acquisition LLC | $100,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | February 10, 2005 | $250,000 | Canandaigua Lake Acquisition LLC | $250,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | March 3, 2005 | $500,000 | Canandaigua Lake Acquisition LLC | $500,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | April 7, 2005 | $100,000 | Performance Trailers, Inc. | $100,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | May 9, 2005 | $250,000 | Performance Trailers, Inc. | $250,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | June 6, 2005 | $300,000 | Performance Trailers, Inc. | $300,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | July 12, 2005 | $100,000 | Performance Trailers, Inc. | $100,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | July 28, 2005 | $300,000 | Performance Trailers, Inc. | $300,000 | Equity value reduced to zero through bankruptcy |

| FLCP Portfolio Company | Date(s) of Investment | Amount of Investment | Investment Vehicle | Amount of Loss | Circumstances of Loss |
|---|---|---|---|---|---|
| Performance Trailers, Inc. | September 21, 2005 | $750,000 | Canandaigua Lake Acquisition LLC | $750,000 | Equity value reduced to zero through bankruptcy |
| Performance Trailers, Inc. | December 14, 2006 | $983,886 | Finger Lakes Debt Partners | $983,886 | Equity value reduced to zero through bankruptcy |
| Portadam, Inc. | September 15, 2004 | $90,000 | Keuka Lake Acquisition LLC | $90,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |
| Portadam, Inc. | October 7, 2004 | $1,860,000 | Keuka Lake Acquisition LLC | $1,860,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |
| Portadam, Inc. | February 14, 2005 | $500,000 | Keuka Lake Acquisition LLC | $500,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |

| FLCP Portfolio Company | Date(s) of Investment | Amount of Investment | Investment Vehicle | Amount of Loss | Circumstances of Loss |
|---|---|---|---|---|---|
| Portadam, Inc. | July 6, 2005 | $500,000 | Keuka Lake Acquisition LLC | $500,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |
| Portadam, Inc. | February 6, 2006 | $500,000 | Keuka Lake Acquisition LLC | $500,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |
| Portadam, Inc. | April 16, 2007 | $300,000 | Keuka Lake Acquisition LLC | $300,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |
| Portadam, Inc. | June 14, 2007 | $200,000 | Keuka Lake Acquisition LLC | $200,000 | Company turned over to creditors with sale of equity interests for de minimus consideration |
| Tiber Industries, Inc. | February 20, 2004<br><br>April 1, 2004 | $200,000<br><br>$200,000 | Tiber Industries, Inc. | $376,468.13 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |

7

| FLCP Portfolio Company | Date(s) of Investment | Amount of Investment | Investment Vehicle | Amount of Loss | Circumstances of Loss |
|---|---|---|---|---|---|
| Tiber Industries, Inc. | April 22, 2004 | $1,862,848.81 | Seneca Lake Acquisition LLC | $1,862,848.81 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |
| Tiber Industries, Inc. | August 31, 2004 | $100,000 | Seneca Lake Acquisition LLC | $100,000 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |
| Tiber Industries, Inc. | September 15, 2004 | $813,953.50 | Seneca Lake Acquisition LLC | $813,953.50 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |
| Tiber Industries, Inc. | October 19, 2004 | $175,000 | Seneca Lake Acquisition LLC | $175,000 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |
| FLDP | March 10, 2006

July 1, 2006 | $3,000,000

$400,000 | FLDP | $2,225,000 (only principal) | Write-downs per Lyrical's analysis of financial performance of FLDP borrower Tiber Industries, Inc. |

| FLCP Portfolio Company | Date(s) of Investment | Amount of Investment | Investment Vehicle | Amount of Loss | Circumstances of Loss |
|---|---|---|---|---|---|
| FLDP | March 13, 2006 | $250,000 | FLDP | $250,000 | Write-downs per Lyrical's analysis of financial performance of FLDP borrower Tiber Industries, Inc. |
| Tiber Industries, Inc. | March 28, 2007 | $250,000 | Tiber Industries, Inc. | $250,000 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |
| Tiber Industries, Inc. | May 22, 2007 | $250,000 | Tiber Industries, Inc. | $250,000 | Write-downs per Lyrical's analysis of financial performance of Portfolio Company |

In addition, Keswin lent $400,000 directly to Mehta and Shalov, and Mehta acknowledged that this amount – along with the entire investment portfolio – would be included in any calculation under the Clawback Agreement. Lyrical reserves the right to supplement this response if and when Rethink Autism incurs any losses and upon further review of any information received from Plaintiff.

Further, the FLDP Operating Agreement provides that FLCP is required to
return the carried interest it has derived from FLDP if the returns are below a
specified level.  FLDP has failed to make those required returns for over two years.
The exact amount of carried interest is still being ascertained, but the available
documents show that it falls between $98,000 and $193,000.  In addition, under the
terms of the FLDP Operating Agreement, Shalov and Mehta are personally liable
for these carried interest amounts.  Under the Allocation Agreement, Lyrical would
be entitled to 20% of this carried interest earned by FLCP, but is not claiming such
amounts because of the foregoing terms of the FLDP Operating Agreement, which
require Shalov and Mehta to return such amounts.  As acknowledged by Mehta,
FLDP would be required to pay Lyrical first on account of its accrued and unpaid
interest.

13.    Provide a computation of all amounts that Lyrical contends are
due under the Allocation Agreement.

**ANSWER:**

Lyrical is entitled to 25% of the Carried Interest from the Revolabs proceeds
earned through HLA I or 25% of such lesser amount from those proceeds after
taking the Clawback Agreement into account (including any future losses on
account of Rethink Autism), and will be entitled to 25% of the Carried Interest
from any future payments from the escrow of the Revolabs proceeds.  In addition,

10

Lyrical is entitled to 25% of the Management Fees earned by FLCP. Further, the
Allocation Agreement provides Lyrical with 10% of the Carried Interest earned
from HLA II and HLA III. Based on information received prior to this litigation
and in this litigation, the amount due under the Allocation Agreement is believed
to be in excess of approximately $1.98 million, but Lyrical may adjust this amount
as more information is received. In particular, Lyrical has not included any
amount of profits earned by FLCP, to which it would be entitled.

    15.    Identify all conduct by FLCP that constitutes performance of,
or performance in accordance with, the terms of the Term Sheet.

**ANSWER:**

    FLCP set up various companies using Lyrical's capital as contemplated by
the Allocation Agreement. Zubin Mehta and Gregory Shalov led Lyrical to believe
that FLCP was unprofitable and its management fees were so modest that no
material amounts would be due to Lyrical, pending sale of Revolabs or some other
profitable venture. As it relates to Performance Trailers and Tiber, under the
Allocation Agreement, "the first $325,000 in Management Fees will flow to
FLCP" and otherwise 50/50. In addition, FLCP prepared a waterfall distribution
giving effect to the Allocation Agreement, which will be produced. Also, the
Allocation Agreement provides Lyrical with "the right of first refusal to invest
and/or source the entire amount, or any amount so desired, of the total capital

11

needed to complete any new Investment," which FLCP routinely referenced in communications with Lyrical. Further, FLCP complied with other requirements of the Allocation Agreement, including that it regularly update Lyrical of its activities, operate as an independent LLC, and be run on a day-to-day basis by Mehta and Shalov, Finally, the Allocation Agreement provided that Mehta and Shalov could take annual compensation of up to $150,000 each from FLCP, and both did so.

16.    Identify all conduct by Lyrical that constitutes performance of, or performance in accordance with, the terms of the Term Sheet.

**ANSWER:**

Lyrical provided millions of dollars in capital to FLCP so that FLCP could set up various companies as contemplated by, and in reliance on, the Allocation Agreement. Zubin Mehta and Gregory Shalov led Lyrical to believe that FLCP was unprofitable and its management fees were modest such that no amounts would be due to Lyrical. Lyrical trusted those representations and accordingly did not demand payment under the Allocation Agreement. As it relates to Performance Trailers and Tiber, under the Allocation Agreement, "the first $325,000 in Management Fees will flow to FLCP" and otherwise 50/50. In addition, on April 13, 2004, Defendant provided $1.975 million to Canandaigua

12

Lake Acquisition, LLC which used those funds, along with $25,000 obtained from

FLCP, to purchase $2,000,000 in Performance Trailers 6.0% Preferred Stock.

Defendant also made the following additional investments in Canandaigua Lake

Acquisition, LLC:

| FLCP Portfolio Company | Investment Vehicle | Amount Invested | Date |
|---|---|---|---|
| Performance Trailers, Inc. | CLA | $475,000 | October 19, 2004 |
| Performance Trailers, Inc. | CLA | $100,000 | January 19, 2005 |
| Performance Trailers, Inc. | CLA | $250,000 | February 10, 2005 |
| Performance Trailers, Inc. | CLA | $500,000 | March 3, 2005 |
| Performance Trailers, Inc. | CLA | $750,000 | September 21, 2005 |

Defendant's principal, Jeff Keswin, also personally lent funds to Canandaigua

Lake Acquisition LLC:

| FLCP Portfolio Company | Investment Vehicle | Amount Invested | Date |
|---|---|---|---|
| Performance Trailers, Inc. | CLA | $100,000 | April 7, 2005 |
| Performance Trailers, Inc. | CLA | $250,000 | May 9, 2005 |
| Performance Trailers, Inc. | CLA | $300,000 | June 6, 2005 |
| Performance Trailers, Inc. | CLA | $100,000 | July 12, 2005 |
| Performance Trailers, Inc. | CLA | $300,000 | July 28, 2005 |

Further, Lyrical abided by the provision of the Allocation Agreement that it did not "receive any rights to implement any changes with regards to FLCP's investments or day to day operations without the express consent of either [Mehta] or [Shalov]." Finally, pursuant to its rights to oversee FLCP under the Allocation Agreement, Lyrical met with FLCP regularly.

May 1, 2015

SMITH, KATZENSTEIN & JENKINS LLP

_/s/ David A. Jenkins_                .
David A. Jenkins (ID No. 932)
The Corporate Plaza, Suite 1000
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302.652.8400
Fax: 302.652.8405
Email: djenkins@skjlaw.com

*Of Counsel:*

Bijan Amini
John Brewer
STORCH AMINI &
MUNVES PC
2 Grand Central Tower
140 East 45th Street
25th Floor
New York, NY 10017
Telephone: 212.490.4100
Facsimile: 212.490.4208
Email: bamini@samlegal.com
Email: jbrewer@samlegal.com

*Attorneys for Honeoye Lake Acquisition and Lyrical Opportunity Partners, L.P.*

# EXHIBIT B

| **From:** | Zubin Mehta <mehta@flcpartners.com> |
|---|---|
| **Sent:** | Tuesday, November 21, 2006 9:53 PM |
| **To:** | Jeff Keswin |
| **Cc:** | Gregory Shalov |
| **Subject:** | (Suspected SPAM): |

Jeff,

Sorry I missed out on the most of your conversation today with Greg, but nevertheless wanted to follow-up on a couple of items after I spoke with Greg (some for clarification and some for just general information to frame the conversation). Ultimately, while we are sorry we are in this spot and sorry that we lost your money, at this point we are where we are (some through our own doing and calls, and some through genuine theft and an altogether horrid industry that we are now bearing the brunt of) and simply looking to make the best of a bad situation.  Over and above that, while it's not something any of us want to deal with – it's pretty important (at least to us personally) that we deal with this as soon as possible to continue to limit our losses.  Nevertheless, on that note, I wanted to address a couple of things:

(1) While we were specifically told that the bridge loans to Performance Trailers were coming from different legal entities and that they were all subject to a clawback, it was never explicitly or un-explicitly told to us that they would be subject to different clawback mechanisms given that they were coming from different entities. Morevoer, as all of these loans were made directly to Performance Trailers and not Greg or myself personally (as is the case with the $400K), it doesn't seem fair that they should be treated in the same manner.  Ultimately, if they intended on being loans to Greg and myself personally, that we would have then needed to loan to Performance, we obviously would have never tried to keep Performance Trailers alive via the bridge loans, as it would have never allowed either of us to make money in both the short and medium term.  Ultimately, all of the documents to specify that we need to make up via the clawback.  Further to this, it would be unrealistic in any PE situation for the Partners of a firm to make up investment losses via their carried interest rather than a clawback (with the idea being if I make up your money back from a loss, we should be able to participate in the upside), as we'd never have any upside going forward (and that's not a situation that makes sense for either of us, given our incentives)

(2) The $400K loan was indeed something that you (or whatever vehicle it may be) gave to us personally to cover our PT PG's – and this is something that the overall Fund (meaning all investments through FLCP/FLDP or the "Fund") did not need, and as a result is indeed something we have to make up via our carried interest and the not the clawback.  We were clear about this and we all agree here.

   -- Ultimately, I do think we openly discussed it in (2) and never discussed it in (1).  Moreover, as the loan in (1) was made to PT (and or part of the Fund) and the loan in (2) was made to Greg and I personally, it stands to reason that they should be treated differently.

(3) On FLDP, on a full reading of the document, we are required to payback the money via a clawback through FLDP exclusively.  Given where we are and the requirement to not take a loss, we are willing to assume this – but do not think it's fair to have it paid back via carried interest as our contractual obligation is to pay it back via clawback.  Over and above that, while the loss was around $700K (when you consider $300K in interest that was paid over time), we should technically only be obligated to pay that via a clawback.  In good faith (and to preserve the return and box all loses related to PT), we have agreed to assume the $1.0 MM, but really do feel it's against the spirit of everything here to make us not have to pay it back through a clawback.

(4) While we realize the subordination is not an ideal situation, we are ultimately doing all of this to avoid the two of us filing personally.  We initially put it in place to protect you in the event we filed personally.  By subordinating, we are creating a situation where we will not have to file personally and at the same time, in no uncertain terms, we are committed to paying you back the personal loan regardless of what happens going forward.  We realize this is an uncomfortable situation and we do sincerely wish we never had to take a personal loan from you, I do think it's worth mentioning that it came about because we were trying to protect all of our money during the litigation last year.  Ultimately, I do want you to know that we will pay you back (regardless of what happens now or eventually) and unfortunately while we can only give you our word, I hope that it stands for something.

(5) In generally, we need to understand how all the entities work, so that we do not have these situations going forward and perhaps clean up our overall structure, so we don't have these problems going forward – but this is a discussion for another time.

We are by no means trying to minimize that fact that we ended up in a terrible situation and lost a lot of money.  In fact, at this point, Greg and I personally are going lose (money that we don't have and will be making) nearly as much as you and your entities as a result of Performance – and while it's a terrible situation, we are doing whatever we can to right it and make good by everyone.  We do sincerely believe we will make this all up to you and our families, but also would like the ability (if we do), to be able to be successful as well.  While the losses the are personal will clearly impact this such that we could end up in a situation where our overall fund is up 30% and we still end up with nothing, we are accepting of this fact and will deal with it as such.  Nevertheless, we are trying to be fair and upstanding, take our losses as they are, and try to put us all in a best case situation going forward, given where we are.  While I realize you are on vacation, it really is pretty important for us to try and come to some resolution as soon as practical, as every day that goes by such that we can't come to an agreement with the bank, is another day whereby Greg and I lose more money personally – and this point, we just want to get the "cancer" off our backs, accept our lumps and try and make right by everyone.

In any case, I hope this all makes sense – as always, we welcome your thoughts and know we will come to an agreement that makes sense.  Let us know when we can discuss this, and we'll make ourselves available.

Best,
Zubin

PS Sorry again to have to bring this up during your vacation, but it is unfortunately a situation we are in and something we are simply trying to resolve amicably between all involved parties.

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 99 of 282

# EXHIBIT B

EFiled:  May 22 2015 01:29PM EDT
Transaction ID 57284185
Case No. 9742-VCL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9742-VCL |
| | ) | |
| HONEOYE LAKE ACQUISITION, LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) | PUBLIC VERSION |
| | ) | FILED MAY 22, 2015 |
| | ) | |
| Defendants. | ) | |

## DEFENDANT LYRICAL OPPORTUNITY PARTNERS L.P.'S OPENING PRE-TRIAL BRIEF

OF COUNSEL:
Bijan Amini
John W. Brewer
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
Facsimile: 212.490.4208
Email: bamini@samlegal.com
Email: jbrewer@samlegal.com

SMITH KATZENSTEIN &
JENKINS LLP
David A. Jenkins (ID No. 932)
800 Delaware Avenue, Suite 1000
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Telecopy: 302-652-8405
Email: Djenkins@skjlaw.com

*Attorneys for Defendants*

May 15, 2015

(Mehta Tr. at 131:5-133:12.)

In connection with the difficulties faced by FLCP in the
Performance Trailers situation, on July 28, 2006, Shalov asked for Keswin
to loan an additional $1,000,000 to FLCP which Mehta and Shalov would
personally guarantee.  (Shalov Exh. 18.)   Keswin ultimately lent $400,000
to FLCP (Shalov Tr. at 260:10-24), and Shalov "had every intent on
repaying him up until the date that I found out he was – had a different
stance on the funds flow [for the Revolabs proceeds]."   (Shalov Tr. at
256:11-17.)

In about November 2006, Lyrical's investment of over $6
million in Performance Trailers was wholly lost through bankruptcy.
(LOP00015550; LOP00015571.)   On November 21, 2006, Mehta e-mailed
Keswin to provide his understanding of the clawback agreement.   Mehta
stated that:

> (1) "[W]e were specifically told that the bridge loans to
> Performance Trailers were coming from different legal entities
> and that they were all subject to a clawback . . . ;"

> (2) The $400,000 loan from Keswin to FLCP was
> "something that the overall Fund (meaning all investments
> through FLCP/FLDP of the 'Fund') did not need, and as a
> result is indeed something we have to make up via our carried

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 102 of 282

# Exhibit C

1                    Gage

2       A.    It was my understanding that the

3    clawback agreement, I mean, it was my

4    understanding based on what I read and what

5    I had heard from I guess Mr. Keswin.

6       Q.    So let's be more specific.   In

7    page 2 of Plaintiff's 19, you verified that

8    Lyrical forbore from declaring defaults on

9    the multiple notes, copies of which have

10   been produced.   Do you see that?   Do you

11   see that or not?   Do you see that sentence?

12      A.    You're looking --

13      Q.    At the bottom of page 2 to the

14   top of page 3.   Do you see that sentence?

15      A.    I do.

16      Q.    It's a sentence?

17      A.    Yes.

18      Q.    You understand that the

19   interrogatory requested you to identify any

20   consideration provided for the clawback

21   agreement and state when such consideration

22   was provided.   Do you understand that?

23      A.    Yes.

24      Q.    You verified the answer, right

25   sir?

1                    Gage

2        A.    Yes.

3        Q.    And you said, in addition,

4   Lyrical forbore from declaring defaults

5   under multiple notes, copies of which have

6   been produced.   Do you see that?

7        A.    Yes.

8        Q.    What was your basis for saying

9   that was accurate and truthful as a

10  response, if anything?

11       A.    Well, because I knew that I had

12  to include Finger Lakes Debt Partners and

13  the Tiber notes in here and I also know

14  that I had referenced the personal loans.

15  And so I believe that, you know, we --

16  obviously we did not exert our rights on

17  those agreements.

18       Q.    How can you truthfully testify

19  that Lyrical forbore from declaring those

20  defaults?

21            MR. AMINI:     Objection.

22       A.    I understand we had rights that

23  we could have pursued that we did not

24  because my understanding was that this

25  would kind of come out in the clawback

1                    Gage

2    agreement.

3         Q.    Okay.   Earlier you had testified

4    that Plaintiff's Exhibit 3 was a

5    memorialization that was accurate with

6    regard to the clawback, do you remember?

7         A.    Yes.

8         Q.    And we also went through that and

9    you indicated to me that there was nothing

10   that Lyrical agreed to do that was noted in

11   Plaintiff's Exhibit 3, do you remember

12   that?

13        A.    Yes.

14        Q.    So explain to me, sir, if you

15   can, how Lyrical agreed to forebear from

16   declaring defaults as part of the clawback

17   given that your sole understanding of the

18   terms of the clawback are as expressed in

19   Plaintiff's Exhibit 3.

20             MR. AMINI:    Objection.

21        A.    Well, in reviewing materials for

22   this case, I had seen some e-mails that we

23   presented as part of discovery in which

24   Zubin Mehta referred to the other notes

25   that weren't on the schedule.

1                              Gage

2       Q.   So is it your testimony that FLCP

3  had some legal right to enforce -- I'm

4  sorry, is it your testimony that FLCP had

5  some legal right to prevent Lyrical from

6  enforcing any note at any time, ever?

7            MR. AMINI:    Objection.

8       A.   I didn't believe they had a legal

9  right but for this agreement to, you know,

10 agree to the clawback.  And that's my

11 understanding, that that's part of the

12 reason why Lyrical didn't pursue the rights

13 under the debt obligations.

14      Q.   What I'm saying to you, sir, is

15 I'm hearing you say well, they chose not to

16 move forward on our notes.  That's what

17 you're saying, right, sir?

18      A.   That's correct.

19      Q.   But FLCP had no legal right to

20 prevent Lyrical from enforcing any note at

21 any time, right?

22            MR. AMINI:    Objection.

23      Q.   To the best of your knowledge,

24 right?

25      A.   I don't know.

1                    Gage

2       Q.   You don't know?  You think that

3  FLCP had such a right?

4       A.   I don't.

5       Q.   You don't think FLCP had any such

6  right, correct?

7       A.   To the best of my knowledge, I

8  don't think they had a right.

9       Q.   Right.  So FLCP could have

10 enforced any note at any time subject to

11 its discretion, right?

12      A.   FLCP could have enforced its

13 note?

14      Q.   Sorry, Lyrical could have

15 enforced those notes at any time at its

16 discretion, right?

17      A.   My understanding was that we

18 didn't because of the clawback agreement.

19      Q.   Okay.  My question, sir, was

20 Lyrical could have enforced those notes at

21 any time at its discretion, correct?

22           MR. AMINI:   Objection.

23      A.   I don't believe so.  I thought

24 that that was the agreement right there

25 that prevented us from doing that.

1                          Gage

2        Q.    Can you show me an agreement in

3    Plaintiff's Exhibit 3 where Lyrical agreed

4    not to enforce a note?

5        A.    No.  Again, I think the clawback

6    agreement was an oral agreement.  This is,

7    you know, a summary of the basic construct

8    of that agreement.

9        Q.    Earlier, sir, you had said that

10   this was a memorialization of all of the

11   terms of the clawback, remember?  Every

12   single one.  Do you recall that?

13           MR. AMINI:    Objection.

14       A.    I don't recall saying all of

15   them.

16       Q.    Because if it's not, I want you

17   to tell me every relevant term of the

18   clawback right now.

19           MR. AMINI:    Note my objection.

20       Q.    Tell me every relevant term of

21   the clawback right now if Plaintiff's 3

22   isn't the full encapsulation.

23           MR. AMINI:    Note my objection.

24       A.    Well, I don't think the notes,

25   personal notes are on here, and I don't

1                          Gage

2     believe the notes to Tiber are there.

3          Q.   I wasn't asking about notes to

4     Tiber and about notes.  I was asking about

5     any terms of the clawback agreement to the

6     best of your knowledge that exist that you

7     can testify to that aren't on

8     Plaintiff's 3.

9          A.   Oh, I thought you meant what was

10    not included in this.

11         Q.   No, sir.  You said to me, you

12    said to me that Plaintiff's 3 is a basic

13    understanding of the clawback.  I want

14    every term of the clawback to the best of

15    your knowledge, given that you verified

16    that you understand the terms in court.

17              MR. AMINI:    Objection.

18         A.   I consider those notes as part --

19    as terms of this agreement that weren't

20    listed here.

21         Q.   Okay, tell me what terms you mean

22    with regard to those notes.  What were the

23    terms of the agreement with regard to any

24    notes?

25         A.   That they would be included on

                          Gage

1    this schedule as part of the overall

2    portfolio.

3        Q.   Oh, that notes would be included

4    as something that would be recoverable

5    under the clawback, right?

6        A.   Correct.

7        Q.   Yes,  Now, show me where there is

8    a term under which Lyrical agreed in sum or

9    substance not to enforce any note in

10   exchange for receiving the clawback.

11           MR. AMINI:   Objection.

12       A.   I don't see that said here.

13       Q.   Right.  It's not in

14   Plaintiff's 3, correct?  Now, is it your

15   testimony, sir, that that was a term in the

16   clawback, notwithstanding the fact that

17   it's absent from Plaintiff's 3?

18           MR. AMINI:   Objection.

19       A.   It wasn't my understanding based

20   on my reading of this.

21       Q.   No, sir.  You verified what you

22   knew to be the consideration for the

23   clawback agreement in your answer to

24   Interrogatory 8, right sir?

1                    Gage

2        A.   Yes.

3        Q.   And you said that that was a true

4   and correct answer to the best of your

5   knowledge, information and belief, right

6   sir?

7        A.   That's correct.

8        Q.   So you know full well what you

9   think the terms of the clawback are with

10  regard to consideration, right?

11            MR. AMINI:    Objection.

12       Q.   Right?

13       A.   Yes.

14       Q.   Otherwise you couldn't have

15  answered 8 truthfully, right?

16       A.   Yes.

17       Q.   And you did answer 8 truthfully,

18  did you not?

19       A.   I did.

20       Q.   Good.  So given that you answered

21  8 truthfully, tell me where this term about

22  forbearance exists other than in your own

23  mind.

24       A.   My understanding of the clawback

25  agreement is one that was based on

1                        Gage

2    conversations over time with Keswin and

3    internal conversations, some e-mails, this,

4    so my understanding was through the time

5    period in which I had discussed this over

6    the years of my employment, that that was

7    part of it.  That was why they went -- they

8    agreed to do this clawback.

9         Q.   Lyrical never cancelled those

10   notes, right?

11        A.   No.

12        Q.   Lyrical retained them, right?

13        A.   Correct.

14        Q.   Lyrical could have sued on them

15   at any time, right?

16        A.   I don't know.

17        Q.   You don't know?

18        A.   I guess.

19        Q.   If Lyrical would have sued on any

20   one of the notes, is it your testimony that

21   FLCP could have come in to court and said

22   no, no, no, we had an oral agreement that

23   would prevent that?  Is that your

24   testimony?

25        A.   I don't know what FLCP would have

                        Gage

1

2    done.

3        Q.    I'm saying, you kept the notes,

4    right?

5        A.    We didn't rip them up.

6        Q.    Right, you kept the notes.  You

7    didn't cancel them in any way, right?

8        A.    I did not cancel them.

9        Q.    So if you had gone into court to

10   enforce any of them, is it your testimony

11   that FLCP could have come into court and

12   said no, no, no, Lyrical can't enforce them

13   because of an oral conversation that we had

14   years ago, is that your testimony?

15            MR. AMINI:    Objection.

16       A.    I never thought about bringing

17   them to court over those notes because I

18   thought we had this.

19       Q.    Please answer the hypothetical if

20   you can.

21            MR. AMINI:    Objection.

22       A.    Is part of the hypothetical that

23   they were going to default on the clawback

24   agreement and not live up to their

25   obligation?

1                          Gage

2       Q.   Under the clawback agreement you

3  said that Lyrical was going to forebear

4  from defaulting FLCP, correct?

5       A.   Yes.

6       Q.   So you are stating under oath,

7  aren't you, sir, that Lyrical agreed to

8  hold off from declaring a default on any of

9  those notes, aren't you?

10      A.   That was my understanding, so

11  yes.

12      Q.   And that understanding, it's more

13  than an understanding, it's something that

14  you stated under oath and verified, right?

15      A.   That is correct.

16      Q.   It's not like a hunch that you

17  came up with yesterday, right sir?

18      A.   That is correct.

19      Q.   You were very careful in making

20  that statement, weren't you?

21      A.   I was.

22      Q.   You wouldn't want to mislead

23  anyone in making it, right?

24      A.   No.

25      Q.   No.  So Lyrical retained all

1                       Gage

2    those notes, right?

3        A.   Yes.

4        Q.   If Lyrical had taken one of those

5    notes to court to enforce payment

6    thereunder, is it your contention that FLCP

7    could have come to court and said no, no,

8    no, we have an oral agreement in 2005 that

9    stops Lyrical from enforcing it.  Is that

10   your contention?

11             MR. AMINI:    Objection.

12       Q.   You can answer.

13       A.   I guess they could have done

14   that.

15       Q.   They could have done that?

16       A.   In this hypothetical.

17       Q.   They could have done that.  And

18   you would agree with them that that oral

19   conversation from 2005 would be sufficient

20   to stop Lyrical from enforcing any of those

21   notes?

22             MR. AMINI:    Objection.

23       Q.   Is that right?

24       A.   I believe that the clawback

25   agreement was a valid agreement.

1                        Gage

2        Q.   I'm not asking if the clawback

3   agreement is valid.  Did I ask that?

4        A.   What was the question?

5        Q.   Yes, I asked a different

6   question.  Please focus on my question.  My

7   question was if Lyrical went to court with

8   a note, did you follow me so far?

9        A.   Yes.

10       Q.   Good.  If Lyrical goes to court

11  with a note to seek enforcement of the note

12  against FLCP, is it your contention that

13  FLCP could have come into court and said

14  no, you can't -- Lyrical can't enforce this

15  note because of an oral conversation that

16  we had with Lyrical years ago in 2005, is

17  that your contention?

18       A.   I guess under this hypothetical

19  they could have said that, yes.

20       Q.   Yes.  Would Lyrical have

21  contested that?

22            MR. AMINI:    Objection.

23       A.   I don't know.

24       Q.   You don't know?

25       A.   It wasn't my decision.  I don't

1                    Gage

2    control Lyrical.

3         Q.    Well, let me ask you this, sir.

4    How does FLCP have any right whatsoever in

5    exchange for any rights that it gave up in

6    the clawback if FLCP can't enforce it?

7              MR. AMINI:    Objection.

8         A.    I don't know.

9         Q.    You don't know.  Like for example

10   let's say you and I make a deal today,

11   right?  And you say to me, I'll testify for

12   as long as I feel like it, okay?  And I say

13   alright.  Do we have an agreement?

14             MR. AMINI:    Objection.

15        Q.    Is that your understanding?

16        A.    Yes.

17        Q.    Yes, you think that's an

18   agreement, that you can leave at any time

19   at your discretion, right?

20             MR. AMINI:    Objection.

21        Q.    In that agreement as you call it,

22   correct?

23        A.    I made an agreement, I made an

24   agreement.

25        Q.    Yes, I'm saying the agreement is,

                              Gage

1    I will testify for as long as I feel like

2

3    it.

4         A.    Okay.

5         Q.    You think that's enforceable,

6    that I can enforce it.  You decide at one

7    point to stop testifying, I say no, no, no,

8    you have to say.  And you say no, no, no, I

9    said I was just going to testify for as

10   long as I felt like it, I don't feel like

11   it an I'm leaving.  What enforceable right

12   do I have in that hypothetical?

13        A.    I don't know.

14        Q.    None, right sir?

15        A.    No, I just said I don't know.

16        Q.    You don't know.

17        A.    I'm not an attorney so I don't

18   know what legal rights you have.

19        Q.    You deal with many agreements in

20   the course of your professional experience,

21   sir, right?

22        A.    I do.

23        Q.    You read them and analyze them

24   for their financial impact, don't you, sir?

25        A.    I do.

1                    Gage

2        Q.    You've read thousands of such

3    agreements over the decades that you've

4    been working, haven't you, sir?

5              MR. AMINI:    Objection.

6        A.    Thousands?  I've read a lot.

7        Q.    Thousands, haven't you, sir?

8        A.    Okay.

9        Q.    Yeah.  So you have a very good

10   understanding of what agreements mean and

11   don't, don't you?

12       A.    Certain parts of agreements I

13   rely on my attorneys tell me what they

14   mean.

15       Q.    Of course.  With regard to this

16   agreement about forbearance, what was the

17   amount of time that Lyrical agreed to

18   forbear?

19       A.    My understanding was that we

20   would forebear until this kind of came out

21   in the wash.

22       Q.    So what is the amount of time

23   that Lyrical agreed to forebear?  Was it a

24   definite time or unclear?

25       A.    It was unclear to me.

1                          Gage

2         Q.    And how did Lyrical agree to

3    forbear?  What did Lyrical agree to

4    forebear from, if anything?

5         A.    My understanding, it was an

6    agreement to not pursue its rights to

7    foreclose on the notes.

8         Q.    And when did Lyrical make that

9    agreement not to pursue its rights to

10   forebear under the notes?

11        A.    I'm not sure about the Tiber

12   notes.

13        Q.    You're not sure about the Tiber

14   notes, so you don't know any date about

15   that, is that right?

16        A.    That was before my time.

17        Q.    So you don't know any date about

18   that, is that correct?

19        A.    Those notes were made before I --

20   and went bad before I --

21        Q.    Please answer my question.  You

22   don't have any date that you can give me

23   with regard to the Tiber notes at all,

24   correct?

25        A.    That is correct.

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 121 of 282

Page 326

1                          Gage

2          Q.    Yes.   When was the agreement

3    about other notes, if you can tell me at

4    all?

5          A.    The FLDP debt, well, that went

6    into default, they stopped paying interest

7    fully and then completely 2009, I think was

8    when they stopped paying some interest and

9    then by 2011 and 12, interest really had

10   stopped being paid altogether.

11         Q.    Okay, so when did Lyrical agree

12   to forebear from declaring default on that

13   note, if ever?

14              MR. AMINI:    Objection.

15         A.    I'd say it would be at the time

16   when the notes weren't paying interest.

17         Q.    That would be 2011 or 12,

18   correct?

19         A.    Correct.

20         Q.    Correct.  What other agreement

21   did Lyrical provide to forebear from

22   declaring default on any note, if there was

23   any such additional agreement other than

24   Tiber and FLDP?

25              MR. AMINI:    Objection.

1                              Gage

2        A.    Personal notes were something

3    that Greg and Zubin had talked about a lot,

4    and I know that Jeff had decided not to go

5    after that, and it was my understanding,

6    was that because it was wrapped up as part

7    of this agreement.

8        Q.    Yes.   When was the agreement made

9    to forebear on that personal note, if ever?

10        A.    I don't know.

11        Q.    No idea at all, is that correct?

12        A.    I don't know.

13        Q.    No idea at tall, is that correct?

14    It could be 2004 or 2015 or any time in

15    between, is that right?

16        A.    I don't know.

17        Q.    That's what I'm trying to get at.

18    It's just a black box to you, sir, between

19    2004 and 2015, just no way of further

20    refining it, is that right?

21        A.    I don't recall when Jeff and Greg

22    and Zubin had their conversation.   I wasn't

23    privy to all their conversations.

24        Q.    I understand that.   If you don't

25    know it any better, just tell me you don't

                            Gage

1    know it any better.

3        A.    I thought I did.  I don't know

4    when he agreed to not pursue his claims.

5    My understanding had been when I talked to

6    Mr. Keswin about this e-mail in particular,

7    was that it included debt.

8        Q.    Alright.  But what other

9    agreement to forebear declaring defaults on

10   notes exists with regard to the clawback,

11   if any at all?

12       A.    I think those are the only notes

13   that were invested in and were defaulted

14   on.

15       Q.    That's it then, right?

16       A.    Well, the Performance Trailers

17   notes were -- had defaulted and they were

18   included in the clawback, you know, by the

19   time that this e-mail was sent, that was

20   parts of the current clawback.  So those

21   notes were included.

22       Q.    Was Greg Shalov responsible for

23   payment on performance trailer notes?  Is

24   that your testimony?

25            MR. AMINI:    Objection.

1                          Gage

2        A.   I don't think Greg Shalov was

3   responsible, I think those notes were with

4   the company.

5        Q.   Right.  Greg Shalov was not party

6   to those notes, correct?

7             MR. AMINI:    Objection.

8        Q.   Is that correct?

9        A.   I don't know.  I don't

10  remember -- I haven't seen those notes.

11       Q.   Well, you're saying Lyrical

12  forbore from declaring defaults in favor of

13  FLCP, right?

14             MR. AMINI:    Objection.

15       Q.   Is that correct, sir, with regard

16  to your answer to interrogatory 8?

17       A.   Yes.

18       Q.   Yes.  So I'm asking you how if at

19  all was forbearing on notes with regard to

20  Performance Trailers forbearance with

21  regard to FLCP?

22             MR. AMINI:    It doesn't say

23         that, by the way.  You know, to read

24         this stuff to him.  Honestly, I'm

25         going to object to it.  Your statement

1                Gage

2    about what it says is untrue, so note

3    my objection.

4        MR. KAGEN:    By the way, just to

5    be clear about your counsel's

6    statement, I'm not reading anything.

7    I'm asking you a question.

8        MR. AMINI:    No, no, you're

9    doing what you typically do.  You are

10   professing to restate what's in the

11   answer and you are restating it

12   specifically wrong.  Objection.

13       MR. KAGEN:    Not at all.  That's

14   totally false.  It's a question to

15   you, sir.

16       MR. AMINI:    It's late and I'm

17   tired.

18       MR. KAGEN:    It's a question to

19   you, sir, and I want it answered.

20       MR. AMINI:    Right, and you

21   know, that part of Keswin and Lyrical

22   and all that, you just made that up as

23   you go along.  You know --

24       MR. KAGEN:    This again is a

25   very long speaking colloquy that --

1                        Gage

2              MR. AMINI:    I understand that.

3         It's late, I'm tired, and I'm sorry,

4         but this line of questions, like most

5         of your lines, where you tend to

6         restate what's in documents is

7         misleading.  So you know, I'm just

8         telling you that.

9         Q.   It's true, is it not, sir, that

10   the Performance Trailers note was only

11   signed by Performance Trailers, Inc., right

12   sir?

13             MR. AMINI:    Objection.  Is

14        there just one note in Performance

15        Trailers or more?  I have no idea,

16        Stuart.  I believe there are multiple

17        ones.

18             MR. KAGEN:    That objection has

19        absolutely no basis whatsoever, and

20        again it's a long speaking objection

21        that is pointless.

22             MR. AMINI:    I actually think

23        there are seven bridge notes.  So you

24        know, you're now truly misleading the

25        witness.  So it's late in the day and

1                          Gage

2          I believe I have seen seven of them

3          because I remember looking at the

4          seventh one at some point.  Do you

5          have them?  Put them in front of them.

6          You're testing him on a note that he

7          said he hasn't seen.

8                MR. KAGEN:   Since your counsel

9          seems to believe that the Performance

10         Trailers notes have FLCP as a party,

11         initially three of them, quickly --

12               MR. AMINI:   Oh, now we've gone

13         from the one note to let me show you

14         three of them.  At least the record

15         should reflect that Mr. Kagen just a

16         minute ago represented to this witness

17         that there was one note, and all of a

18         sudden he has three.

19               MR. KAGEN:   Bijan, I'm going to

20         ask you --

21               MR. AMINI:   You know what, it's

22         irritating.  Let's take a break.  I

23         need a break, Stuart.

24               (Recess taken:  4:40-5:05 p.m.)

25     FURTHER EXAMINATION BY MR. KAGEN:

1              Gage

2      Q.   Mr. Gage, you served out original

3   responses to these interrogatories on or

4   about April 13th of 2015, correct?

5      A.   Yes.

6      Q.   Yes.  And then about two weeks

7   later you revised them on May 1st, right?

8      A.   Yes.

9      Q.   Okay.  What if anything happened

10  between April 13th and May 1st to cause you

11  to change your answer to those

12  interrogatories?

13     A.   I realized that I forgot to

14  include some items that should have been

15  there.

16     Q.   Okay, what if anything caused you

17  to remember that?

18     A.   When I was going through our

19  internal financials and schedules I noticed

20  that I didn't have all of the things that I

21  should have had.

22     Q.   Did you not go through those

23  schedules before you filed your first

24  interrogatory response?

25     A.   I did.  I just missed it.

Gage

1
2     Q.   Did you not conduct a reasonable
3  investigation before filing your answer,
4  your original answer on April 13th?
5     A.   I believe I did.
6     Q.   What if anything did you check in
7  those two weeks to allow you to state that
8  there was additional consideration for a
9  2005 oral agreement?
10     A.   I reviewed our audited financial
11  statements, schedules of all our
12  investments, trying to reconcile them back
13  and forth to one another, and that's when I
14  realized that I had left some things off.
15     Q.   Okay, you reviewed audited
16  financial statements for Lyrical
17  Opportunity Partners LP?
18     A.   Yes.
19     Q.   Anything else?  Any other form of
20  financial statements?
21     A.   Lyrical Multi-Manager Offshore
22  Fund Ltd.
23     Q.   Lyrical Multi-Manager Offshore
24  Fund Ltd.  Any other financial statements
25  in that two-week period?

1                         Gage

2         A.    No.

3         Q.    With regard to those audited

4    financial statements, there is nothing in

5    either of those Lyrical -- there is nothing

6    in either of those financial statements

7    that is talking about forbearance from

8    declaring defaults on any debt, correct?

9         A.    Correct.

10        Q.    And then you said you reviewed

11   some schedules.  What schedules were those?

12        A.    They were the schedules that were

13   originally attached, you know, to the

14   April 8, 2008 MO that showed the FLCP

15   portfolio.  That schedule had been sent to

16   us or provided to us in person on two

17   different occasions so I had different

18   versions or different dates anyway.  I had

19   other schedules that we had prepared that

20   kind of had our own accounting of the

21   individual investments that ultimately tied

22   into the financials.

23        Q.    Anything else?

24        A.    That was it I think.

25        Q.    Okay, there is nothing in any of

                        Gage

1

2    those schedules that discusses forbearance

3    by Lyrical of any debt at any time, right?

4         A.    No.

5         Q.    So there is nothing in any

6    material that you reviewed in this two-week

7    interim period that gave you additional

8    information about forbearance of declaring

9    defaults on notes, right?

10        A.    No.

11        Q.    So where did that come from, if

12   it wasn't from any document that you

13   reviewed in that two-week period?  Where

14   did you get that additional information, if

15   anywhere?

16        A.    Again, at the time my

17   understanding of the clawback agreement

18   when I first started asking questions

19   about, you know, what is this clawback

20   agreement, how did it arise, I recall that

21   that was what was explained to me by

22   Mr. Keswin.

23        Q.    You had that understanding as of

24   the time of the filing of your first

25   interrogatory response, right?

1                         Gage

2         A.   Yes.

3         Q.   Nothing changed with regard to

4    your understanding of the clawback in the

5    two-week period, right?

6         A.   No.

7         Q.   And you reviewed no document that

8    gave you additional information to put the

9    forbearance down, right?

10        A.   Well again, I reviewed detailed

11   schedules to reconcile and tie out to the

12   dollar, and that's where I realized that I

13   made a mistake on that first one.

14        Q.   Yes, but I'm talking about

15   forbearance on defaults of notes, right?

16        A.   Okay.

17        Q.   And as you've already testified,

18   not even a single piece of paper that you

19   reviewed in the two-week period indicated

20   that Lyrical agreed to forebear on any

21   note, right?

22        A.   No.

23        Q.   No.  So where did this additional

24   information come from from this two-week

25   period that allowed you to amend your

1                        Gage

2   response in that way?

3       A.    I just remember those were notes

4   that were not pursued and when I put them

5   in the schedule as corrected, speaking with

6   counsel I realized that --

7       Q.    I'm not seeking discussion with

8   counsel.  Just to be clear, I'm seeking

9   information that you swore to as true in

10  your interrogatory response, which I'm

11  fully entitled to ask about, and am.

12      A.    They owe us money, they haven't

13  paid us back, we haven't gone after them.

14  All of that is correct.

15      Q.    Right.  And this understanding

16  comes from your own mind and nowhere else,

17  right?

18          MR. AMINI:    Objection.

19      A.    It was I'll say a general

20  understanding at Lyrical Partners that they

21  owe us money, they haven't paid us, we

22  haven't gone after them because we believe

23  that we have this clawback to recoup our

24  investment.

25      Q.    Yes, but I'm saying in that

1                           Gage

2    two-week period that you used to amend your

3    response, the only source of information

4    that leads to that forbearance is your own

5    understanding in your own head, correct?

6         A.   Yes.

7         Q.   Nothing else, right?

8              MR. AMINI:    Objection.

9         A.   No.

10        Q.   Okay.  By including those notes

11   you increased the amount of the clawback,

12   right?

13        A.   Yes.

14        Q.   Yes, thank you.  And that works

15   out in Lyrical's financial favor of course,

16   right?

17        A.   By virtue of the clawback, yes.

18        Q.   Okay.  Now, you are aware, are

19   you not, that Finger Lakes Capital Partners

20   LLC invested a hundred thousand dollars of

21   its own capital into HLA, is that right?

22        A.   I am aware of that, yes.

23        Q.   And FLCP is what you would call

24   the promotor or manager originally for HLA,

25   right?

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 135 of 282

# EXHIBIT C

.

| | |
|---|---|
| **From:** | Zubin Mehta |
| **Sent:** | Tuesday, October 20, 2009 5:44 PM |
| **To:** | Ted Gage |
| **Cc:** | Shalov, Gregory; Shalov, Barry D. |
| **Subject:** | Summary |
| **Attachments:** | FLCP I Capitalization 10-20-09.xls |

Ted,

Thank you for taking the time to sit down with me on Thursday.  As a follow up to our meeting, I wanted to summarize our understanding of things going forward and put down a plan of attack with respect to how things will work between us going forward, to make sure the lines of communication stay open and that we avoid any further misunderstandings.

(1) I'll plan on sending you a bi-weekly update on any key developments on the overall FLCP Investment portfolio.  In addition to this, I'll continue to send any key or noteworthy developments as they occur on a real-time basis.

(2) FLDP
    a.  FLDP is currently in default with respect to both the LMMO Note and the Other Investors in FLDP
    b.  Both Portadam and Tiber are in default on their loans to FLDP as both underlying operating businesses have been impacted by the overall global economic climate
    c.  FLDP (in conjunction with FLCP as the Manager of KLA and SLA) is working with Portadam and Tiber to put in place plans focused on protecting the principal balances of the FLDP loans to both Portadam and Tiber, with the ultimate goal of paying back the principal and interest as soon as practical (both through underlying operations and eventual sale of the businesses)
    d.  FLDP recognizes LMMO's position that their Note is in a Senior Position to the other investors in FLDP
    e.  Going forward, FLDP will pay all proceeds into FLDP towards LMMO's 17% interest payment first.  If in any year, there is excess cash generated by FLDP, it will go to pay down the principal balance of the LMMO Note.  If in any year, there is a shortfall towards the 17% accrued interest towards LMMO, the unpaid interest amount will accrue and carry over as interest to be paid the following year
    f.  FLDP's goal is to work with Portadam and Tiber to pay down the principal balances of the FLDP Notes to each business over time.  FLDP's goal is and has always been to protect principal balances of its loans to the FLCP portfolio businesses
    g.  The LMMO Note currently has a principal balance of $3,500,000.00 and the Other investors currently have an aggregate principal balance of $925,000.00.

(3) RAI
    a.  At present, FLCP will work with RAI to grow the business and will provide LOP with updates and developments as they occur and on a bi-weekly basis as noted above
    b.  FLCP will assist RAI and trying to bring in additional investors to fund the operating losses at RAI going forward (provided you are ok with this, as it needs to be discussed with Jeff)
    c.  RAI recently raised another $250,000.00 in Common Stock from one of its original investors and believes confidently that it'll be able to raise another $500,000.00 in Common Stock in the near future.

(4) Revolabs
    a.  The overall operating business continues to perform very strongly after a tough Q4 of 2008 and Q1 of 2009.  The business did just over $1.2 MM in September of 2009 and is expecting to end the year between $1.375 MM and $1.5 MM.  Overall, with GS taking over Global sales and the continued focus on new product development and manufacturing, the business expects to be at $1.7 MM to $2.0 MM at some point in the next 9-12 months (assuming no other catastrophic intervention – economic or otherwise).
    b.  Revolabs recently received an inquiry from Shure to outright buy the Revolabs business.  They had indicated a preliminary range of $30 to $50 MM.  In discussing this with Bankers (Centerview, GCA Savvian), the current belief is that getting them to stretch to $100 MM would be tougher now and make more sense if we track at or near what the business is expecting to do over the next 6-9 months.  As such, the business strategically kept Shure in the discussion while at the same time indicating that their initial valuation numbers were significantly lower than what the business was worth today – without providing any information to Shure at the present time.  It is currently FLCP and Revolabs expectation that we'll have a very strong 6-9 months and that we'll be in a very good position to sell the business in the next 12 to 18 months (barring the same interventions as stated above).  Both Centerview and GCA

agree with the strategy going forward and believe strongly that we'll be in a position to sell the business during that timeframe for values between $100 and $150 MM and potentially north of there.  FLCP, however, will continue to drive the business forward and is not looking to sell until it can comfortable get to a valuation well north of $100 MM.

c.  Overall, the market is very hot right now as Cisco has made a number of big acquisitions last year, Shure has expressed their outright desire to acquire us and there are numerous strong strategic fits and buyers for Revolabs.  Beyond this, we continue to be the only company focused on this space and our new products and soon to be launched product in the coming months will only further our standing as a strong strategic asset.

Overall, while LOP and Jeff are disappointed by FLCP's current results and our investment portfolio's performance, we believe strongly that we'll be able to provide a strong overall return to LOP and that while we may have not gotten there with the original intended path, we believe our returns on our overall portfolio will likely be north of the gross 3x we had always intended and expected to deliver for LOP at the time we hooked up with Jeff and LOP.  As a further basis for this, please see the attached spreadsheet that describes our current portfolio.  Lastly, if you could please confirm receipt and that this works for you and LOP, that would be great – short of that, we are going to do everything in our power to ensure we get LOP and Jeff a strong overall return on the FLCP Investment portfolio.

If you have any questions, please do not hesitate to contact me.

Best,
Zubin

============================
Zubin Mehta
Managing Partner
Finger Lakes Capital Partners LLC
400 West 22nd Street, Suite 2R
New York, NY 10011
(212) 502-1102
(201) 221-8224 (F)
mehta@flcpartners.com
============================

**FLCP Invested Capital**

($000's)

| Total FLCP Portfolio (Equity) | LOP | JK/LP/LMMO | LOP&Family Subtotal | FLCP/Other | Total |
|---|---|---|---|---|---|
| Seneca Lake Acquisition LLC (Tiber) | 2,951,802.33 | 376,468.13 | 3,328,270.46 | 23,531.87 | 3,351,802.33 |
| Keuka Lake Acquisition LLC (Portadam) | 3,950,000.00 | 0.00 | 3,950,000.00 | 50,000.00 | 4,000,000.00 |
| Honeoye Lake Acquisition LLC I&II (Revolabs) | 4,600,000.00 | 0.00 | 4,600,000.00 | 2,600,000.00 | 7,200,000.00 |
| Canandaigua Lake Acquistion LLC (Performance) | 2,450,000.00 | 0.00 | 2,450,000.00 | 50,000.00 | 2,500,000.00 |
| Owasco Lake Acquisition LLC | 1,949,000.00 | 0.00 | 1,949,000.00 | 461,000.00 | 2,410,000.00 |
| Total Invested Equity | 15,900,802.33 | 376,468.13 | 16,277,270.46 | 3,184,531.87 | 19,461,802.33 |
| Plus:  FLDP Clawback *(a)* | 983,886.00 | 0.00 | 983,886.00 | 0.00 | 983,886.00 |
| Plus:  CLA Debt Clawback *(b)* | 2,650,000.00 | 0.00 | 2,650,000.00 | 0.00 | 2,650,000.00 |
| Total Invested Equity + Clawback | 19,534,688.33 | 376,468.13 | 19,911,156.46 | 3,184,531.87 | 23,095,688.33 |
| | | | | | |
| Memo: | | | | | |
| Total Invested Equity (Current) | 13,450,802.33 | 376,468.13 | **13,827,270.46** | 3,134,531.87 | 16,961,802.33 |
| Total Clawback (Current) *(f)* | 6,083,886.00 | 0.00 | **6,083,886.00** | 50,000.00 | 6,133,886.00 |
| Subtotal *(c)* | 19,534,688.33 | 376,468.13 | **19,911,156.46** | 3,184,531.87 | 23,095,688.33 |
| | | | | | |
| Total FLDP & Bridge Loan Portfolio (Debt/Other)  *(d)* | | | | | |
| Canandaigua Lake Acquistion LLC (Debt) | 1,600,000.00 | 1,050,000.00 | 2,650,000.00 | 550,000.00 | 3,200,000.00 |
| FLDP (LOP&LMMO Debt) | 250,000.00 | 3,400,000.00 | 3,650,000.00 | 925,000.00 | 4,575,000.00 |
| LOP Tiber Bridge Loan | 500,000.00 | 0.00 | 500,000.00 | 0.00 | 500,000.00 |
| Total Invested Debt | 2,350,000.00 | 4,450,000.00 | 6,800,000.00 | 1,475,000.00 | 8,275,000.00 |
| | | | | | |
| Other | | | | | |
| Jeff Keswin Loan to GS/ZM *(e)* | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 400,000.00 |
| Total Other Debt | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 400,000.00 |

Notes:
*(a) As part of PT and CLA Loss, FLCP Agreed to assume LMMO loss of $983,886.00 in the FLCP Investment Portfolio Clawback*
*(b) As part of PT and CLA Loss, FLCP Agreed to assume CLA Debt loss of $2,650,000.00 in the FLCP Investment Portfolio Clawback*
*(c) Subtotal of $19,911,156.46 is equal to total maximum pool available for FLCP Investment Portfolio Clawback*
*(d) All other Debt (FLDP and LOP Tiber Bridge Loans) are due back from the FLDP and Tiber and are not included as potential FLCP Investment Portfolio Clawback (with the exception of LMMO loss in PT of $983,886.00 and CLA Debt of $2,650,000.00)*
*(e) Loan to GS/ZM from Jeff Keswin is not included in FLCP Investmet Portfolio Clawback and is due back to JK from GS and ZM out of their carried interest from FLCP Investment Portfolio*
*(f) The Total Clawback (Current) includes FLDP Clawback of $983,886.00, The CLA Debt Clawback of $2,650,000.00 and the CLA Equity of $2,450,000.00*

FILED: NEW YORK COUNTY CLERK 09/01/2015 06:53 PM
NYSCEF DOC. NO. 19

INDEX NO. 156356/2015

RECEIVED NYSCEF: 09/01/2015

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 139 of 282

# EXHIBIT D

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC          :
                                            :
              Plaintiff,                    :
                                            :
        v                                   :  Civil Action
                                            :  No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and          :
LYRICAL OPPORTUNITY PARTNERS, L.P.,         :
                                            :
              Defendants.                   :
                                            :


                          _ _ _


                    Chancery Courtroom No. 12C
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Wednesday, January 28, 2015
                    10:00 a.m.


                          _ _ _

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.


                          _ _ _

ORAL ARGUMENT ON DEFENDANTS' PARTIAL MOTION TO DISMISS
THE COMPLAINT, PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT
     ON THE PLEADINGS AND MOTION TO DISMISS CERTAIN
        COUNTERCLAIMS, and RULINGS OF THE COURT




------------------------------------------------------
             CHANCERY COURT REPORTERS
            New Castle County Courthouse
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                  (302) 255-0522

54

1   course, if necessary.

2                   What this means, from my standpoint,

3   is that I think that the amount of the reasonable

4   reserve for claims going forward, given the fact that

5   I am granting the motion for judgment on the pleadings

6   on Count I and staying Counts II and III, the

7   reasonable reserve is approximately zero.  What I will

8   allow is a reserve equal to the amount that has been

9   incurred for attorneys' fees and expenses to date

10  relating to the plaintiff's claims in this litigation.

11  I think it's pretty clear under Section 4.4 of the

12  agreement, which is a broad indemnification right,

13  that those fees are likely to be indemnifiable and

14  that certainly they were advanceable based on the

15  allegations in the complaint.  So I will allow a

16  deduction for those fees incurred to date.

17                  Otherwise, judgment is entered in

18  favor of the plaintiff on the pleadings declaring that

19  they have a right to 25 percent of the cash currently

20  held by HLA plus 25 percent of the preferential

21  distribution in the amount of approximately

22  6.083 million that was distributed previously by HLA

23  caused by Lyrical under the clawback agreement and the

24  allocation agreement.

55

1           I will leave it to the parties to

2    figure out what that amount is.  If for some reason

3    you can't do that, you can submit specific and

4    targeted letter submissions to me telling me what the

5    dispute is over those numbers.

6           Since I've already touched on next

7    steps a little bit, I will tell you that what I'm not

8    going to do is I'm not going to enter this as a Rule

9    54(b) judgment so that Finger Lakes can go ahead and

10   collect on its distribution.  As I am going to

11   explain, I do think that there are viable claims here

12   as to the allocation agreement and the clawback

13   agreement.  I think it makes sense that any claims

14   that the defendants would have on those agreements

15   would be potentially setoffs against amounts that they

16   could owe or, under the more equitable term,

17   potentially recoupments.  I think there is some

18   legitimate concern that if these amounts were paid

19   out, they could be distributed and Finger Lakes would

20   essentially be left as a shell entity.

21           Given that this is really a two-party

22   dispute between the principals of Lyrical and the

23   principals of Finger Lakes, I think that the just

24   approach is to effectively balance the parties.  In

65

1                        CERTIFICATE

2

3                I, DEBRA A. DONNELLY, RMR, CRR,

4     Official Court Reporter for the Court of Chancery of

5     the State of Delaware, do hereby certify that the

6     foregoing pages numbered 3 through 64 contain a true

7     and correct transcription of the proceedings as

8     stenographically reported by me at the hearing in the

9     above cause before the Vice Chancellor of the State of

10    Delaware, on the date therein indicated.

11                IN WITNESS WHEREOF I have hereunto set

12    my hand at Wilmington, Delaware, this 3rd day of

13    February, 2015.

14

15

16                /s/ Debra A. Donnelly
                  ----------------------------
17                Debra A. Donnelly, RMR, CRR
                  Official Chancery Court Reporter
18                  Registered Merit Reporter
                    Certified Realtime Reporter
19

20

21

22

23

24

CHANCERY COURT REPORTERS

# Exhibit D

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,      :
                                         :
              Plaintiff/                 :
              Counterclaim Defendant,    :
                                         :
        v                                : Civil Action
                                         : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and       :
LYRICAL OPPORTUNITY PARTNERS, L.P.,      :
                                         :
              Defendants/                :
              Counterclaim Plaintiffs.   :

                              – – –

                         Chancery Courtroom No. 12B
                         New Castle County Courthouse
                         500 North King Street
                         Wilmington, Delaware
                         Monday, June 15, 2015
                         9:15 a.m.

                              – – –

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                              – – –


                TRIAL TRANSCRIPT – VOLUME I


-----------------------------------------------------------
                 CHANCERY COURT REPORTERS
                 New Castle County Courthouse
             500 North King Street – Suite 11400
                 Wilmington, Delaware 19801
                      (302) 255-0523

J. Keswin - Cross                    100

1          Q.          This e-mail from Mr. Gage to you has a

2    listing from Mr. Mehta of the clawback; right?  It's

3    on LLP -- it's actually an unmarked attachment.  It's

4    the last page in this e-mail chain.

5          A.          I'm sorry.  The question was what?

6          Q.          This e-mail from Mr. Gage to you

7    forwards a summary about the clawback from Mr. Mehta;

8    right?

9          A.          Evidently, yes.

10         Q.          Yes.  It's regarding, among other

11   things, the clawback; right?

12         A.          It is.

13         Q.          Yes.  Mr. Mehta's e-mail that Mr. Gage

14   forwards to you shows the total clawback (current),

15   doesn't it?

16         A.          I know this e-mail -- okay.  It -- it

17   purportedly shows the full clawback, yes.

18         Q.          Yes.  On the last page.  There's a

19   line "Total Clawback (Current)"; do you see it?

20         A.          I see it.

21         Q.          It's the same number again,

22   6,083,886.00; right?

23         A.          I see that.

24         Q.          Now, the document has a note for that

J. Keswin – Cross                    101

1   notation, note (f).  Do you see it?

2          A.         Yes.

3          Q.         Yes.  It says the total clawback is

4   983,886.  It says debt clawback, and then it specifies

5   what it's for, Canandaigua debt and equity; right?

6          A.         I see that.

7          Q.         Right.  Canandaigua debt, Canandaigua

8   equity, and it's 983 that you gave to Lyrical to cover

9   the LMMO loss; right?

10         A.         Sure.

11         Q.         Right.  Then it has a note (d).  Do

12  you see that?

13         A.         I do.

14         Q.         "All other Debt ... due back from FLDP

15  and Tiber ... not included as potential FLCP

16  Investment Portfolio Clawback ..."; right?  Do you see

17  that?

18         A.         I do now, yes.

19         Q.         Right.  Right.  Only two exceptions,

20  which we've both talked about; right, sir?

21         A.         So I have no memory of seeing this

22  contemporaneously, although I see the exchange here

23  that Ted did send it to me and to Dan and cc'd Jeff

24  Moses.

J. Keswin - Cross                                102

1          Q.          You saw it during your deposition,
2    didn't you, sir?
3          A.          I don't recall.  Perhaps.
4          Q.          You didn't discuss this with Ted Gage
5    to prepare for your litigation?
6          A.          I'm sorry?
7          Q.          You didn't discuss this document with
8    Mr. Gage to prepare for this deposition?  I'm sorry,
9    for this trial?
10         A.          I did not.
11         Q.          Okay.  Now, this e-mail says
12   specifically, also -- specifically, in written
13   language -- that "Personal loan for Jeff Keswin not
14   included."  Right?  In the clawback.
15         A.          So what I was going to say is this
16   e-mail, this schedule, is a copy of the previous one,
17   except in this case, FLCP -- or I'll say Zubin -- has
18   inserted all of these footnotes that weren't extant in
19   the first one.
20         Q.          Uh-huh.  Right.
21         A.          So I know that I never saw these
22   footnotes or reviewed these footnotes prior to this
23   litigation.
24         Q.          I'm sorry.  Is your testimony that you

J. Keswin - Cross                          103

1  didn't have these notes when Mr. Gage sent this to you

2  in 2009?  Is that what you're saying?

3          A.        That's not my testimony.

4          Q.        Okay.  So you did have all of these

5  notes five years -- yeah, six years ago; right?

6          A.        I believe this e-mail -- evidently

7  this e-mail was sent to Ted.  Ted sent it to me.  It

8  is certainly on my server.

9          Q.        Both you and --

10         A.        I did not -- I never saw these notes,

11 and I never agreed to these notes.

12         Q.        That's fine.

13         A.        They were made up subsequent to the

14 agreement.

15         Q.        Whether you agree or disagree today in

16 court, sir, is not my question.  Six years ago, six

17 years ago, you received them; right?

18         A.        Yes.

19         Q.        Yes.  And your chief financial officer

20 received them?

21         A.        Yes.

22         Q.        Good.  So let's talk about what they

23 say, first, six years ago.  Contemporaneously.

24 Mr. Mehta said, quite specifically, loan to GSZM from

309

| | | |
|---|---|---|

1                          INDEX

2    DEFENDANT'S WITNESSES      Direct    Cross     Redr.     Recr.

3    Jeffrey Keswin              4         47       --        --
     V. Zubin Mehta            163        242
4

5                              -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 151 of 282

# EXHIBIT D

| | |
|---|---|
| **From:** | Zubin Mehta <mehta@flcpartners.com> |
| **Sent:** | Monday, May 24, 2010 2:19 PM |
| **To:** | Daniel Deserio |
| **Subject:** | FW: Summary |
| **Attachments:** | FLCP I Capitalization 10-20-09.xls |

Dan – See the attached schedule which'll clear up the overall situation for you.

Best,
Zubin

*** PLEASE NOTE CHANGE OF ADDRESS ***

============================
Zubin Mehta
FLC Partners LLC
621 West 51st Street, Suite 3E
New York, NY 10019
(212) 502-1102
(201) 221-8224 (F)
mehta@flcpartners.com
============================

**From:** Zubin Mehta
**Sent:** Tuesday, October 20, 2009 5:44 PM
**To:** Ted Gage
**Cc:** Shalov, Gregory; Shalov, Barry D.
**Subject:** Summary

Ted,

Thank you for taking the time to sit down with me on Thursday.  As a follow up to our meeting, I wanted to summarize our understanding of things going forward and put down a plan of attack with respect to how things will work between us going forward, to make sure the lines of communication stay open and that we avoid any further misunderstandings.

(1) I'll plan on sending you a bi-weekly update on any key developments on the overall FLCP Investment portfolio.  In addition to this, I'll continue to send any key or noteworthy developments as they occur on a real-time basis.
(2) FLDP
    a. FLDP is currently in default with respect to both the LMMO Note and the Other Investors in FLDP
    b. Both Portadam and Tiber are in default on their loans to FLDP as both underlying operating businesses have been impacted by the overall global economic climate
    c. FLDP (in conjunction with FLCP as the Manager of KLA and SLA) is working with Portadam and Tiber to put in place plans focused on protecting the principal balances of the FLDP loans to both Portadam and Tiber, with the ultimate goal of paying back the principal and interest as soon as practical (both through underlying operations and eventual sale of the businesses)
    d. FLDP recognizes LMMO's position that their Note is in a Senior Position to the other investors
    e. Going forward, FLDP will pay all proceeds into FLDP towards LMMO's 17% interest payment first.  If in any year, there is excess cash generated by FLDP, it will go to pay down the principal balance of the LMMO Note.  If in any year, there is a shortfall towards the 17% accrued interest towards LMMO, the unpaid interest amount will accrue and carry over as interest to be paid the following year
    f. FLDP's goal is to work with Portadam and Tiber to pay down the principal balances of the FLDP Notes to each business over time.  FLDP's goal is and has always been to protect principal balances of its loans to the FLCP portfolio businesses

   g.  The LMMO Note currently has a principal balance of $3,500,000.00 and the Other investors currently have an aggregate principal balance of $925,000.00.
(3) RAI
   a.  At present, FLCP will work with RAI to grow the business and will provide LOP with updates and developments as they occur and on a bi-weekly basis as noted above
   b.  FLCP will assist RAI and trying to bring in additional investors to fund the operating losses at RAI going forward (provided you are ok with this, as it needs to be discussed with Jeff)
   c.  RAI recently raised another $250,000.00 in Common Stock from one of its original investors and believes confidently that it'll be able to raise another $500,000.00 in Common Stock in the near future.
(4) Revolabs
   a.  The overall operating business continues to perform very strongly after a tough Q4 of 2008 and Q1 of 2009.  The business did just over $1.2 MM in September of 2009 and is expecting to end the year between $1.375 MM and $1.5 MM.  Overall, with GS taking over Global sales and the continued focus on new product development and manufacturing, the business expects to be at $1.7 MM to $3.0 MM at some point in the next 9-12 months (assuming no other catastrophic intervention – economic or otherwise).
   b.  Revolabs recently received an inquiry from Shure to outright buy the Revolabs business.  They had indicated a preliminary range of $30 to $50 MM.  In discussing this with Bankers (Centerview, GCA Savvian), the current belief is that getting them to stretch to $100 MM would be tougher now and make more sense if we track at or near what the business is expecting to do over the next 6-9 months.  As such, the business strategically kept Shure in the discussion while at the same time indicating that their initial valuation numbers were significantly lower than what the business was worth today – without providing any information to Shure at the present time.  It is currently FLCP and Revolabs expectation that we'll have a very strong 6-9 months and that we'll be in a very good position to sell the business in the next 12 to 18 months (barring the same interventions as stated above).  Both Centerview and GCA agree with the strategy going forward and believe strongly that we'll be in a position to sell the business during that timeframe for values between $100 and $150 MM and potentially north of there.  FLCP, however, will continue to drive the business forward and is not looking to sell until it can comfortable get to a valuation well north of $100 MM.
   c.  Overall, the market is very hot right now as Cisco has made a number of big acquisitions last year, Shure has expressed their outright desire to acquire us and there are numerous strong strategic fits and buyers for Revolabs.  Beyond this, we continue to be the only company focused on this space and our new products and soon to be launched product in the coming months will only further our standing as a strong strategic asset.


Overall, while LOP and Jeff are disappointed by FLCP's current results and our investment portfolio's performance, we believe strongly that we'll be able to provide a strong overall return to LOP and that while we may have not gotten there with the original intended path, we believe our returns on our overall portfolio will likely be north of the gross 3x we had always intended and expected to deliver for LOP at the time we hooked up with Jeff and LOP.  As a further basis for this, please see the attached spreadsheet that describes our current portfolio.  Lastly, if you could please confirm receipt and that this works for you and LOP, that would be great – short of that, we are going to do everything in our power to ensure we get LOP and Jeff a strong overall return on the FLCP Investment portfolio.

If you have any questions, please do not hesitate to contact me.

Best,
Zubin




============================

Zubin Mehta
Managing Partner
Finger Lakes Capital Partners LLC
400 West 22nd Street, Suite 2R
New York, NY 10011
(212) 502-1102
(201) 221-8224 (F)
mehta@flcpartners.com

**FLCP Invested Capital**

($000's)

| Total FLCP Portfolio (Equity) | LOP | JK/LP/LMMO | LOP&Family Subtotal | FLCP/Other | Total |
|---|---|---|---|---|---|
| Seneca Lake Acquisition LLC (Tiber) | 2,951,802.33 | 376,468.13 | 3,328,270.46 | 23,531.87 | 3,351,802.33 |
| Keuka Lake Acquisition LLC (Portadam) | 3,950,000.00 | 0.00 | 3,950,000.00 | 50,000.00 | 4,000,000.00 |
| Honeoye Lake Acquisition LLC I&II (Revolabs) | 4,600,000.00 | 0.00 | 4,600,000.00 | 2,600,000.00 | 7,200,000.00 |
| Canandaigua Lake Acquistion LLC (Performance) | 2,450,000.00 | 0.00 | 2,450,000.00 | 50,000.00 | 2,500,000.00 |
| Owasco Lake Acquisition LLC | 1,949,000.00 | 0.00 | 1,949,000.00 | 461,000.00 | 2,410,000.00 |
| Total Invested Equity | 15,900,802.33 | 376,468.13 | 16,277,270.46 | 3,184,531.87 | 19,461,802.33 |
| Plus:  FLDP Clawback *(a)* | 983,886.00 | 0.00 | 983,886.00 | 0.00 | 983,886.00 |
| Plus:  CLA Debt Clawback *(b)* | 2,650,000.00 | 0.00 | 2,650,000.00 | 0.00 | 2,650,000.00 |
| Total Invested Equity + Clawback | 19,534,688.33 | 376,468.13 | 19,911,156.46 | 3,184,531.87 | 23,095,688.33 |
| *Memo:* | | | | | |
| Total Invested Equity (Current) | 13,450,802.33 | 376,468.13 | **13,827,270.46** | 3,134,531.87 | 16,961,802.33 |
| Total Clawback (Current) *(f)* | 6,083,886.00 | 0.00 | **6,083,886.00** | 50,000.00 | 6,133,886.00 |
| Subtotal *(c)* | 19,534,688.33 | 376,468.13 | **19,911,156.46** | 3,184,531.87 | 23,095,688.33 |
| **Total FLDP & Bridge Loan Portfolio (Debt/Other)  *(d)*** | | | | | |
| Canandaigua Lake Acquistion LLC (Debt) | 1,600,000.00 | 1,050,000.00 | 2,650,000.00 | 550,000.00 | 3,200,000.00 |
| FLDP (LOP&LMMO Debt) | 250,000.00 | 3,400,000.00 | 3,650,000.00 | 925,000.00 | 4,575,000.00 |
| LOP Tiber Bridge Loan | 500,000.00 | 0.00 | 500,000.00 | 0.00 | 500,000.00 |
| Total Invested Debt | 2,350,000.00 | 4,450,000.00 | 6,800,000.00 | 1,475,000.00 | 8,275,000.00 |
| **Other** | | | | | |
| Jeff Keswin Loan to GS/ZM *(e)* | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 400,000.00 |
| Total Other Debt | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 400,000.00 |

Notes:

*(a) As part of PT and CLA Loss, FLCP Agreed to assume LMMO loss of $983,886.00 in the FLCP Investment Portfolio Clawback*

*(b) As part of PT and CLA Loss, FLCP Agreed to assume CLA Debt loss of $2,650,000.00 in the FLCP Investment Portfolio Clawback*

*(c) Subtotal of $19,911,156.46 is equal to total maximum pool available for FLCP Investment Portfolio Clawback*

*(d) All other Debt (FLDP and LOP Tiber Bridge Loans) are due back from the FLDP and Tiber and are not included as potential FLCP Investment Portfolio Clawback (with the exception of LMMO loss in PT of $983,886.00 and CLA Debt of $2,650,000.00)*

*(e) Loan to GS/ZM from Jeff Keswin is not included in FLCP Investmet Portfolio Clawback and is due back to JK from GS and ZM out of their carried interest from FLCP Investment Portfolio*

*(f) The Total Clawback (Current) includes FLDP Clawback of $983,886.00, The CLA Debt Clawback of $2,650,000.00 and the CLA Equity of $2,450,000.00*

INDEX NO. 156356/2015

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit RECEIVED NYSCEF: 09/01/2015
document 1    Pg 155 of 282

# EXHIBIT E

Page 1

1                        GREGORY SHALOV

2    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3       FINGER LAKES CAPITAL            )
                                        )
4       PARTNERS, LLC,                  )
                                        )
5                        Plaintiff,     )
                                        )
6          v.                           )   C.A. No. 9742-VCL
                                        )
7       HONEOYE LAKE ACQUISITION,       )
        LLC, and LYRICAL                )
8       OPPORTUNITY PARTNERS, L.P.,     )
                                        )
9                        Defendants.    )

10

11            Contians Confidential Portions

12            DEPOSITION OF GREGORY SHALOV

13                 New York, New York

14               Monday, April 27, 2015

15

16

17

18

19

20

21

22

23      Reported by:

24      KATHY S. KLEPFER, CSR, RMR, RPR, CRR, CLR

25      JOB NO. 92887

Contains Confidential Portions

Page 162

GREGORY SHALOV

1
2 business, aren't you?
3    A.   Yes.
4    Q.   And Zubin has the ability to bind you,
5 doesn't he?  At least to bind FLCP, doesn't he?
6    A.   Yes, he does.
7    Q.   So when he sends these e-mails out,
8 you understand that he has the ability to bind
9 FLCP, don't you?
10    A.   Yes, I do.
11    Q.   And you understand that he represents
12 FLCP when he's sending such e-mails out?
13    A.   Yes, I do.
14    Q.   As one of the managing members, right?
15    A.   I do understand that, yes.
16    Q.   So you understood that this
17 representation, if it were false, would be
18 coming from FLCP, not just Zubin, Mehta, and
19 that you, Mr. Shalov, as a half-owner of that
20 entity, would have equal responsibility for such
21 misrepresentations, do you not?
22       MR. COHEN:  Object to the form.
23    A.   I think I understand what you just
24 said, so yes.
25    Q.   And you did nothing to correct it?

Page 163

GREGORY SHALOV

1
2    A.   Not that I'm aware of, and I don't
3 have those e-mails, so...
4    Q.   You say, "One thing that we would like
5 to discuss with you is the sharing mechanism
6 with the LPs that we negotiated some time back."
7       What are you referring to?
8       MR. COHEN:  Object to the form.
9    A.   Again, I do not know.
10    Q.   You're sending over the PT and PD
11 budgets; do you see what those are?
12    A.   I would assume "PT" stands for
13 Performance Trailers and "PD" stands for
14 Portadam.
15    Q.   All right.  And you were doing that
16 also because under the term sheet you were to
17 keep him periodically informed as to the
18 investments; isn't that right?
19       MR. COHEN:  Object to the form.
20    A.   No, that would not be correct.  I
21 believe that he is entitled, as all members of
22 the LLC are, to updates on the underlying
23 companies.
24    Q.   And are they also entitled to the 2004
25 budget for FLCP?

Page 164

GREGORY SHALOV

1
2    A.   Not under those documents.
3    Q.   Under what documents are they entitled
4 to that?
5       MR. COHEN:  Object to the form.
6    A.   There are none.
7    Q.   Why should you share your budget with
8 Mr. Keswin?
9    A.   Again, I can't answer that.  I don't
10 know.
11       MR. AMINI:  All right.  Let's take a
12 quick break.  If we're going to eat lunch,
13 we might as well do it.
14       THE VIDEOGRAPHER:  The time is 1:16
15 p.m.  We're going off the record.
16       (Luncheon recess.)
17
18
19
20
21
22
23
24
25

Page 165

GREGORY SHALOV
AFTERNOON SESSION

1
2
3       THE VIDEOGRAPHER:  The time is 2:04
4 p.m.  We're back on the record, video number
5 4.
6 GREGORY SHALOV, resumed and
7    testified further as follows:
8 EXAMINATION BY (Cont'd.)
9 MR. AMINI:
10    Q.   I want to ask you a couple of things
11 about the most recent companies you said that
12 you were engaged in, JumpHawk and Nourish
13 Snacks.  That's what I understood them to be.
14    A.   Correct.
15    Q.   And is that through FLCP?
16    A.   Nourish -- Nourish Snacks was a
17 different investor, asked us to monitor that for
18 him, and we did do it through FLCP on that part
19 of the investment with -- now, though, we are --
20 directly -- "employed" would be the wrong word
21 because I don't have a W-2, but I guess we are
22 directly employed with Nourish Snacks.  And then
23 Generate Holding has nothing to do with FLCP.
24    Q.   So you're in -- you're employed with a
25 W-2 by Generate Holdings -- Holding?

42

Contains Confidential Portions

---

Page 274

GREGORY SHALOV

1
2    Q.    In 2008, you decided -- you went to
3    Mr. Keswin with yet another one of your
4    investments, this time Rethink Autism?
5        A.    That is correct.
6        Q.    You called this one Oswega [sic] Lake
7    Acquisition, or OLA?
8            MR. COHEN: It's Owasco, O-W --
9            MR. AMINI: Owasco.  Yes, I'm not good
10   with this.  They're all part of the Finger
11   Lakes.
12           MR. COHEN: For the court reporter,
13   O-W-A-S-C-O.
14       A.    That's correct.
15       Q.    And you were asking him to put up
16   $1,949,000 for yet another investment the two of
17   you had found, correct?
18       A.    That's correct.
19       Q.    Which you were hoping to manage,
20   correct?
21       A.    That is correct.
22       Q.    And from which you would get
23   management fees and a 25 percent or 18.75
24   percent, depending on what version we're working
25   with, upside --

---

Page 275

GREGORY SHALOV

1
2            MR. COHEN: Objection.
3        Q.    -- on the carry, right?
4            MR. COHEN: Objection.
5        A.    You're correct on the carry.  There
6    were no management fees at Rethink until I
7    started a full-time position there.  So we
8    weren't anticipating any.
9        Q.    And in response, this was when Mr.
10   Keswin said, okay, but guys, it's time to
11   document the clawback, didn't he?
12           MR. COHEN: Objection.
13       A.    Not to my recollection.
14           (Shalov Exhibit 22, an e-mail chain
15   with attachment bearing Bates Nos.
16   LOP00003985 through 3986, marked for
17   identification, as of this date.)
18   BY MR. AMINI:
19       Q.    To put it in perspective for you, and
20   to cut through it, Mr. Shalov, the million-949
21   was funded on April 9, 2008, for Rethink Autism.
22           I'm just telling you that from the
23   documents we have.  I don't need to spend my
24   time going through those.
25       A.    Okay.  I have no reason not to believe

---

Page 276

GREGORY SHALOV

1
2    you.
3        Q.    So, on the day before --
4        A.    Uh-huh.
5        Q.    -- here's an e-mail from Mr. Mehta to
6    Mr. Moses with a CC to Mr. Keswin?
7        A.    Uh-huh.
8        Q.    I assume you're aware of this e-mail?
9        A.    Yes, I am.
10       Q.    I assume that Mr. Mehta's undertaking
11   in this e-mail binds both himself, Finger Lakes,
12   and you, as far as you know?
13       A.    As far as I know.
14       Q.    It says right here, "Per the attached
15   schedule, FLCP and its two managing members,
16   Gregory Shalov and Zubin Mehta, are agreeing
17   that FLCP's entire investment portfolio is
18   subject to clawback." Do you see that?
19       A.    Yes, I do.
20       Q.    Isn't that what you agreed to on that
21   date?
22       A.    It is what we promised.
23       Q.    You had already made that promise to
24   him several times since at least 2005?
25       A.    That's correct.

---

Page 277

GREGORY SHALOV

1
2        Q.    And now he wanted an e-mail?
3        A.    No, Jeff Moses wanted it scheduled
4    out.  This is to Jeff Moses.
5        Q.    Okay.
6        A.    Not to Jeff Keswin.  He actually asked
7    because he didn't quite understand what all the
8    investments were.
9        Q.    And he wanted -- and Jeff Moses wanted
10   it documented?
11       A.    He wanted it scheduled.
12       Q.    Right.
13       A.    As to what the investments were.
14       Q.    And that was -- Jeff Moses was one of
15   Lyrical's people, correct?
16       A.    Yes.
17       Q.    He worked for Jeff Keswin?
18       A.    As far as I understand it, yes.
19       Q.    He still does, as far as you
20   understand?
21       A.    I have no idea.
22       Q.    And Mr. Moses said, fine, but I want
23   the schedule and I want to see what it is that's
24   included?
25       A.    He said he would like to see what was

---

70

Contains Confidential Portions

Page 361

1                    GREGORY SHALOV

2

3                    CERTIFICATE

4    STATE OF NEW YORK )

                                :  ss

5    COUNTY OF NEW YORK)

6        I, Kathy S. Klepfer, a Registered

7    Merit Reporter and Notary Public within and

8    for the State of New York, do hereby

9    certify:

10       That GREGORY SHALOV, the witness whose

11   deposition is herein before set forth, was

12   duly sworn by me and that such deposition is

13   a true record of the testimony given by such

14   witness.

15       I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage and that I am in no way

18   interested in the outcome of this matter.

19       In witness whereof, I have hereunto

20   set my hand this 4th day of May, 2015.

21

22   ---------------------------------------

             KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

# Exhibit E

**EFiled: May 22 2015 01:29PM EDT**
**Transaction ID 57284185**
**Case No. 9742-VCL**

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION, LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) | PUBLIC VERSION FILED MAY 22, 2015 |
| Defendants. | ) ) | |

### DEFENDANT LYRICAL OPPORTUNITY PARTNERS L.P.'S OPENING PRE-TRIAL BRIEF

OF COUNSEL:
Bijan Amini
John W. Brewer
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
Facsimile: 212.490.4208
Email: bamini@samlegal.com
Email: jbrewer@samlegal.com

SMITH KATZENSTEIN &
JENKINS LLP
David A. Jenkins (ID No. 932)
800 Delaware Avenue, Suite 1000
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Telecopy: 302-652-8405
Email: Djenkins@skjlaw.com

*Attorneys for Defendants*

May 15, 2015

C.    Other Miscellaneous Relief.

Shalov and Mehta personally guaranteed a $400,000 loan that Keswin made to FLCP, which has never been repaid.  After a variety of earlier statements indicating that this loan balance would be subject to the Clawback Agreement, Mehta stated in the schedule attached to an e-mail dated October 20, 2009 that: "Loan to [Shalov/Mehta] from Jeff Keswin is not included in FLCP Investment Portfolio Clawback and is due back to [Keswin] from [Shalov] and [Mehta] out of their carried interest from FLCP Investment Portfolio".    (Mehta Exh. 39; LOP00001014.)    The most straightforward and equitable resolution of this separate issue is for $400,000 of the amount, if any, that would otherwise be due to FLCP from the Revolabs proceeds to be reallocated to Lyrical, which will assure that it is properly allocated to Mr. Keswin.[14]

---

[14]    Mr. Keswin will execute any reasonable documentation to confirm that payment to Lyrical will be deemed payment to him so that FLCP and its guarantors will not face a double exposure.   As with the Lyrical debt investments directly subject to the Clawback Agreement, no claim is made

for the very substantial amount of unpaid interest in arrears, only the lost
principal amount of the loan.

FILED: NEW YORK COUNTY CLERK 06/24/2015 07:45 PM
INDEX NO. 156356/2015
NYSCEF DOC. NO.
16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 164 of 282
RECEIVED NYSCEF: 06/24/2015

# EXHIBIT E

Page 1

1                    GREGORY SHALOV

2  IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3     FINGER LAKES CAPITAL            )

                                      )

4     PARTNERS, LLC,                  )

                                      )

5                    Plaintiff,       )

                                      )

6         v.                          )  C.A. No. 9742-VCL

                                      )

7     HONEOYE LAKE ACQUISITION,       )

      LLC, and LYRICAL               )

8     OPPORTUNITY PARTNERS, L.P.,    )

                                      )

9                    Defendants.     )

10

11          Contians Confidential Portions

12          DEPOSITION OF GREGORY SHALOV

13               New York, New York

14             Monday, April 27, 2015

15

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, CSR, RMR, RPR, CRR, CLR

25     JOB NO. 92887

Contains Confidential Portions

---

Page 258

GREGORY SHALOV

1
2    A.   I remember that he asked for X percent
3   of all management fees, Y percent of profits.
4   He then -- he took both sides of two separate
5   things and wanted the best of every world and
6   put it forth to us and didn't recall any of the
7   other side to anything.  It was a $3-plus
8   million difference.
9    Q.   So he wanted what you had agreed to in
10  the term sheet, which, as you said, you and Mr.
11  Mehta decided on April 13, 2004, was superseded
12  and over?
13       MR. COHEN:  Objection.
14    A.   I didn't hear the question.  I'm
15  sorry.
16    Q.   What you're saying is, from what I
17  heard your last answer, is that Mr. Keswin
18  wanted to enforce the terms of the term sheet
19  which you and Mr. Mehta had decided on April 13,
20  2004, was no longer effective?
21       MR. COHEN:  Objection.
22    A.   He enforced something that we hadn't
23  heard of in over ten years.
24    Q.   That's right, but every time it had
25  come up, you hadn't bothered to say that it

---

Page 259

GREGORY SHALOV

1
2   wasn't really an agreement, because we've seen
3   those e-mails already.
4        MR. COHEN:  Objection.
5    Q.   You just kept quiet?
6    A.   No, that's not true.
7        MR. COHEN:  Objection.
8        Just give me a chance to object so
9   that we don't talk over each other.
10       MR. AMINI:  Don't worry about it, Dan.
11  I'm not going hold you like you missed it.
12  I don't do that.  My witnesses do the same
13  thing.  I'll give it to you that you can
14  have your objection.
15       MR. COHEN:  It's the court reporter
16  I'm trying to help out.
17       MR. AMINI:  I understand.  Not to
18  worry.  Even I don't have that relationship.
19       (Shalov Exhibit 19, an e-mail with
20  attachment bearing Bates Nos. LOP00015427
21  through 15431, marked for identification, as
22  of this date.)
23       MR. COHEN:  So the court reporter
24  can't take everyone down at once.  That's
25  why I would like to just object if I have an

---

Page 260

GREGORY SHALOV

1
2   objection before you talk, not
3   simultaneously.
4        THE WITNESS:  Don't worry.  You only
5   have to tell me 500 times.
6   BY MR. AMINI:
7    Q.   Is that your signature on Shalov
8   Exhibit 19?
9    A.   I have no reason to believe it is not.
10   Q.   And you borrowed this million dollars
11  from him, didn't you?
12   A.   No, we did not.
13   Q.   What do you mean, "no, we did not"?
14   A.   If this is the same one, we only
15  borrowed $400,000 of it.  Am I missing -- is
16  this not the same note you just showed me?
17   Q.   I don't know if it is or not.  You can
18  look at the two.  I mean, I don't -- you know,
19  it would appear to be, if you ask me.
20   A.   If it is, then the answer is actually
21  not.  We only borrowed $400,000 of it.
22   Q.   So you only took down $400,000 of this
23  amount?
24   A.   That's correct.
25   Q.   And you have never paid it back,

---

Page 261

GREGORY SHALOV

1
2   right?
3    A.   That's correct.
4    Q.   And when asked about it, you said you
5   just didn't have it to pay it back for at least
6   a few years, right?
7    A.   No.
8    Q.   No?  You think Mr. Keswin just forgot
9   about it?
10   A.   I don't know what Mr. Keswin did.  I'm
11  not him.
12   Q.   Well, what about you?  Did you forget
13  about it?  Did you ever say to him, you know, we
14  still owe you that 400 grand?
15   A.   I don't think so.
16   Q.   No?  You didn't feel any obligation to
17  point it out to him if he wasn't going to
18  remember it?
19       MR. COHEN:  Objection.
20   Q.   Is that what your attitude was between
21  the two of you?
22       MR. COHEN:  Objection.
23   A.   No, like I stated to you, I had every
24  intention to pay back his $400,000 plus
25  interest.

Contains Confidential Portions

---

Page 266

GREGORY SHALOV

2  Q.  Where did you ever mention it to them
3  that you weren't going to give them the $400,000
4  back, the 440 that you owed or the 880 that the
5  two of you owed?
6  A.  I don't know when we mentioned it.
7  Q.  Did you ever say it to them?
8  MR. COHEN:  Objection.
9  A.  I don't know.  I don't recall.
10  Q.  Did you and Zubin talk about the fact
11  that maybe they forgot about this?
12  MR. COHEN:  Objection.
13  A.  No.
14  Q.  You'll admit that you should have
15  declared it on your 2013 returns?
16  MR. COHEN:  Objection.
17  A.  Yes.
18  Q.  And you'll admit that you haven't?
19  A.  Yes.
20  Q.  And you'll admit that you know that
21  fact, don't you?
22  MR. COHEN:  Objection.
23  A.  Now I do.
24  Q.  You didn't know that until today?
25  A.  I didn't.  I honestly didn't think

---

Page 267

GREGORY SHALOV

2  about it.  I just thought I was going to put it
3  on 2014.
4  Q.  Today is the first day, right?
5  A.  Today is what?
6  Q.  Today is the first day that you
7  thought about it?
8  A.  I thought what year on my tax returns
9  I put it on?
10  Q.  Right.  Right.
11  A.  Yes, it didn't occur to me that I
12  should have put it on 2013 or '14.
13  Q.  And I -- sorry.  I still have to go
14  back to this.  As of January 2014, you had every
15  intention of paying this back?
16  A.  Yes, I did.
17  Q.  It was only when Ted Gage sent his
18  funds flow to you where you said, that's it, I'm
19  not paying this guy back?
20  A.  That's correct.
21  Q.  But until that moment, you had every
22  intention of paying him back?
23  A.  That is correct.
24  Q.  And you listed it, did you not, on
25  some of your, you know, outstanding amounts owed

---

Page 268

GREGORY SHALOV

2  to, you know, part of, quote, Lyrical's
3  investments at various times, didn't you?
4  A.  I don't know.
5  Q.  Didn't you say at some point that that
6  $400,000 would have to come out of your carried
7  interest?
8  A.  I'm not disputing.  I said I don't
9  know.  I don't remember.
10  Q.  Didn't you at some point represent to
11  Mr. Keswin that the $400,000 wouldn't even come
12  off the top; it would actually come out of your
13  carried interest?
14  A.  I think that's what it says in here.
15  Q.  Right, but I'm -- I'm saying it's not
16  a part of the clawback at this point; it's
17  actually an individual debt of yours and Mr.
18  Mehta's that you were going to pay once you got
19  your carried interest?
20  A.  It's actually not an individual debt.
21  It's a debt from Finger Lakes Capital Partners.
22  Q.  I understand that, but you both signed
23  for it personally?
24  A.  No, we guaranteed it personally.
25  Q.  Right.  And you guaranteed your

---

Page 269

GREGORY SHALOV

2  interest in these -- Finger Lakes' interest in
3  these entities for it?
4  A.  Yes.
5  Q.  And you said to Mr. Keswin, in words
6  or substance, at some point in time prior to the
7  HLA deal that you would pay him back from your
8  carried interest, not -- did you not?
9  A.  Yes, that's what it says in here.
10  Q.  Right.  No.  No.  I'm saying that
11  subsequent to this note, you would have said it
12  to him, didn't you?
13  A.  Sure.  At some point, I must have.
14  Q.  Right, because you didn't have the
15  money until you got carried interest; isn't that
16  right?
17  A.  That is correct.
18  Q.  So when he asked about it or Ted Gage
19  asked about it, you said to Ted, yes, we
20  understand that we owe that amount; we'll give
21  it to you when we get our carried interest?
22  MR. COHEN:  Objection.
23  A.  I don't recall having that
24  conversation, but again, I'm -- I don't know.
25  Q.  You haven't gone back and looked at

---

Contains Confidential Portions

Page 361

1              GREGORY SHALOV

2

3              CERTIFICATE

4    STATE OF NEW YORK )

                    :  ss

5    COUNTY OF NEW YORK)

6        I, Kathy S. Klepfer, a Registered

7    Merit Reporter and Notary Public within and

8    for the State of New York, do hereby

9    certify:

10       That GREGORY SHALOV, the witness whose

11   deposition is herein before set forth, was

12   duly sworn by me and that such deposition is

13   a true record of the testimony given by such

14   witness.

15       I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage and that I am in no way

18   interested in the outcome of this matter.

19       In witness whereof, I have hereunto

20   set my hand this 4th day of May, 2015.

21

22   ---------------------------------------

         KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

FILED: NEW YORK COUNTY CLERK 09/01/2015 06:53 PM          INDEX NO. 156356/2015

NYSCEF DOC. NO. 16      16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit    RECEIVED NYSCEF: 09/01/2015
                        document 1    Pg 169 of 282

# EXHIBIT E

1           GREGORY SHALOV

2   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3     FINGER LAKES CAPITAL           )
                                     )
4     PARTNERS, LLC,                 )
                                     )
5                    Plaintiff,      )
                                     )
6        v.                          )  C.A. No. 9742-VCL
                                     )
7     HONEOYE LAKE ACQUISITION,      )
      LLC, and LYRICAL               )
8     OPPORTUNITY PARTNERS, L.P.,    )
                                     )
9                    Defendants.     )

10

11         Contians Confidential Portions

12         DEPOSITION OF GREGORY SHALOV

13            New York, New York

14          Monday, April 27, 2015

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, CSR, RMR, RPR, CRR, CLR

25    JOB NO. 92887

Contains Confidential Portions

Page 162

GREGORY SHALOV

1
2  business, aren't you?
3      A.   Yes.
4      Q.   And Zubin has the ability to bind you,
5  doesn't he?  At least to bind FLCP, doesn't he?
6      A.   Yes, he does.
7      Q.   So when he sends these e-mails out,
8  you understand that he has the ability to bind
9  FLCP, don't you?
10      A.   Yes, I do.
11      Q.   And you understand that he represents
12  FLCP when he's sending such e-mails out?
13      A.   Yes, I do.
14      Q.   As one of the managing members, right?
15      A.   I do understand that, yes.
16      Q.   So you understood that this
17  representation, if it were false, would be
18  coming from FLCP, not just Zubin, Mehta, and
19  that you, Mr. Shalov, as a half-owner of that
20  entity, would have equal responsibility for such
21  misrepresentations, do you not?
22          MR. COHEN:  Object to the form.
23      A.   I think I understand what you just
24  said, so yes.
25      Q.   And you did nothing to correct it?

Page 163

GREGORY SHALOV

1
2      A.   Not that I'm aware of, and I don't
3  have those e-mails, so...
4      Q.   You say, "One thing that we would like
5  to discuss with you is the sharing mechanism
6  with the LPs that we negotiated some time back."
7          What are you referring to?
8          MR. COHEN:  Object to the form.
9      A.   Again, I do not know.
10      Q.   You're sending over the PT and PD
11  budgets; do you see what those are?
12      A.   I would assume "PT" stands for
13  Performance Trailers and "PD" stands for
14  Portadam.
15      Q.   All right.  And you were doing that
16  also because under the term sheet you were to
17  keep him periodically informed as to the
18  investments; isn't that right?
19          MR. COHEN:  Object to the form.
20      A.   No, that would not be correct.  I
21  believe that he is entitled, as all members of
22  the LLC are, to updates on the underlying
23  companies.
24      Q.   And are they also entitled to the 2004
25  budget for FLCP?

Page 164

GREGORY SHALOV

1
2      A.   Not under those documents.
3      Q.   Under what documents are they entitled
4  to that?
5          MR. COHEN:  Object to the form.
6      A.   There are none.
7      Q.   Why should you share your budget with
8  Mr. Keswin?
9      A.   Again, I can't answer that.  I don't
10  know.
11          MR. AMINI:  All right.  Let's take a
12  quick break.  If we're going to eat lunch,
13  we might as well do it.
14          THE VIDEOGRAPHER:  The time is 1:16
15  p.m.  We're going off the record.
16          (Luncheon recess.)
17
18
19
20
21
22
23
24
25

Page 165

GREGORY SHALOV
AFTERNOON SESSION

1
2
3          THE VIDEOGRAPHER:  The time is 2:04
4  p.m.  We're back on the record, video number
5  4.
6  GREGORY SHALOV, resumed and
7      testified further as follows:
8  EXAMINATION BY (Cont'd.)
9  MR. AMINI:
10      Q.   I want to ask you a couple of things
11  about the most recent companies you said that
12  you were engaged by, JumpHawk and Nourish
13  Snacks.  That's what I understood them to be.
14      A.   Correct.
15      Q.   And is that through FLCP?
16      A.   Nourish -- Nourish Snacks was a
17  different investor, asked us to monitor that for
18  him, and we did do it through FLCP on that part
19  of the investment with -- now, though, we are --
20  directly -- "employed" would be the wrong word
21  because I don't have a W-2, but I guess we are
22  directly employed with Nourish Snacks.  And then
23  Generate Holding has nothing to do with FLCP.
24      Q.   So you're in -- you're employed with a
25  W-2 by Generate Holdings -- Holding?

Contains Confidential Portions

1          GREGORY SHALOV
2     Q.   In 2008, you decided -- you went to
3     Mr. Keswin with yet another one of your
4     investments, this time Rethink Autism?
5     A.   That is correct.
6     Q.   You called this one Oswega [sic] Lake
7     Acquisition, or OLA?
8          MR. COHEN: It's Owasco, O-W --
9          MR. AMINI: Owasco. Yes, I'm not good
10    with this. They're all part of the Finger
11    Lakes.
12         MR. COHEN: For the court reporter,
13    O-W-A-S-C-O.
14    A.   That's correct.
15    Q.   And you were asking him to put up
16    $1,949,000 for yet another investment the two of
17    you had found, correct?
18    A.   That's correct.
19    Q.   Which you were hoping to manage,
20    correct?
21    A.   That is correct.
22    Q.   And from which you would get
23    management fees and a 25 percent or 18.75
24    percent, depending on what version we're working
25    with, upside --

1          GREGORY SHALOV
2          MR. COHEN: Objection.
3     Q.   -- on the carry, right?
4          MR. COHEN: Objection.
5     A.   You're correct on the carry. There
6     were no management fees at Rethink until I
7     started a full-time position there. So we
8     weren't anticipating any.
9     Q.   And in response, this was when Mr.
10    Keswin said, okay, but guys, it's time to
11    document the clawback, didn't he?
12         MR. COHEN: Objection.
13    A.   Not to my recollection.
14         (Shalov Exhibit 22, an e-mail chain
15    with attachment bearing Bates Nos.
16    LOP00003985 through 3986, marked for
17    identification, as of this date.)
18    BY MR. AMINI:
19    Q.   To put it in perspective for you, and
20    to cut through it, Mr. Shalov, the million-949
21    was funded on April 9, 2008, for Rethink Autism.
22         I'm just telling you that from the
23    documents we have. I don't need to spend my
24    time going through those.
25    A.   Okay. I have no reason not to believe

1          GREGORY SHALOV
2     you.
3     Q.   So, on the day before --
4     A.   Uh-huh.
5     Q.   -- here's an e-mail from Mr. Mehta to
6     Mr. Moses with a CC to Mr. Keswin?
7     A.   Uh-huh.
8     Q.   I assume you're aware of this e-mail?
9     A.   Yes, I am.
10    Q.   I assume that Mr. Mehta's undertaking
11    in this e-mail binds both himself, Finger Lakes,
12    and you, as far as you know?
13    A.   As far as I know.
14    Q.   It says right here, "Per the attached
15    schedule, FLCP and its two managing members,
16    Gregory Shalov and Zubin Mehta, are agreeing
17    that FLCP's entire investment portfolio is
18    subject to clawback." Do you see that?
19    A.   Yes, I do.
20    Q.   Isn't that what you agreed to on that
21    date?
22    A.   It is what we promised.
23    Q.   You had already made that promise to
24    him several times since at least 2005?
25    A.   That's correct.

1          GREGORY SHALOV
2     Q.   And now he wanted an e-mail?
3     A.   No, Jeff Moses wanted it scheduled
4     out. This is to Jeff Moses.
5     Q.   Okay.
6     A.   Not to Jeff Keswin. He actually asked
7     because he didn't quite understand what all the
8     investments were.
9     Q.   And he wanted -- and Jeff Moses wanted
10    it documented?
11    A.   He wanted it scheduled.
12    Q.   Right.
13    A.   As to what the investments were.
14    Q.   And that was -- Jeff Moses was one of
15    Lyrical's people, correct?
16    A.   Yes.
17    Q.   He worked for Jeff Keswin?
18    A.   As far as I understand it, yes.
19    Q.   He still does, as far as you
20    understand?
21    A.   I have no idea.
22    Q.   And Mr. Moses said, fine, but I want
23    the schedule and I want to see what it is that's
24    included?
25    A.   He said he would like to see what was

Contains Confidential Portions

Page 361

1                    GREGORY SHALOV

2

3                    CERTIFICATE

4     STATE OF NEW YORK )

                          :  ss

5     COUNTY OF NEW YORK)

6          I, Kathy S. Klepfer, a Registered

7     Merit Reporter and Notary Public within and

8     for the State of New York, do hereby

9     certify:

10          That GREGORY SHALOV, the witness whose

11    deposition is herein before set forth, was

12    duly sworn by me and that such deposition is

13    a true record of the testimony given by such

14    witness.

15          I further certify that I am not

16    related to any of the parties to this action

17    by blood or marriage and that I am in no way

18    interested in the outcome of this matter.

19          In witness whereof, I have hereunto

20    set my hand this 4th day of May, 2015.

21

22    --------------------------------------

             KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

FILED: NEW YORK COUNTY CLERK 08/25/2015 05:33 PM INDEX NO. 156356/2015

NYSCEF DOC. NO. 20 RECEIVED NYSCEF: 08/25/2015

# Exhibit F

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION, LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) | **PUBLIC VERSION FILED JUNE 15, 2015** |
| Defendants. | ) ) ) | |

## DEFENDANT LYRICAL OPPORTUNITY PARTNERS L.P.'S PRE-TRIAL REPLY BRIEF

OF COUNSEL:
Bijan Amini
John W. Brewer
Jaime B. Leggett
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
Facsimile: 212.490.4208
E-mail: bamini@samlegal.com
E-mail: jbrewer@samlegal.com
E-mail: jleggett@samlegal.com

SMITH KATZENSTEIN &
JENKINS LLP
David A. Jenkins (ID No. 932)
The Brandywine Building
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE 19899
Telephone: 302-652-8400
Telecopy: 302-652-8405
E-mail: Djenkins@skjlaw.com

*Attorneys for Defendants*

June 8, 2015

V.        **The Clawback Agreement Extends to Tiber, Portadam, and
FLDP, and FLCP Cannot Evade Its Principals' Express
Agreement to Repay Keswin's Personal Loan Out of
Carried Interest They Receive.**

The clearest indication of the terms of the Clawback Agreement is

found within Mehta's April 8, 2008 e-mail and its attachments. (Shalov Exh. 22.)

This e-mail provides that the clawback extends to "FLCP's entire investment

portfolio" and included within the clawback investments made by Lyrical, Keswin,

and LMMO.[16]  It does not require that losses be realized at the time of a sale of one

of the investments for the clawback to apply.  (*Id.*)  It likewise does not require

losses be realized at the time the proceeds are received from such a sale for the

clawback to apply.  (*Id.*)  Mehta later confirmed in a schedule detailing the

Clawback Agreement that the $400,000 personal loan from Keswin (for which

Keswin was granted a security interest in all of the assets of FLCP, Mehta, and

Shalov, including their rights to payment from HLA) would be repaid in full from

---

entities that FLCP characterizes as analogous to the Allocation Agreement only
because those entities would provide regular distributions to Lyrical (as opposed to
FLCP, where the parties intended to settle up once Revolabs was sold). (*See, e.g.*,
EISNER0000091.)

[16]     With respect to LMMO, the FLDP note was transferred to Lyrical in 2012.
(LOP00012618; LOP00025926.)  While FLCP argues that debt investments should
not be included in the clawback, the purpose of FLDP was to make additional
investments in the FLCP Portfolio Companies (LOP00019761), and Mehta
included Lyrical's $500,000 junior loans to Tiber in the clawback. (Mehta Exh.
38.)

14136:BRF:10287478.DOCX.1                    27

Mehta's and Shalov's carried interest as and when FLCP received such carried interest.[17]  (Mehta Exh. 39; LOP00001014.)

At the time of the March 21, 2014 Revolabs sale (as well as at the time of the February 24, 2014 takeover of the investment vehicles by Lyrical and at the time of the October 31, 2014 transfer of Portadam's equity to its subordinated lender), Portadam had no equity value, Tiber had no equity value, and it was apparent that the principal of Tiber's loan to FLDP would never be repaid.

FLCP does not attempt to claim that the investments in Tiber have a non-zero value; instead it relies solely on the claim that those losses are still "unrealized." But not only is there no requirement in the Clawback Agreement for losses to have been formally realized (particularly losses that are inevitable as an economic matter), FLCP offers no response to the overwhelming evidence that it has intentionally abused its control of Tiber (which it retains via its control of FLDP, the senior player in Tiber's capital structure) to postpone realization of those

---

[17]    FLCP does not deny that Mehta and Shalov agreed to pay the note from their share of FLCP's carried interest, and the note provides that "[i]n the event of a sale, distribution, or liquidation of any or all of the Collateral, all proceeds will go directly to the Holder until this note has been repaid in full and all accrued interest has been paid." (Shalov Exh. 19.)  FLCP likewise does not deny that such a payment could not occur unless and until FLCP actually received carried interest. Further, the note governing the loan provided a security interest to Keswin in FLCP's assets, including its carried interest and investments of HLA I, SLA, and KLA (which are in Keswin's control). (*Id.*)  This note was signed by both Mehta and Shalov (*id.*), and Shalov confirmed that he intended to repay the full $400,000 loan plus interest. (Shalov Tr. at 261:20-25.)

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 178 of 282

# EXHIBIT F

Contains Confidential Portions

1                         ZUBIN MEHTA

2    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

3       FINGER LAKES CAPITAL            )

                                        )

4       PARTNERS, LLC,                  )

                                        )

5                        Plaintiff,     )

                                        )

6          v.                           )   C.A. No. 9742-VCL

                                        )

7       HONEOYE LAKE ACQUISITION,       )

        LLC, and LYRICAL                )

8       OPPORTUNITY PARTNERS, L.P.,     )

                                        )

9                        Defendants.    )

10

11        ***(Contains confidential portion)***

12              DEPOSITION OF ZUBIN MEHTA

13                  New York, New York

14                Tuesday, April 28, 2015

15

16

17

18

19

20

21

22

23       Reported by:

24       KATHY S. KLEPFER, CSR, RMR, RPR, CRR, CLR

25       JOB NO. 92888

Page 150

```
 1              ZUBIN  MEHTA
 2   on your personal guarantees?
 3       A.   It's close to that number, $3 million.
 4   I don't know the exact amount.  Somewhere
 5   between -- well, let me take a step back.  It's
 6   somewhere between 3 and 4 in the aggregate, and
 7   the initial number may have been around 4, 4 and
 8   a half, I don't know.
 9       Q.   Okay.  Where did you get the money to
10   pay off that -- those personal guarantees?
11       A.   It was borrowed from family.
12       Q.   How much did you borrow?
13       A.   We borrowed probably 3 and a half -- 3
14   to 3 and a half million from Greg's father and
15   my father.
16       Q.   From Mr. Shalov's father and your
17   father?
18       A.   Correct.
19        (Page 151 has been designated
20   confidential and will continue on the next
21   page.)
22
23
24
25
```

Page 151

```
 1        CONFIDENTIAL - ZUBIN MEHTA
 2       Q.   Okay.  How much from your father?
 3       A.   $500,000.
 4       Q.   And how much from Greg Shalov's
 5   father?
 6       A.   Somewhere between 2 and a half and 3
 7   million dollars, I think.
 8
 9        (The non-confidential portion will
10   continue on the next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 152

```
 1              ZUBIN  MEHTA
 2       Q.   Okay.
 3        MR. COHEN:  I don't mean to interrupt.
 4   Can we just designate as confidential
 5   anything referring to the loans, the loan
 6   amounts?
 7        MR. JENKINS:  Sure.  And feel free to
 8   interrupt on this.  It's easiest to remember
 9   it at the time as opposed to going back.
10        I'm happy to keep that part of the
11   transcript confidential.  By doing this and
12   by doing the other confidentiality
13   agreements, we are not going to agree to be
14   restricted from using it at trial, if
15   appropriate.
16        MR. COHEN:  Understood.  We'll deal
17   with that.
18        MR. JENKINS:  Exactly.  But otherwise,
19   that's fine.
20        THE WITNESS:  And I believe we
21   borrowed some money from Jeff Keswin at the
22   time as well.
23       Q.   I'm sorry, you?
24       A.   We borrowed some money from Jeff
25   Keswin at the time too.
```

Page 153

```
 1              ZUBIN  MEHTA
 2       Q.   How much money did you borrow from Mr.
 3   Keswin?
 4       A.   $400,000.
 5       Q.   Have you paid that back?
 6       A.   No, we have not.
 7       Q.   Have you paid back the money that you
 8   borrowed from your father?
 9       A.   No, we have not.
10       Q.   What about the money you borrowed from
11   Gregory Shalov's father?
12       A.   No, we have not.
13       Q.   All right.  Let me turn to Portadam.
14   I'm going to go through the portfolio companies
15   one by one.  I've done some already, and I won't
16   repeat myself.
17        What does Portadam do?
18       A.   It has construction technology for
19   water displacement and water containment.
20       Q.   The name "Portadam" sounds like it
21   builds portable dams; is that a correct
22   understanding?
23       A.   Portable dams are for displacement of
24   water.
25       Q.   Okay.  Aren't they also for water
```

Page 214

1                      ZUBIN   MEHTA

2

3                      CERTIFICATE

4    STATE OF NEW YORK )

                              :   ss

5    COUNTY OF NEW YORK)

6            I, Kathy S. Klepfer, a Registered

7    Merit Reporter and Notary Public within and

8    for the State of New York, do hereby

9    certify:

10           That ZUBIN MEHTA, the witness whose

11   deposition is herein before set forth, was

12   duly sworn by me and that such deposition is

13   a true record of the testimony given by such

14   witness.

15           I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage and that I am in no way

18   interested in the outcome of this matter.

19           In witness whereof, I have hereunto

20   set my hand this 4th day of May 2015.

21

22   ------------------------------------------

          KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 182 of 282

# EXHIBIT F

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,        :
                                           :
                Plaintiff/                  :
                Counterclaim Defendant,     :
                                           :
        v                                  : Civil Action
                                           : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and         :
LYRICAL OPPORTUNITY PARTNERS, L.P.,        :
                                           :
                Defendants/                 :
                Counterclaim Plaintiffs.   :

                        _ _ _

                        Chancery Courtroom No. 12B
                        New Castle County Courthouse
                        500 North King Street
                        Wilmington, Delaware
                        Monday, June 15, 2015
                        9:15 a.m.

                        _ _ _

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                        _ _ _


                TRIAL TRANSCRIPT - VOLUME I


------------------------------------------------------------
                CHANCERY COURT REPORTERS
                New Castle County Courthouse
            500 North King Street - Suite 11400
                Wilmington, Delaware 19801
                    (302) 255-0523

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 184 of 282



J. Keswin - Direct                                    45

1  which we decided that our interests weren't being put
2  where we thought they should be.
3       Q.        At the time of we'll call it the
4  takeover of the portfolio companies, what was the
5  circumstances of Performance Trailers?
6       A.        I think it was a wipeout by that
7  point.
8       Q.        At the time of the takeover of the
9  Performance companies, what was the situation at Tiber
10  Industries?
11      A.        It was in default on its obligations,
12  and it didn't seem like there was any equity value.
13      Q.        At the time of the takeover of the
14  portfolio companies, what was the situation at
15  Portadam?
16      A.        It wasn't as clear to us at the time.
17  And then over the next number of months, relatively
18  quickly, we concluded that there was also no equity
19  value for us.
20      Q.        In this lawsuit, is Lyrical
21  Opportunity Partners seeking I'll call it a piece of
22  the management fees earned by Finger Lakes Capital
23  Partners from the various portfolio companies?
24      A.        Yes.

CHANCERY COURT REPORTERS


J. Keswin - Direct                                    46

1       Q.        Prior to this lawsuit, did Lyrical
2  press its demand on Finger Lakes Capital Partners for
3  a portion of the management fees?
4       A.        No. For the most part, no. Over the
5  years, we had spoken with Greg and Zubin, and at many,
6  many points they said, "We're, you know, just getting
7  by." And so we had lots of conversations about how we
8  would ultimately make everything whole at the end with
9  respect to the carry and the management fees.
10      Q.        I think one last investment. Then we
11  may be done.
12                Did you ever personally loan money to
13  Finger Lakes Capital Partners, Mr. Mehta and
14  Mr. Shalov?
15      A.        Yes.
16      Q.        How much?
17      A.        I believe it was $400,000.
18      Q.        When did you loan this amount?
19      A.        I don't recall the date, but it was
20  when Performance was having troubles and they were
21  involved in a bunch of litigation, and they asked for
22  me to support them.
23      Q.        Did you do so?
24      A.        Yes.

CHANCERY COURT REPORTERS


J. Keswin - Cross                                     47

1       Q.        Has any portion of that I think you
2  said 400,000 been paid back?
3       A.        No.
4       Q.        On behalf of Lyrical, were you the one
5  involved in determining how much is owed by Finger
6  Lakes Capital Partners to Lyrical? I'm talking about
7  precise dollars here.
8       A.        No.
9       Q.        Who at Lyrical was so involved, if
10  anyone?
11      A.        Ted Gage, primarily. He might have
12  had some help from one other colleague, Dan Deserio.
13                MR. JENKINS:  Your Honor, I think I am
14  done with Mr. Keswin. Could I speak with Mr. Amini
15  and Mr. Leggett for a moment, please?
16                THE COURT:  Sure.
17                MR. JENKINS:  They tell me I am done,
18  Your Honor.
19                So thank you, Mr. Keswin.
20                THE COURT:  Thank you.
21                Cross.
22                CROSS-EXAMINATION
23  BY MR. KAGEN:
24      Q.        As I understand it, sir, earlier, you

CHANCERY COURT REPORTERS


J. Keswin - Cross                                     48

1  testified that you're not seeking anything with regard
2  to the 25 percent interest in Finger Lakes that you
3  claim is listed in this allocation right. Is that
4  right, sir?
5       A.        Correct.
6       Q.        And did you ever review the
7  counterclaims that you set forth in this case before
8  today?
9       A.        I presume I read them.
10      Q.        You met with your lawyers before you
11  testified, did you not, sir?
12      A.        I did.
13      Q.        For hours. Right, sir?
14      A.        For hours.
15      Q.        Could you turn with me to take a look
16  at the answer and counterclaims that you put forth?
17  It's in the binders at Exhibit 11.
18                Are you there, sir?
19      A.        Yes.
20      Q.        Could you turn with me, please, to the
21  page numbered 39 of that document?
22                Are you there?
23      A.        Yes.
24      Q.        Could you read out what is stated in

CHANCERY COURT REPORTERS

673

1                          CERTIFICATE

2                  We, JEANNE CAHILL, JULIANNE LaBADIA,

3     and NEITH D. ECKER, Official Realtime Reporters for

4     the Court of Chancery of the State of Delaware, do

5     hereby certify that the foregoing pages numbered 3

6     through 671 contain a true and correct transcription

7     of the proceedings as stenographically reported by us

8     at the hearing in the above cause before the Vice

9     Chancellor of the State of Delaware, on the date

10    therein indicated.

11                  IN WITNESS WHEREOF we have hereunto

12    set our hands at Wilmington, this 22nd day of June

13    2015.

14

15                             /s/ Neith D. Ecker
                        ---------------------------------
16                      Chief Realtime Court Reporter

17

18                             /s/ Jeanne Cahill
                        ---------------------------------
19                      Official Realtime Court Reporter

20

21                             /s/ Julianne LaBadia
                        ---------------------------------
22                      Official Realtime Court Reporter

23

24

CHANCERY COURT REPORTERS

# Exhibit G

187 of 282

310

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,       :
                                          :
              Plaintiff/                  :
              Counterclaim Defendant,     :
                                          :
      v                                   : Civil Action
                                          : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and        :
LYRICAL OPPORTUNITY PARTNERS, L.P.,       :
                                          :
              Defendants/                 :
              Counterclaim Plaintiffs.    :

                          _ _ _

                    Chancery Courtroom No. 12B
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Tuesday, June 16, 2015
                    9:15 a.m.

                          _ _ _

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                          _ _ _

              TRIAL TRANSCRIPT - VOLUME II

---------------------------------------------------------
              CHANCERY COURT REPORTERS
            New Castle County Courthouse
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                 (302) 255-0523

E. Gage - Direct                    561

1

2

3

4              MR. AMINI:  Your Honor, I'd like to at

5    this point show the witness a demonstrative.  We did

6    provide it to the other side.  And very late last

7    night because of what happened yesterday, we stayed up

8    till 12:40 at night to send them the back-and-forth.

9    It's, of course, subject to -- these are documents --

10   these are numbers that come from documents that are

11   already in the case.  And so to the extent there's any

12   errors or anything, we can certainly deal with them

13   afterwards.

14              THE COURT:  Let's see it.

15              MR. AMINI:  Mark it as Demonstrative

16   No. 2?  I don't know how to proceed.

17              (Defendants/Counterclaim Plaintiffs'

18   Demonstrative Exhibit No. 2 was marked for

19   identification.)

20   BY MR. AMINI:

21      Q.      Mr. Gage, let me show you what we've

22   marked as Demonstrative Exhibit No. 2.  And I'm just

23   going to ask you an open question.  Do you know what

24   this is?

E. Gage - Direct                                    562

1          A.        I do.

2          Q.        What is it?

3          A.        This is the allocation of proceeds

4    from HLA I, considering all of the operative

5    agreements that were in place between FLCP and

6    Lyrical.

7          Q.        And who prepared this?

8          A.        I did.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

E. Gage - Direct                              582

1

2

3

4

5          Q.        Go to the next place, "Loan to FLCP."

6    That's the -- that's the $400,000 Jeff Keswin loan,

7    isn't it?

8          A.        That's correct, yep.

9          Q.        With interest?

10         A.        My understanding, again, that was

11   going to be paid directly out of whatever carry that

12   they did take or it would just be an outright

13   obligation on their part if there was no such carry.

14   So that's the 400,000 plus the 700,000 and change in

15   accumulated interest.

16

17

18

19

20

21

22

23

24

672

INDEX

| DEFENDANTS' WITNESSES | Direct | Cross | Redr. | Recr. |
|---|---|---|---|---|
| Gregory Shalov, Resumed | 312 | 401 | 540 | – |
| Edward Gage | 542 | 586 | – | – |

- - -

DEFENDANTS'/COUNTERCLAIM PLAINTIFFS' EXHIBITS

| Demonstrative No. | Marked |
|---|---|
| 2 --------------------------------------- | 561 |

- - -

CHANCERY COURT REPORTERS

673

1                        CERTIFICATE

2                 We, JEANNE CAHILL, JULIANNE LaBADIA,

3    and NEITH D. ECKER, Official Realtime Reporters for

4    the Court of Chancery of the State of Delaware, do

5    hereby certify that the foregoing pages numbered 3

6    through 671 contain a true and correct transcription

7    of the proceedings as stenographically reported by us

8    at the hearing in the above cause before the Vice

9    Chancellor of the State of Delaware, on the date

10   therein indicated.

11                 IN WITNESS WHEREOF we have hereunto

12   set our hands at Wilmington, this 22nd day of June

13   2015.

14

15                          /s/ Neith D. Ecker
                  ----------------------------------
16                Chief Realtime Court Reporter

17

18                          /s/ Jeanne Cahill
                  ----------------------------------
19                Official Realtime Court Reporter

20

21                          /s/ Julianne LaBadia
                  ----------------------------------
22                Official Realtime Court Reporter

23

24

CHANCERY COURT REPORTERS

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 193 of 282

# EXHIBIT G

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,      :
                                         :
                Plaintiff/               :
            Counterclaim Defendant,      :
                                         :
        v                                : Civil Action
                                         : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and       :
LYRICAL OPPORTUNITY PARTNERS, L.P.,      :
                                         :
                Defendants/              :
            Counterclaim Plaintiffs.     :

                          - - -

                      Chancery Courtroom No. 12B
                      New Castle County Courthouse
                      500 North King Street
                      Wilmington, Delaware
                      Monday, June 15, 2015
                      9:15 a.m.

                          - - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                          - - -


            TRIAL TRANSCRIPT - VOLUME I


------------------------------------------------------------
                CHANCERY COURT REPORTERS
               New Castle County Courthouse
          500 North King Street - Suite 11400
               Wilmington, Delaware 19801
                    (302) 255-0523

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit
document 1   Pg 195 of 282

Z. Mehta - Cross                                    289

1          This page is FLCP's entire investment
2  portfolio, which is set forth -- which you mention on
3  the first page of the exhibit in the e-mail.  Correct?
4          A.     At that time, I believe that's
5  correct.
6          Q.     Okay.  There were several changes you
7  agreed to make to this schedule of FLCP's entire
8  investment portfolio; correct?
9          A.     To what are you referring?
10          Q.     Good point.  Let's turn to Joint
11  Exhibit 83, the very next one.
12          A.     Okay.
13          Q.     You received this e-mail from Kerilyn
14  Fields -- I'm sorry.  That's confusing.
15          The third e-mail down is an e-mail
16  that Kerilyn Fields sent to you on April 25; correct?
17          A.     Correct.
18          Q.     And Ms. Fields worked at Lyrical
19  Partners; correct?
20          A.     I believe that's correct.
21          Q.     And if you care, you can see, at the
22  bottom of the first page of Exhibit 83, going over to
23  the second page, is another version of your e-mail
24  that was JX 82.  Do you see that, sir?

Z. Mehta - Cross                                    290

1          A.     I do.
2          Q.     All right.  So you see that Ms. Fields
3  is responding to your e-mail; correct?
4          A.     I do.
5          Q.     All right.  She says there, "I agree
6  with everything except for the Seneca Lake Acquisition
7  contributions.  It looks like you are missing the
8  3/28/2007 and 5/22/2007 $250,000 contributions (total
9  $500,000) which went to a Seneca Lake note."  She told
10  you that; correct?
11          A.     She did.
12          Q.     And you agree that those two notes
13  should be added to the schedule of FLCP's entire
14  investment portfolio that is attached to Exhibit 82;
15  correct?
16          A.     They would be in the schedule, but not
17  part of the clawback.
18          Q.     Hmm.  Why wouldn't they be part of the
19  clawback?
20          A.     That was debt that was lent by LOP
21  directly to Tiber, and it wouldn't be part of the
22  equity investments that are in the clawback but for
23  the Performance Trailers exceptions.
24          Q.     Do you mention anywhere here that they

Z. Mehta - Cross                                    291

1  would not be part of the clawback?
2          A.     I don't think I do.
3          Q.     Let me go on to the last sentence on
4  your April 25, 2008, e-mail, at 11:36 a.m. to
5  Ms. Fields.  You say, "JK also has a personal loan to
6  FLCP for 400K as well, which I might not have included
7  in the analysis as well."  Do you see that, sir?
8          A.     I do.
9          Q.     By that did you mean that Mr. Keswin's
10  $400,000 personal loan to FLCP should also be subject
11  to the clawback?
12          A.     No.  It should be on the schedule, but
13  not subject to the clawback.
14          Q.     All right.  Do you believe that FLCP
15  should be paying back Mr. Keswin his $400,000 loan?
16          A.     It was our intent to pay it back.
17  During the course of the -- whatever happens to the
18  litigation, happens to the litigation, so we'll live
19  by it.
20          Q.     Okay.  Is it your intent today to have
21  FLCP pay back that $400,000 loan to Mr. Keswin?
22          A.     We will do whatever happens as a
23  result of the litigation.
24          Q.     Okay.  Thank you.  I think my question

Z. Mehta - Cross                                    292

1  was a little different.  If you could listen to my
2  question, please.  Is it your current intent, your and
3  Mr. Shalov's current intent, as the principals of
4  Finger Lakes Capital Partners, to pay back the
5  $400,000 loan that Mr. Keswin made to FLCP?
6          A.     I don't believe so today.
7          Q.     Okay.  Why not?
8          A.     We were told, as part of this
9  litigation, that it's no longer a note and not due and
10  payable.
11          Q.     Not due and payable?
12          A.     Yeah.
13          THE COURT:  What is it now?
14          THE WITNESS:  I think that we did
15  borrow the money, but I believe there was a note at
16  some point.  I think it's past the statute of
17  limitations, as far as I understand it.
18          THE COURT:  Oh, I see.  So it may
19  still be a note, may still be out there, but it's a
20  statute of limitations issue?
21          THE WITNESS:  That's correct.
22          THE COURT:  Got you.
23
24  BY MR. JENKINS:

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit
document 1   Pg 196 of 282

Z. Mehta - Cross                                    293

1    Q.    Any other reasons that you and
2    Mr. Shalov do not intend to pay the $400,000 note?
3    A.    No.
4    Q.    All right.  Thank you.  Let me go back
5    to the allocation -- excuse me.  We'll use the term on
6    the document.  The term sheet.  You remember the term
7    sheet, Mr. Mehta; correct?
8    A.    I do.
9    Q.    Is it yours and Mr. Shalov's intention
10   to live up to the terms of the term sheet?
11   A.    I don't believe so.  And the only
12   reason is we -- when we wrote the term sheet, we wrote
13   it together with Jeff and Greg, and we fully
14   anticipated turning it over to lawyers to do
15   definitive operating agreements.
16   Q.    To do definitive -- I'm sorry?
17   A.    Operating agreements.
18   Q.    Operating agreements.  Is there any
19   other reason, other than what you've just mentioned,
20   that you and Mr. Shalov are not willing to live up to
21   what's set forth in the term sheet?
22   A.    I don't believe so.
23   Q.    Okay.  Thank you.  The personal -- I'm
24   sorry.  I'm switching subjects.  I promised I'd let

CHANCERY COURT REPORTERS

Z. Mehta - Cross                                    294

1    you know about that.  I'm switching subjects to
2    Performance Trailers.
3            The personal guarantees that you and
4    Mr. Shalov gave in connection with Performance
5    Trailers, neither Mr. Keswin nor any of the Lyrical
6    entities gave such a personal guarantee; correct?
7    A.    Correct.
8    Q.    And they were never asked to do so;
9    correct?
10   A.    I don't recollect, but I don't believe
11   so.
12   Q.    Okay.  I confess, I was confused as to
13   some of the very last questioning between your counsel
14   and you in connection with that personal guarantee.
15   Is it your position that if, in fact, Lyrical has a 25
16   percent interest in FLCP, it has some legal obligation
17   to pay back personal guarantees?
18   A.    I don't know what "legal obligation"
19   means, but I believe that's the case.  I'm not sure,
20   though.
21   Q.    That is, just because Lyrical has --
22   withdrawn.  I recognize you don't agree with it, but
23   let's assume for purposes of my questioning that
24   Lyrical has a 25 percent ownership interest in FLCP.

CHANCERY COURT REPORTERS

Z. Mehta - Cross                                    295

1    Okay?
2    A.    Okay.
3    Q.    Your understanding is that because of
4    that interest, and for no other reason, Lyrical would
5    have to pay a portion of the personal guarantees that
6    you and Mr. Shalov entered into?
7    A.    I think that's correct, but I'm not
8    sure.
9    Q.    Okay.
10           THE COURT:  Do you think that they've
11   got a 25 percent participation?
12           THE WITNESS:  I do not.
13           THE COURT:  See, I think it's the
14   other way around.  I thought the line of inquiry was
15   to say isn't it clear that you don't have 25 percent,
16   because if you did, wouldn't we -- wouldn't we have
17   come to you for guarantees?  And the fact that we
18   didn't come to you for guarantees, doesn't that show
19   evidence that you, in fact, do not have.
20           MR. JENKINS:  That part I got.
21           THE COURT:  Yeah.
22           MR. JENKINS:  I thought there was a
23   second line, and perhaps it was just --
24           THE COURT:  You were probably a step

CHANCERY COURT REPORTERS

Z. Mehta - Cross                                    296

1    ahead of me.
2            MR. JENKINS:  -- confusing questions,
3    that because Lyrical had a 25 percent ownership
4    interest, therefore it had some legal obligation to
5    pay, which is a legal obligation I'm unfamiliar with.
6    And I was trying to press the witness.
7    BY MR. JENKINS:
8    Q.    Let me just try this again, Mr. Mehta.
9    Do you believe that because Lyrical was -- again,
10   assuming that Lyrical has a 25 percent ownership
11   interest in FLCP, does Lyrical, for that reason alone,
12   owe something in connection with the personal
13   guarantees signed by you and Mr. Shalov?
14   A.    I -- I don't believe so.  I don't
15   know.
16   Q.    Okay.  We'll leave it at that.  You
17   testified that you borrowed money -- in addition to
18   borrowing the 400,000 from Mr. Keswin, you borrowed
19   $500,000 from your father to pay off the personal
20   guarantees; correct?
21   A.    Around that amount.  Not exactly.
22   Q.    All right.  I'll use approximately
23   500,000.  The precise amount is not important for my
24   question.  Did FLCP give your father a note in

CHANCERY COURT REPORTERS

673

CERTIFICATE

1

2                  We, JEANNE CAHILL, JULIANNE LaBADIA,

3    and NEITH D. ECKER, Official Realtime Reporters for

4    the Court of Chancery of the State of Delaware, do

5    hereby certify that the foregoing pages numbered 3

6    through 671 contain a true and correct transcription

7    of the proceedings as stenographically reported by us

8    at the hearing in the above cause before the Vice

9    Chancellor of the State of Delaware, on the date

10   therein indicated.

11                  IN WITNESS WHEREOF we have hereunto

12   set our hands at Wilmington, this 22nd day of June

13   2015.

14

15                                  /s/ Neith D. Ecker
                         ---------------------------------
16                        Chief Realtime Court Reporter

17

18                                  /s/ Jeanne Cahill
                         ---------------------------------
19                        Official Realtime Court Reporter

20

21                                  /s/ Julianne LaBadia
                         ---------------------------------
22                        Official Realtime Court Reporter

23

24

CHANCERY COURT REPORTERS

FILED: NEW YORK COUNTY CLERK 09/01/2015 06:53 PM
INDEX NO. 156356/2015
NYSCEF DOC. NO. 10
RECEIVED NYSCEF: 09/01/2015

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 198 of 282

# EXHIBIT G

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,        :
                                           :
            Plaintiff/                     :
            Counterclaim Defendant,        :
                                           :
        v                                  : Civil Action
                                           : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and         :
LYRICAL OPPORTUNITY PARTNERS, L.P.,        :
                                           :
            Defendants/                    :
            Counterclaim Plaintiffs.       :

                        - - -

                    Chancery Courtroom No. 12B
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Monday, June 15, 2015
                    9:15 a.m.

                        - - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                        - - -


            TRIAL TRANSCRIPT - VOLUME I


------------------------------------------------------------
            CHANCERY COURT REPORTERS
          New Castle County Courthouse
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                (302) 255-0523

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 200 of 282

V. Zubin Mehta    193

1    Q.    Who is Dr. Mehta?
2    **A.    He is my father.**
3    Q.    And Joan and Barry Shalov, who are
4    they?
5    **A.    Gregory's parents.**
6    Q.    How much does Finger Lakes Capital
7    Partners owe to Mr. Shalov?
8    **A.    I believe somewhere between 2 1/2 and**
9    **$3 million.**
10    Q.    And how much does Finger Lakes Capital
11    Partners owe to Dr. Mehta?
12    **A.    Around $500,000**
13    Q.    Are these debts -- withdrawn.
14    What was the purpose of creating
15    Finger Lakes Debt Partners as opposed to Finger Lakes
16    Capital Partners?
17    **A.    It was meant to be a separate**
18    **investment vehicle to provide senior financing to the**
19    **portfolio companies against inventory and AR.**
20    Q.    Did Mr. Keswin personally ever loan
21    any money to Finger Lakes?
22    **A.    He did.**
23    Q.    Do you know when?
24    **A.    Around the time of the Performance**

V. Zubin Mehta    195

1    the question?
2    A.    Yes.
3    **A.    Once it was funded, is that the**
4    **question?**
5    A.    Yes.
6    **A.    No, they could not have.**
7    Q.    And why could they not?
8    **A.    It was a private investment vehicle,**
9    **and so once it was funded, it was governed by the**
10    **operating agreement.  And, ultimately, when we got a**
11    **distribution, they would get whatever their equity**
12    **share was.**
13    Q.    Before the time that the Honeoye Lake
14    Acquisition agreement was signed, before that time,
15    did Lyrical provide funds for that intended use?
16    **A.    Can you ask me the question one more**
17    **time?**
18    Q.    Sure.  Before Honeoye was signed by
19    all of the parties, before that happened, did Lyrical
20    provide money that was intended to be used for
21    Honeoye?
22    **A.    No, they did not.**
23    Q.    Could Lyrical have chosen not to fund
24    Honeoye whether or not you gave a clawback?

V. Zubin Mehta    194

1    **Trailers bankruptcy, we had a number of personal**
2    **guarantees against some of the vendors, so he lent us**
3    **money.**
4    Q.    When was this bankruptcy of
5    Performance Trailers?  What year?
6    **A.    I believe it was around 2005, 2006,**
7    **sometime in that period.**
8    Q.    2005, 2006.
9    When did you close Honeoye Lake
10    Acquisition LLC?
11    **A.    I believe the first close was sometime**
12    **around September, October, 2005.**
13    Q.    Okay.  Between the time that Honeoye
14    was first agreed to and the time of its final close,
15    did Lyrical wire in more money with regard to that
16    investment?
17    **A.    They did.**
18    Q.    How much?
19    **A.    The initial investment I think was**
20    **$2 million, and so over time, I think their investment**
21    **got to 4.6 million.**
22    Q.    Could Lyrical have withdrawn that
23    money at any time?
24    **A.    Could they have withdrawn it?  Is that**

V. Zubin Mehta    196

1    **A.    Yes, they could have.**
2    Q.    Did Lyrical ever threaten to sue
3    Finger Lakes on any notes if Finger Lakes didn't give
4    a clawback?
5    **A.    No, it did not.**
6    Q.    Did Lyrical ever promise to anyone at
7    Finger Lakes that it would forego a lawsuit if Finger
8    Lakes agreed to a clawback?
9    **A.    No, it did not.**
10    Q.    Okay.  Let's take a look at Joint
11    Exhibit 82, please.
12    **A.    Okay.**
13    Q.    When you sent this e-mail, did you
14    think it was accurate in all respects?
15    **A.    I believe so.**
16    Q.    Did you intend to honor what you set
17    forth in the e-mail when you sent it?
18    **A.    I did.**
19    Q.    Can you explain what the clawback
20    described in this -- is there a clawback described in
21    this e-mail of any kind?
22    **A.    Yes, there is.**
23    Q.    Well, what are the terms of that
24    clawback?

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit
document 1   Pg 201 of 282



V. Zubin Mehta                                    237

1    you put in a discount for the clawback?
2        A.      No, we did not.
3        Q.      No.  What I mean to say, in that funds
4    flow, did you account for the clawback in that funds
5    flow?
6        A.      Yes, we did.
7        Q.      Yes, you did.
8        And by accounting for the funds flow,
9    accounting for the clawback, what did you do in your
10   proposed funds flow?
11       A.      We included a clawback of just over
12   $6 million whereby we would be taking care of interest
13   on that portion.
14       Q.      Okay.  So are you saying that, in
15   other words, that you were willing to take that money
16   out of the pot, whether or not it's enforceable, to
17   honor what you had earlier said?
18       A.      Yes, we were.
19       Q.      Now, do you believe that that
20   agreement is in the HLA agreement?
21       A.      No, I do not.
22       Q.      Did that change your desire to honor
23   that agreement at the time, to honor that obligation
24   at that time?

V. Zubin Mehta                                    239

1    that position before March of 2014 with you?
2        A.      They never did.
3        Q.      If they knew that they were going to
4    take that with you when you were taking salaries,
5    would you have characterized those salaries as
6    management fees?
7        A.      No, we would not have.
8        Q.      How, if at all, would that have
9    affected your decision not to file for bankruptcy, if
10   you knew they were taking that position with you at
11   that difficult time previously in your life?
12       A.      It would have made a -- it would have
13   been a substantial thing to think about.
14       Q.      Did you have any idea that they were
15   going to take that position later?
16       A.      No, we did not.
17       Q.      Or take that position at all?
18       A.      No, we did not.
19       Q.      Was it surprising to you that they
20   took that position when they did?
21       A.      It was very surprising.
22       Q.      Beyond the management fees, was there
23   anything else surprising that they did when they sent
24   that funds flow to you?

V. Zubin Mehta                                    238

1        A.      No, it did not.
2        Q.      So what changed?  Why are we here in
3    court?
4        A.      I believe that they took a very
5    different position on their funds flow that wasn't
6    consistent with what we understood.
7        Q.      And what was the different position
8    that they took on the funds flow?  Did they send you
9    back a funds flow of their own?
10       A.      They did.  They sent it, I believe, on
11   a Friday in February.
12       Q.      And what did their funds flow say that
13   was different than yours?
14       A.      They included paid-back management
15   fees.  It did not include a management catch-up.  A
16   few items like that.
17       Q.      In that funds flow, what did they say
18   about management fees?
19       A.      They said they were entitled to I
20   believe 25 percent of the management fees and salaries
21   over time and then 25 percent of the profits
22   thereafter.
23       Q.      If you knew that they were going to --
24   did you know they were going to -- did they ever take

V. Zubin Mehta                                    240

1        A.      They also took 75 percent of the
2    return on our investment.
3        Q.      Was that surprising to you?
4        A.      It was at the time because I didn't
5    realize that the agreement showed that.
6        Q.      What did you understand your rights to
7    your monies to be?
8        A.      I thought that we were going to put
9    our investment in and get -- aside from the carry that
10   comes to us, would effectively come back to us.  So
11   that would make a substantial return on the
12   investment.
13       Q.      Now, in fact, when you were thinking
14   about substantial return, was that in part coming from
15   the Honeoye agreement that you had signed and
16   documented?
17       A.      That's correct.
18       Q.      But when you gave that funds flow to
19   them, did you also indicate that they could take
20   25 percent of whatever you could get?
21       A.      I believe we may have.
22       Q.      Now, that's not in the Honeoye
23   agreement, is it?
24       A.      I think we thought it was at the time.

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit
document 1   Pg 202 of 282

Z. Mehta - Cross    301

1    Q.    Can you give me an approximation?
2    A.    **Somewhere between $500 million.**
3    Q.    Okay.  Tiber stopped paying management
4  fees to FLCP in 2009; correct?
5    A.    **That sounds correct.**
6    Q.    Because it couldn't afford to do so;
7  right?
8    A.    **That's correct.**
9    Q.    Now, Tiber currently is in default on
10  its loans to FLDP; correct?
11    A.    **That's correct.**
12    Q.    It's not paying interest on a regular
13  basis, is it?
14    A.    **That's correct.**
15    Q.    FLDP has elected not to enforce the
16  terms of its loan to Tiber; correct?
17    A.    **I believe that's correct.**
18    Q.    FLDP has the legal ability to -- I'll
19  use the word "foreclose" -- foreclose on its loans to
20  Tiber, and if Tiber can't pay the notes, essentially,
21  obtain the company for itself; correct?
22    A.    **I think that's correct.**
23    Q.    All right.  Let me turn just briefly
24  to Finger Lakes Debt Partners, FLDP.  There are equity

CHANCERY COURT REPORTERS

---

Z. Mehta - Cross    302

1  investments of about $825,000 in Finger Lakes Debt
2  Partners; correct?
3    A.    **That sounds correct.**
4    Q.    All right.  And 250,000 of this 825
5  was invested by Lyrical Opportunity Partners; correct?
6    A.    **That's correct.**
7    Q.    $3.4 million was loaned by Lyrical to
8  FLDP; correct?
9    A.    **That's correct.**
10    Q.    FLDP currently is in default on
11  payments of its debt to its debtholders; correct?
12    A.    **All holders, I think, that's correct.**
13    Q.    And FLDP is also in default on
14  payments to its equityholders; correct?
15    A.    **That's correct.**
16          MR. JENKINS:   Your Honor, I may be
17  done with Mr. Mehta.  Could I check with my
18  colleagues?
19          THE COURT:   You may.
20    (Counterclaim plaintiff's counsel briefly conferred)
21  BY MR. JENKINS:
22    Q.    Mr. Mehta, I do have one other area of
23  questioning.  This goes back to the $400,000 loan that
24  Mr. Keswin made to Finger Lakes Capital Partners to

CHANCERY COURT REPORTERS

---

Z. Mehta - Cross    303

1  help you and Mr. Shalov pay off a portion of your
2  personal guarantees.  You recall that?
3    A.    **I do.**
4    Q.    All right.  And you agreed with
5  Mr. Keswin that this $400,000 would be paid back from
6  the carried interest that you and Mr. Shalov earned
7  through FLCP if any of the portfolio investments were
8  successful; correct?
9    A.    **That sounds correct, but I don't know**
10  **for sure.**
11    Q.    Okay.  Let me point you to JX 65,
12  please.
13    A.    **Hang on a second.  I got it.  Give me**
14  **one second.**
15    Q.    Certainly.  Take your time.
16    A.    **You said 63, or -- 60 --**
17    Q.    I think I said 65.
18    A.    **65.  Got it.  Okay.**
19    Q.    That's what I meant to say.  You're
20  free to look at anything there, but the paragraph I'd
21  like you to focus on is the numbered paragraph (2)
22  about halfway down the page.  Do you see that?
23    A.    **I do.**
24    Q.    All right.  And it says there that

CHANCERY COURT REPORTERS

---

Z. Mehta - Cross    304

1  "The $400,000 loan was indeed something that you (or
2  whatever vehicle it may be) gave to us personally to
3  cover our PT PGs - and this is something that the
4  overall Fund (meaning all investments through
5  FLCP/FLDP or the 'Fund') did not need, and as a result
6  is indeed something we have to make up via our carried
7  interest and the not the clawback."  I think there's
8  an extra "not" there.  There's an extra "the" there.
9  "We were clear about this and we all agree here."
10          Does that help refresh your
11  recollection, Mr. Mehta, that you and Mr. Shalov,
12  through FLCP, have agreed to pay back Mr. Keswin on
13  his $400,000 loan via your carried interest?
14    A.    **It appears so.**
15    Q.    All right.  And you intend to honor
16  that agreement; correct?
17    A.    **If, out of these proceedings, that**
18  **happens, yeah.**
19    Q.    Okay.
20          MR. JENKINS:   Excuse me, Your Honor.
21  My colleagues think I should --
22          MR. AMINI:   Sorry, Your Honor.
23          MR. JENKINS:   No.  That's fine.  It's
24  your time.  You should use it as you see fit.  Fear

CHANCERY COURT REPORTERS

FLCP vs. Honeoye Lake Acquisition - 6/15/15 Trial Transcript Vol I - Del. Chanc. C.A. 9742-VCL

16-08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit
document 1   Pg 203 of 282

Z. Mehta - Cross                    305

1  not. You've got six more minutes you can use today.
2         (Counterclaim plaintiff's counsel briefly conferred)
3  BY MR. JENKINS:
4         Q.   One more question, Mr. Mehta. Other
5  than your carried interest from -- withdrawn.
6              Other than any carried interest that
7  you and Mr. Shalov obtain through FLCP from the HLA --
8  from the Revolabs investment, do you and Mr. Shalov
9  have the funds to pay back Mr. Keswin on his $400,000
10  loan?
11        A.   No, we do not.
12        Q.   All right.
13             MR. JENKINS:   That's it, Your Honor.
14  I'm not even going back to my colleagues.
15             THE COURT:   All right. Redirect?
16             MR. KAGEN:   No further questions, Your
17  Honor.
18             THE COURT:   All right. Mr. Mehta,
19  thank you for being here. You're excused. I
20  appreciate your time.
21             (Witness excused.)
22             THE COURT:   All right. Even though we
23  have five minutes to go, let's go ahead and break for
24  the day.

Z. Mehta - Cross                    306

1              Counsel, this is going to put you on
2  the spot, but do you-all have any sense, are we moving
3  forward at a sufficiently diligent pace that we're
4  going to be able to finish tomorrow?
5              MR. JENKINS:   For better or worse, we
6  are five minutes faster than where I anticipated
7  being. I thought I would finish Mr. Mehta at 4:45.
8              THE COURT:   Okay.
9              MR. JENKINS:   And I'm five minutes
10  early. And we anticipated that we'd have Mr. Keswin
11  and Mr. Mehta today and Mr. Shalov and Mr. Gage, in
12  that order, tomorrow.
13             MR. KAGEN:   Do I need to approach,
14  Your Honor?
15             THE COURT:   Sure. Makes you easier to
16  hear.
17             MR. KAGEN:   If we are required to
18  continue, we are ready to continue and to finish on
19  time, I believe.
20             THE COURT:   All right. Great. Well,
21  look. I'll look forward to seeing you-all tomorrow
22  morning. Look, I do think it would be great for
23  you-all to talk. I think I said this at the beginning
24  of the case, and I still believe it.

Z. Mehta - Cross                    307

1              You know, when I meet financial guys
2  like you, sir, and these two gentlemen in the back of
3  the room, I really do believe that you're probably
4  much better than the lawyers, frankly, at pricing how
5  these things are likely to come out, because you-all
6  deal with risk all the time. You deal with contingent
7  possibilities all the time. You deal with, you know,
8  limited pools of capital that you then have to whack
9  up between yourselves and your friends all the time.
10             So, you know, get some input from your
11  friends the lawyers about what the likely outcomes
12  are. You know, these folks, particularly the
13  Delawareans, Mr. Jenkins, Mr. Cordo, they've both been
14  in trials before me. They can give you probabilities.
15  Who knows. You know, I'm sort of an unpredictable guy
16  sometimes. But within realms of 90 percent confidence
17  intervals, they can give you some indications and
18  whack this thing up -- I mean, there's a point at
19  which you can't get more blood from a stone -- and see
20  what you can do.
21             I thought earlier you guys could
22  probably resolve this over a sandwich or a cup of
23  coffee. I still think that, but since you're all in
24  town together, you could go over to the Hotel du Pont,

Z. Mehta - Cross                    308

1  have a nice drink in their bar, and probably figure
2  all this out.
3              But if you don't, I will look forward
4  to seeing you-all at 9:15 tomorrow and we will resume.
5  We stand in recess till then.
6              (Recess taken at 4:42 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

673

1                        CERTIFICATE

2                    We, JEANNE CAHILL, JULIANNE LaBADIA,

3    and NEITH D. ECKER, Official Realtime Reporters for

4    the Court of Chancery of the State of Delaware, do

5    hereby certify that the foregoing pages numbered 3

6    through 671 contain a true and correct transcription

7    of the proceedings as stenographically reported by us

8    at the hearing in the above cause before the Vice

9    Chancellor of the State of Delaware, on the date

10   therein indicated.

11                   IN WITNESS WHEREOF we have hereunto

12   set our hands at Wilmington, this 22nd day of June

13   2015.

14

15                              /s/ Neith D. Ecker
                           ----------------------------------
16                         Chief Realtime Court Reporter

17

18                              /s/ Jeanne Cahill
                           ----------------------------------
19                         Official Realtime Court Reporter

20

21                              /s/ Julianne LaBadia
                           ----------------------------------
22                         Official Realtime Court Reporter

23

24

                  CHANCERY COURT REPORTERS

# Exhibit H

# REVOLABS – WATERFALL ANALYSIS

| Total HLA Proceeds | $31,284,216.07 |
|---|---|
| Less: Escrow | $4,178,251.04 |
| Less: Indemnification (Legal Fees) | $137,043.00 |
| Plus: True up adjustment | $45,591.74 |
| Available Funds for Waterfall | $27,014,513.77 |

## I.   Available Cash to Waterfall – Clawback Agreement

| Available Funds for Waterfall | $27,014,513.77 |
|---|---|
| Less: Performance Trailers Loss* | $6,083,886.00 |
| Less: Tiber Industries Loss | $6,303,270.44 |
| *Equity* | *$3,328,270.44* |
| *Direct Loans* | *$500,000.00* |
| *FLDP Note* | *$2,225,000.00* |
| *FLDP Equity* | *$250,000.00* |
| Less: Portadam Loss | $3,950,000.00 |
| Total Deduction | $16,337,156.44 |
| Remaining Funds | $10,677,357.33 |

## II.  Distributions from HLA – HLA Operating Agreement
### *a.  Return of Capital and Preferred Return*

| Available Funds for Distribution | $10,677,357.33 |
|---|---|
| Less: Return of Capital to Lyrical* | $4,600,000.00 |
| Less: Return of Capital to FLCP* | $100,000.00 |
| Less: Preferred Return to Lyrical* | $2,526,822.00 |
| Less: Preferred Return to FLCP* | $65,531.00 |
| Total Deduction | $7,292,353.00 |
| Remaining Funds | $3,385,004.33 |

### *b.  Common Allocation*

| Available Funds for Common Allocation | $3,385,004.33 |
|---|---|
| Less: Lyrical: 75% | $2,538,753.25 |
| *FLCP: 25%* | *$846,251.08* |
| Available Funds for Reallocation | $846,251.08 |

---

* These amounts were distributed to Lyrical and FLCP in August 2014.

### III. Distributions from FLCP to Lyrical – Allocation Agreement
#### a. *Lyrical's Share of FLCP's Common Allocation*

| Available Funds for Reallocation | $846,251.08 |
|---|---|
| Less: Lyrical Share: 25% | $211,562.77 |
| *FLCP Share: 75%* | *$634,688.31* |
| Lyrical Liability to FLCP | $634,688.31 |

#### b. *Lyrical's Share of HLA II and HLA III Carried Interest*

| Lyrical Liability to FLCP | $634,688.31 |
|---|---|
| Less: Lyrical Share of HLA II Carried Interest: 10% | $101,007.20 |
| Less: Lyrical Share of HLA III Carried Interest: 10% | $6,736.90 |
| Remaining Lyrical Liability to FLCP | $526,944.21 |

#### c. *Lyrical's Share of FLCP's Management Fees*

| Lyrical Liability to FLCP | $526,944.21 |
|---|---|
| Less: Lyrical Share of FLCP Management Fees | $1,511,365.52 |
| FLCP Liability to Lyrical | $984,421.31 |

| Management Fees | 25% Share to Lyrical | |
|---|---|---|
| | Total | Post-6/11/2011 |
| Revolabs | $4,164,896.10 | $2,826,426.24 |
| Portadam | $1,425,000.00 | $505,074.00 |
| Rethink Autism | $455,566.00 | $429,573.00 |
| Total | $6,045,462.10 | $3,761,073.24 |
| Lyrical Share | $1,511,365.52 | $940,268.31 |

| IV. Loan to FLCP | |
|---|---|
| FLCP Liability to Lyrical | $984,421.31 |
| Plus: Liability of FLCP, Mehta, and Shalov to Keswin (Loan Plus Interest) | $1,106,666.62 |
| Total FLCP Liability to Lyrical | $2,091,087.93 |

| V.  FLDP Clawback – FLDP Operating Agreement | |
|---|---|
| FLCP Liability to Lyrical | $2,091,087.93 |
| Less: FLCP Carried Interest from FLDP | $23,025.20 - $193,515.67 |
| Total FLCP Liability to Lyrical | $2,114,113.13 - $2,284,603.60 |

## FLCP Liability to Lyrical
# $2,114,113.13 - $2,284,603.60

16-08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit
document 1   Pg 209 of 282

# EXHIBIT H

310

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,          :
                                             :
                Plaintiff/                    :
                Counterclaim Defendant,      :
                                             :
        v                                     : Civil Action
                                             : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and           :
LYRICAL OPPORTUNITY PARTNERS, L.P.,          :
                                             :
                Defendants/                   :
                Counterclaim Plaintiffs.  :


                            _ _ _


                    Chancery Courtroom No. 12B
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Tuesday, June 16, 2015
                    9:15 a.m.


                            _ _ _

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                            _ _ _



                TRIAL TRANSCRIPT - VOLUME II


--------------------------------------------------------
                CHANCERY COURT REPORTERS
                New Castle County Courthouse
            500 North King Street - Suite 11400
                Wilmington, Delaware 19801
                    (302) 255-0523

1  in reality, what you lose from that money is either
2  2.5 million under your version sometimes or
3  1.875 million under our version of carry.
4       A.       That's correct.
5       Q.       You don't lose 10 million of carry.
6       A.       No; that's correct.
7       Q.       Lyrical shoulders that.  I mean, that
8  goes -- instead of becoming profit on HLA, that gets
9  applied to repay them for their losses.  So they
10 pay 25 -- 75 to 81.25 percent comes out of their share
11 of the upside.  That's correct math.
12      A.       Yeah.
13      Q.       Simple math.
14      A.       That's math.
15      Q.       In the case of the 400K, however, the
16 two of you said, okay -- in the case of the 400K, the
17 two of you said that you were going to pay it back not
18 in the waterfall; but once it was determined how much
19 carry you got, you would pay it directly from your
20 carry.  You were going to pay a hundred cents on the
21 dollar because it was a personal matter for you.
22      A.       That's what it says in this agreement,
23 yes.
24      Q.       Right.  And it was a personal matter

1  for you because you were taking it, in part, to pay
2  off the personal fraud suit that had been filed
3  against the two of you.
4       A.       No, that is not correct.
5       Q.       What were you taking it for?
6       A.       We had borrowed -- we had signed
7  personally with a lot of vendors, and this was at a
8  time we were actually trying to keep Performance
9  running.  So we were borrowing to pay vendors,
10 actually personal -- mainly personal but to keep the
11 business operating.
12      Q.       All right.  Well, at that time for
13 whatever it was, for whatever reason you're going to
14 give us now, the two of you determined that it was
15 yours -- your personal debt and your personal problem
16 and it would have to come out of your specific share
17 of the carry.
18      A.       That is correct.
19      Q.       And that's, in fact, what you said to
20 the man in Exhibit 65, I believe it is.  That's
21 item (2).
22      A.       (Reviewing)  Yes, that's what it says.
23      Q.       And you had every intention of
24 repaying the loan with interest from the HLA carry

1  until Mr. Gage sent you his March 2015 waterfall;
2  isn't that true?
3       A.       Yes, it is.
4       Q.       All right.  Let me talk briefly about
5  management fees; all right?
6                Your counsel showed Mr. Keswin
7  yesterday JX-101.  Would you take a look at Joint
8  Exhibit 101?  Do you see that?
9       A.       Yes, I do.
10      Q.       And it has attached to it a -- it
11 looks like a "Finger Lakes Summary v3.xls."  I guess
12 it's an Excel spreadsheet.  "File Produced Natively."
13 See that?
14      A.       Yes, I do.
15      Q.       Those are -- those are financials
16 received from you by Lyrical, are they not?  The
17 information on there is sent to you -- sent to them by
18 you, is it not?  It's a question.
19      A.       Ted Gage, Dan Deserio, Ted from Dan,
20 Dan, Ted.
21      Q.       I'm asking about the attachment that
22 they're talking about.
23      A.       I don't know if the attachment was
24 sent by us because -- I mean, it could have been.

1       Q.       Well, would this information have
2  gotten anywhere else?
3       A.       Well --
4       Q.       In any event --
5       A.       -- you're asking me to testify --
6       Q.       Take --
7       A.       -- to something --
8       Q.       Take --
9       A.       -- I don't know.
10      Q.       Take a look with me.
11      A.       I'm not trying to be difficult.
12      Q.       Take a look with me.  Your counsel
13 yesterday on the second page of this xls sheet pointed
14 Mr. Keswin to FLCP management fees and then pointed
15 out 561,000 and 616.  Do you see those?
16      A.       Yes, I do.
17      Q.       Those aren't correct, are they?
18      A.       I believe at the time they were
19 correct.
20      Q.       You believe at the time that Tiber
21 paid you in 2008 $226,225 in fees?  They didn't pay
22 you anything that year.
23      A.       I don't -- I don't know what this is.
24      Q.       Right.  So those numbers are wrong,

673

1                        CERTIFICATE

2                    We, JEANNE CAHILL, JULIANNE LaBADIA,

3    and NEITH D. ECKER, Official Realtime Reporters for

4    the Court of Chancery of the State of Delaware, do

5    hereby certify that the foregoing pages numbered 3

6    through 671 contain a true and correct transcription

7    of the proceedings as stenographically reported by us

8    at the hearing in the above cause before the Vice

9    Chancellor of the State of Delaware, on the date

10   therein indicated.

11                   IN WITNESS WHEREOF we have hereunto

12   set our hands at Wilmington, this 22nd day of June

13   2015.

14

15                            /s/ Neith D. Ecker
                     ---------------------------------
16                   Chief Realtime Court Reporter

17

18                            /s/ Jeanne Cahill
                     ---------------------------------
19                   Official Realtime Court Reporter

20

21                            /s/ Julianne LaBadia
                     ---------------------------------
22                   Official Realtime Court Reporter

23

24

                CHANCERY COURT REPORTERS

FILED: NEW YORK COUNTY CLERK 09/01/2015 06:53 PM
INDEX NO. 156356/2015
NYSCEF DOC. NO. 19
RECEIVED NYSCEF: 09/01/2015

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 213 of 282

# EXHIBIT H

310

        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FINGER LAKES CAPITAL PARTNERS, LLC,     :
                                        :
                Plaintiff/              :
                Counterclaim Defendant, :
                                        :
        v                               : Civil Action
                                        : No. 9742-VCL
HONEOYE LAKE ACQUISITION, LLC, and      :
LYRICAL OPPORTUNITY PARTNERS, L.P.,     :
                                        :
                Defendants/             :
                Counterclaim Plaintiffs. :


                        - - -

                        Chancery Courtroom No. 12B
                        New Castle County Courthouse
                        500 North King Street
                        Wilmington, Delaware
                        Tuesday, June 16, 2015
                        9:15 a.m.

                        - - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

                        - - -


            TRIAL TRANSCRIPT - VOLUME II


------------------------------------------------------------
            CHANCERY COURT REPORTERS
        New Castle County Courthouse
    500 North King Street - Suite 11400
        Wilmington, Delaware 19801
            (302) 255-0523

**342**

G. Shalov - Direct

1  in lieu of salary.  Most people in my position would
2  have probably received salary and options.  I received
3  options.
4      Q.      Who received the options?  I'm sorry.
5  Who received -- did you get the money from these
6  options, ultimately?
7      A.      Yes.
8      Q.      Did it go to you personally?
9      A.      I'm sorry.  No.  Finger Lakes Capital
10  Partners received the money for the options.
11      Q.      That's my question.  Why is Finger
12  Lakes receiving the money for options given to you
13  personally?
14      A.      My workings with Mr. Mehta was
15  everything we earned was split 50/50.  That was just
16  the way we partner.
17      Q.      Did Revolabs have any other employees
18  who also received options at any time?
19      A.      Yes.
20      Q.      Who?
21      A.      Well, I mean, a lot of people received
22  small options, as you can see here, but many people
23  received large options, like Chris Jenkins, who was
24  the CFO.  The second CFO came after, Peter Hemme.  Our

**343**

G. Shalov - Direct

1  head of engineering, Bill Barton, and then our
2  subsequent head of engineering.  So any senior person
3  received nice-sized options.
4      Q.      Do you know if the options grants to
5  these other folks were similar in size to the options
6  that you received?
7      A.      It looks pretty similar to me.
8      Q.      Were these people, unlike you,
9  receiving a salary also?
10      A.      Yes, they were.
11      Q.      In December of 2007, how much was this
12  company worth, do you know?
13      A.      I -- I don't know.  Let's say 10
14  million.
15      Q.      Okay.  So if the options had been
16  given to you for free -- in other words, with a strike
17  price of zero -- and they were effective immediately,
18  how much would they have been worth to you at the
19  time?
20      A.      $100,000.
21      Q.      Did the options, in fact, have a
22  strike price?
23      A.      Yes, they did.  It's right here as
24  $1.48.  You'll notice that people who received it

**344**

G. Shalov - Direct

1  earlier got it at $1.09.  It's whatever FMV, fair
2  market value, is, that's the option.
3      Q.      That's what I was going to ask you.
4  Do you have any understanding as to how that $1.48
5  valuation -- that $1.48 strike price was determined?
6      A.      It -- it would have been at -- I think
7  that the rule is you need a valuation by a third party
8  to create the strike price of options, but I don't
9  want to swear to that, because I'm not 100 percent
10  positive.  But I thought that's how it worked.
11      Q.      If your sole compensation in 2007 for
12  your sales work were these options, and the company
13  went out of business the next year, how much
14  personally would you have received for your sales work
15  in 2007?
16      A.      Zero.
17      Q.      Previously you testified that you were
18  drawing a salary from Revolabs.
19      A.      Yes.
20      Q.      Did you ever tell Lyrical about that,
21  that you were drawing a salary from Revo?
22      A.      Many times.
23      Q.      And when you say you told Lyrical, who
24  did you tell at Lyrical specifically, if you remember?

**345**

G. Shalov - Direct

1      A.      Jeff Keswin, Ted Gage, and probably
2  Dan Deserio.
3      Q.      And you said they were in the room.
4  So how did it come that you told Revo about that?  I
5  mean, how did it come that you told Lyrical about
6  that?
7      A.      Lyrical knew full well I was in charge
8  of sales.  In fact, I went to their office and
9  installed a system in their office, I think twice.
10  And they knew my position very well.  I told them my
11  position.  They knew.  They asked if I was drawing
12  money.  I said yes.  I -- I mean, I -- I can't recall
13  specific conversations, but there's -- I can't see how
14  they can say they didn't know.
15      Q.      Did Lyrical voice any objection to the
16  amount of salary you were taking?
17      A.      No.
18      Q.      Did you tell -- who at Lyrical did you
19  tell specifically the amount of salary you were
20  taking?
21      A.      I -- I don't recall.
22      Q.      At the time you were discussing the
23  salary with Mr. Keswin, Mr. Gage, others at Lyrical,
24  did any one of those individuals tell you at that time

Trial Transcript Vol II - 6/16/15 - Finger Lakes v Honeyoe Lake, et al. - Del. Chanc. 9742-VCL
16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 216 of 282

G. Shalov - Cross                522

1    you were about to get into a fight?
2         A.        No.
3         Q.        What does your dad do?  What did he
4    do?  He's retired, but what did he do?
5         A.        Actually, he's not retired, and at
6    this time he was working at Quest Advisors, which is a
7    bank restructuring or ...
8         Q.        What was his training?  What was he
9    trained as?
10        A.        He was a lawyer.
11        Q.        He was a lawyer, exactly.  All right.
12        Do you have any documentation of a
13   footnote prior to October 2009 on this schedule?
14        A.        I don't believe so.
15        Q.        Do you have any documentation anywhere
16   of any writing by anybody at Lyrical that says "Oh, we
17   don't think the debt is part of the clawback"?
18        A.        In writing?  No, I don't believe so.
19        Q.        Let me talk to you briefly -- oh,
20   you -- the catch-up, we already established that the
21   first document we have for it is 2009 where you say
22   that you thought it was part of the clawback.  Do you
23   have anything earlier than that when you talked to
24   anybody about it?

G. Shalov - Cross                523

1         A.        I don't know.  I mean, do you -- do I
2    have any documentation?
3         Q.        Yeah.
4         A.        No.
5         Q.        Do you have any documentation -- I'm
6    not aware of any so I'm asking you --
7         A.        I'm not aware of any as well.
8         Q.        Okay, all right.  So fair to state
9    that you probably raised it for the first time in
10   2009?
11        A.        No.
12        Q.        In order to have raised it, it would
13   seem to me you would have had to have read the
14   agreements, don't you think?
15        A.        I don't know if I read them, Zubin
16   read them, or whoever read them.
17        Q.        But in order to have known that you
18   didn't have any catch-ups, you would have had to have
19   read the actual agreement and said "What is the
20   distribution waterfall in this agreement?"; right?
21        A.        Probably, yeah.
22        Q.        Another opportunity to notice that
23   there was no 25 of 25.  Isn't that right?
24        A.        That's right.

G. Shalov - Cross                524

1         Q.        If you had read it carefully enough to
2    understand that there was no catch-up, you would have
3    noticed there's no 25 of 25, wouldn't you?
4         A.        I probably would have noticed I got no
5    return on my investment, too.
6         Q.        Ah, that was --
7         A.        25 percent return.
8         Q.        That was the other question I had for
9    you.  In the allocation agreement, the original term
10   sheet -- I've forgotten the number -- 220, there's
11   no -- there's no catch-up, is there?
12        A.        No.
13        Q.        No.  And the deal that's laid out
14   there doesn't have a catch-up.
15        A.        No, it does not.
16        Q.        It does not.  So your agreement with
17   Mr. Keswin had no catch-up in it, either the
18   allocation agreement or the -- or the operating
19   agreements -- the first operating agreement, which
20   then became the template for all the rest of them,
21   there was no catch-up there; right?
22        A.        I'm not denying that.
23        Q.        And you never discussed it with them,
24   either.

G. Shalov - Cross                525

1         A.        I -- I -- you asked --
2         Q.        It's just a yes.
3         A.        I did at some point --
4         Q.        After --
5         A.        -- yes.
6         Q.        -- before -- before 2009 you didn't
7    discuss it.
8         A.        I believe I did discuss it in an oral
9    discussion, yes.
10        Q.        In 2009 is what we're saying.
11        A.        No.  I'm saying prior to 2009.  I
12   don't remember the exact date, but I recall that Zubin
13   brought it up at some point earlier than that.
14        Q.        Okay.  So you knew about the 25 wasn't
15   part of the 25 earlier than that?
16        A.        Why do you draw that conclusion?
17        Q.        Because how do you read that provision
18   and not see that there's no 25 of 25 in it?
19        A.        The same way I read it and don't see I
20   don't get my money.  I don't know why that's
21   confusing.
22        Q.        Let me ask you briefly about
23   Mr. Keswin's $400,000 personal loan to you.
24        A.        Okay.

1      Q.      Or to Lyrical, which you guaranteed.
2  Let's do this correctly.
3      Q.      The loan to Lyrical which you and
4  Mr. Mehta guaranteed.
5      A.      I think you mean loan to Finger Lakes
6  Capital --
7      Q.      Fair.
8      A.      -- Partners.
9      Q.      I do. You're absolutely right. Thank
10  you.
11     A.      Finger Lakes Capital Partners.
12     Q.      That's right.
13     A.      Okay.
14     Q.      All right. You took out that loan.
15  Right?
16     A.      I'm sorry. I couldn't hear you.
17     Q.      You and Mr. Mehta went to him and
18  asked him for that loan. You asked him for, like, a
19  million-dollar revolver, and then you drew $400,000
20  down on it; right?
21     A.      That's correct.
22     Q.      And he gave it to you.
23     A.      Yes.
24     Q.      Let me ask you to look at 58.

1      Q.      Right. And you knew you weren't --
2  you knew you didn't have that money well before
3  July 31st, 2007, didn't you?
4      A.      Yes.
5      Q.      All right. And it's -- and it's in
6  that connection that you said to him, "All right.
7  Well, we'll pay it back personally. Greg" -- "Zubin,
8  Mr. Mehta and I will pay it back personally to you
9  from the carrying interest portion that comes directly
10  to us."
11     A.      I don't understand the question.
12     Q.      Well, you understand the notion that
13  in the clawback you're not being asked to pay back the
14  full amount of the loss. A lot of that is coming out
15  of money that Mr. Keswin would have
16  received anyway as a result of the HLA investment. Do
17  you understand that? Or does that --
18     A.      I'm not -- I'm not clear on what
19  you're getting at.
20     Q.      Here's what I'm getting at. There's a
21  pot of money there. Let's just do it in round
22  numbers. Let's say there's $20 million that's
23  distributed; right?
24     A.      Okay.

1      A.      I see it.
2      Q.      Right. That's an e-mail you wrote to
3  Mr. Keswin on or about July 28th, 2006.
4      A.      That is correct.
5      Q.      Why was it that there's really nothing
6  else you could say at that point except "... we
7  promise we will bleed until we make you money"?
8      A.      At that point, we had only lost money.
9      Q.      You lost almost $6 million of his
10  money, for sure, at that point; right?
11     A.      That is correct.
12     Q.      And then let me go with you to 59.
13     A.      Yes.
14     Q.      That's the document you sign on
15  August 1st, 2006, for the note.
16     A.      Yes.
17     Q.      And it was due a year and a half
18  later, July 31. It was due a year later. That was
19  the maturity date, July 31, 2007.
20     A.      Yes.
21     Q.      And you couldn't pay it then, either.
22  You couldn't pay it back then, either. You didn't
23  have the money.
24     A.      No, I did not.

1      Q.      You would be entitled to 25 -- 25 --
2  actually, 75 percent of 25 percent, which we've
3  decided is 18.75 percent under one version, or
4  25 percent under some other version of that money, but
5  the breakout would be 75-25. And if the allocation
6  agreement's -- is upheld by the Court, it would be
7  81.25 and 18.75 of the money that's available to be
8  distributed; correct?
9      A.      Correct.
10     Q.      And so the way the clawback works is
11  if you owe the guy $10 million, the 10 million comes
12  off the top of that 20; right?
13     A.      Yes.
14     Q.      Before you do the split.
15     A.      But when you say "that guy," you mean
16  Lyrical Opportunity --
17     Q.      I mean --
18     A.      -- Partners?
19     Q.      -- Lyrical Opportunity Partners --
20     A.      Because that's --
21     Q.      -- that's right.
22     A.      -- an individual and a firm --
23     Q.      I understand that.
24             So that money comes off the top and,

1  in reality, what you lose from that money is either
2  2.5 million under your version sometimes or
3  1.875 million under our version of carry.
4          A.       That's correct.
5          Q.       You don't lose 10 million of carry.
6          A.       No; that's correct.
7          Q.       Lyrical shoulders that.  I mean, that
8  goes -- instead of becoming profit on HLA, that gets
9  applied to repay them for their losses.  So they
10  pay 25 -- 75 to 81.25 percent comes out of their share
11  of the upside.  That's correct math.
12          A.       Yeah.
13          Q.       Simple math.
14          A.       That's math.
15          Q.       In the case of the 400K, however, the
16  two of you said, okay -- in the case of the 400K, the
17  two of you said that you were going to pay it back not
18  in the waterfall; but once it was determined how much
19  carry you got, you would pay it directly from your
20  carry.  You were going to pay a hundred cents on the
21  dollar because it was a personal matter for you.
22          A.       That's what it says in this agreement,
23  yes.
24          Q.       Right.  And it was a personal matter

G. Shalov - Cross                    531

1  for you because you were taking it, in part, to pay
2  off the personal fraud suit that had been filed
3  against the two of you.
4          A.       No, that is not correct.
5          Q.       What were you taking it for?
6          A.       We had borrowed -- we had signed
7  personally with a lot of vendors, and this was at a
8  time we were actually trying to keep Performance
9  running.  So we were borrowing to pay vendors,
10  actually personal -- mainly personal but to keep the
11  business operating.
12          Q.       All right.  Well, at that time for
13  whatever it was, for whatever reason you're going to
14  give us now, the two of you determined that it was
15  yours -- your personal debt and your personal problem
16  and it would have to come out of your specific share
17  of the carry.
18          A.       That is correct.
19          Q.       And that's, in fact, what you said to
20  the man in Exhibit 65, I believe it is.  That's
21  item (2).
22          A.       (Reviewing)  Yes, that's what it says.
23          Q.       And you had every intention of
24  repaying the loan with interest from the HLA carry

1  until Mr. Gage sent you his March 2015 waterfall;
2  isn't that true?
3          A.       Yes, it is.
4          Q.       All right.  Let me talk briefly about
5  management fees; all right?
6          Your counsel showed Mr. Keswin
7  yesterday JX-101.  Would you take a look at Joint
8  Exhibit 101?  Do you see that?
9          A.       Yes, I do.
10          Q.       And it has attached to it a -- it
11  looks like a "Finger Lakes Summary v3.xls."  I guess
12  it's an Excel spreadsheet.  "File Produced Natively."
13  See that?
14          A.       Yes, I do.
15          Q.       Those are -- those are financials
16  received from you by Lyrical, are they not?  The
17  information on there is sent to you -- sent to them by
18  you, is it not?  It's a question.
19          A.       Ted Gage, Dan Deserio, Ted from Dan,
20  Dan, Ted.
21          Q.       I'm asking about the attachment that
22  they're talking about.
23          A.       I don't know if the attachment was
24  sent by us because -- I mean, it could have been.

G. Shalov - Cross                    533

1          Q.       Well, would this information have
2  gotten anywhere else?
3          A.       Well --
4          Q.       In any event --
5          A.       -- you're asking me to testify --
6          Q.       Take --
7          A.       -- to something --
8          Q.       Take --
9          A.       -- I don't know.
10          Q.       Take a look with me.
11          A.       I'm not trying to be difficult.
12          Q.       Take a look with me.  Your counsel
13  yesterday on the second page of this xls sheet pointed
14  Mr. Keswin to FLCP management fees and then pointed
15  out 561,000 and 616.  Do you see those?
16          A.       Yes, I do.
17          Q.       Those aren't correct, are they?
18          A.       I believe at the time they were
19  correct.
20          Q.       You believe at the time that Tiber
21  paid you in 2008 $226,225 in fees?  They didn't pay
22  you anything that year.
23          A.       I don't -- I don't know what this is.
24          Q.       Right.  So those numbers are wrong,

673

1                        CERTIFICATE

2                    We, JEANNE CAHILL, JULIANNE LaBADIA,

3      and NEITH D. ECKER, Official Realtime Reporters for

4      the Court of Chancery of the State of Delaware, do

5      hereby certify that the foregoing pages numbered 3

6      through 671 contain a true and correct transcription

7      of the proceedings as stenographically reported by us

8      at the hearing in the above cause before the Vice

9      Chancellor of the State of Delaware, on the date

10     therein indicated.

11                    IN WITNESS WHEREOF we have hereunto

12     set our hands at Wilmington, this 22nd day of June

13     2015.

14

15                              /s/ Neith D. Ecker
                       ---------------------------------
16                     Chief Realtime Court Reporter

17

18                              /s/ Jeanne Cahill
                       ---------------------------------
19                     Official Realtime Court Reporter

20

21                              /s/ Julianne LaBadia
                       ---------------------------------
22                     Official Realtime Court Reporter

23

24

                 CHANCERY COURT REPORTERS

# Exhibit I

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION, LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT LYRICAL OPPORTUNITY PARTNERS, L.P.'S OPENING POST-TRIAL BRIEF

OF COUNSEL:
Bijan Amini
John W. Brewer
Jaime B. Leggett
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
Facsimile: 212.490.4208
E-mail: bamini@samlegal.com
E-mail: jbrewer@samlegal.com
E-mail: jleggett@samlegal.com

SMITH KATZENSTEIN &
JENKINS LLP
David A. Jenkins
The Brandywine Building
1000 West Street, Suite 1501
P.O. Box 410
Wilmington, DE 19899
Telephone: 302.652.8400
Fax: 302.652.8405
E-mail: djenkins@skjlaw.com

*Attorneys for Defendants*

July 2, 2015

::1. BRIEF.DOCX.1

## NATURE AND STAGE OF PROCEEDINGS

By this breach of contract action, Lyrical[1] seeks to enforce the terms of the Allocation Agreement (JX220) and Clawback Agreement (JX49; JX82), which Manager seeks to repudiate.  Pursuant to those Agreements, Lyrical is entitled to (1) a clawback for its losses from the net proceeds of the March 2014 sale of Revolabs, the only successful investment made by the parties, before the payment of carried interest to Manager; (2) 25% of Manager's carried interest; and (3) 25% of certain management fees earned by Manager from the companies purchased with Investors' funds.[2]

At a hearing on January 28, 2015, the Court orally awarded an interlocutory judgment to Manager for carried interest under the Revolabs Holdings operating agreement, and set for trial Lyrical's counterclaims concerning the Allocation and Clawback Agreements.  Trial took place on June 15-16, 2015. This is Lyrical's opening post-trial brief.

---

[1]    Attached as Exhibit A is a listing of the defined terms for the parties and their affiliates.

[2]    Manager asserted Lyrical lacked standing to enforce the terms of Keswin's $400,000 loan to Manager.  Lyrical accordingly is withdrawing its request for recovery under that agreement.  Keswin has since sued Manager, Mehta, and Shalov in New York state court to recover this loan.

16-08212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit
document 1    Pg 223 of 282

# EXHIBIT I

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff and counterclaim defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 9742-VCL |
| | ) | |
| HONEOYE LAKE ACQUISITION LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) | |
| | ) | |
| Defendants and counterclaim plaintiffs. | ) | |

**ORDER ON
PARTIAL MOTION TO DISMISS AND
PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS**

WHEREAS, on January 28, 2015, the Court held a hearing on the Defendants' Partial Motion To Dismiss The Complaint (the "Motion to Dismiss") and the Plaintiff's Motion For Partial Judgment On The Pleadings On Its Complaint And Partial Motion To Dismiss Counterclaims (the "Motion for Judgment on the Pleadings");

NOW, THEREFORE, this _____ day of _____, 2015, for the reasons stated on the record during the January 28 hearing, it is **ORDERED** as follows:

1.    The Motion for Judgment on the Pleadings is granted in part and denied in part as follows:

(a)    Judgment shall be, and hereby is, entered in favor of the Plaintiff and against Defendants, in the amount of $ _____, calculated as follows:

(i)    25% of the net sales proceeds (after subtracting payments made to Finger Lakes Capital Partners, LLC and Lyrical Opportunity Partners, L.P., including payments representing a return of their capital and their preferred return that is not in dispute) that Honeoye Lake Acquisition, LLC ("HLA") received  as a result of the sale of Revolabs, Inc. ("Revolabs") ($13,775,317,77); plus

(ii)    25% of the amount of the preferential distribution made by HLA to Defendant Lyrical Opportunity Partners, L.P. ("Lyrical") referred to in paragraph 5 of the Counterclaim ($6,083,886.00);  plus

(iii)    25% of the additional interest earned by HLA through July 15, 2015 ($34,952.64); less

(iv)    Subject to counsel for HLA and Lyrical submitting an affidavit in accordance with Rule 88, 25% of the $137,043 amount paid or owing (a) by HLA to its counsel incurred defending against the Complaint through January 28, 2015, or (b) to Lyrical or its counsel for advancement of reasonable

legal fees and expenses incurred defending against the Complaint through January 28, 2015, totaling $34,260.75; plus

(v)    Prejudgment interest at the legal rate of 5.75%, compounding quarterly, running from March 21, 2014 until the date of this Judgment, totaling $_____.

(b)    Post-judgment interest shall accrue from the date of this Judgment, compounding quarterly, at the prevailing legal rate.

(c)    For avoidance of doubt, the legal fees and expenses referred to by subparagraph (a)(iii) above do not include any fees or expenses incurred in connection with prosecuting the Counterclaims.

(d)     Judgment further shall be, and hereby is, entered in favor of the Plaintiff and against the Defendants for 25% of the amount, net of related expenses, that HLA receives from the escrowed portion of the proceeds of the sale of Revolabs referred to in Paragraph 44 of the Complaint.

(e)    The Motion for Judgment on the Pleadings is otherwise denied.

2.    The Motion to Dismiss is denied.

3.    Count II and Count III of the Complaint are stayed until (i) the Court finally adjudicates Count I of the Complaint and the Defendants' Counterclaims, or (ii) further Order of the Court.

_____
Vice Chancellor J. Travis Laster

# Exhibit J

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff and counterclaim defendant, | ) ) ) ) ) | |
| v. | ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) | |
| Defendants and counterclaim plaintiffs. | ) ) ) ) ) | |

## PLAINTIFF'S ANSWERING POST-TRIAL BRIEF

ASHBY & GEDDES
Andrew D. Cordo (#4534)
Toni-Ann Platia (#5051)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
OF COUNSEL:
Stuart Kagen (*pro hac vice*)      Wilmington, Delaware  19801
Daniel A. Cohen (*pro hac vice*)    (302) 654-1888
KAGEN LAW FIRM
570 Lexington Avenue, 16th Floor
New York, NY 10022            *Attorneys for Plaintiff Finger Lakes*
(212) 880-2045              *Capital Partners LLC*

Dated:  July 30, 2015

Sept. 16, 2013).  Lyrical points to no such conduct that is the but-for cause of this litigation.

Lyrical first complains about footnotes in a schedule Mehta gave Lyrical in 2009.  Lyrical's CFO, Gage, admits he discussed this schedule in detail with Mehta; that he did not disagree; and that if Lyrical had any disagreement, he would have communicated it.  (JX6 at 233:5-240:4).  Keswin admits he received this email from Gage at the time and did nothing.  (103:4-8).  These facts belie any claim of fraud or trickery, much less that Mehta's October 21, 2009 email somehow caused the current litigation.

Lyrical's citation to a recording transcript is equally absurd.  Putting aside that the transcript does not evidence any deceit, Lyrical did not even bother to question Shalov or Mehta at trial about this transcript, demonstrating its irrelevance to this action.

## XI.   THE COURT SHOULD DISMISS THE PROMISSORY NOTE CLAIM WITH PREJUDICE, FIND THAT LYRICAL OWNED IT AND IT IS TIME-BARRED, AND AWARD FINGER LAKES ATTORNEYS' FEES.

Lyrical forced Finger Lakes in discovery and at trial to expend considerable time and resources defending a claim based upon a promissory note given by Finger Lakes to Keswin (who manages Lyrical) in 2006 (the "Note").  After trial, without seeking Finger Lakes' consent or leave of Court, Lyrical announced it was

withdrawing the claim, purportedly without prejudice.  (Opening Br. 1 n.2, 11

n.14).  Settled law does not permit Lyrical to split its claims after trial.

Before the untimely withdrawal of this claim, Lyrical presented a shifting

target.  First it claimed during discovery that the Note was subject to the Clawback

because Keswin had agreed not to sue Finger Lakes on the Note.  (JX16 at 9; JX6

at 327:2-7).  Then it claimed before trial it sought only recovery of principal, was

waiving any claim of interest, and that Keswin would execute any papers necessary

to avoid double recovery.  (Opening Pretrial Br. 64 n.4).  Then it asserted that

Finger Lakes must pay interest, too, without saying to whom.  (Reply Pretrial Br.

28 n.17).

Finally, at trial, Lyrical represented that Finger Lakes was directly liable to

*Lyrical* on the Note.  Gage's waterfall, which he based on "all of the operative

agreements that were in place between FLCP and Lyrical" (Tr. 562:3-8), states that

the total note debt of $1,106,666.62 is a "Liability to *Lyrical*."  (DX2 (emphasis

added)).

Finger Lakes has a simple defense:  the note is time-barred.  It matured on

July 31, 2007 (JX60 §1.1), more than six years before this action was filed.  10

*Del. C.* §8109.

To avoid that adverse ruling, one week *after* trial, Lyrical announced that it

was unilaterally withdrawing its claim on the Note, and that Keswin was suing on

the Note in New York.  In Delaware, however, once a responsive pleading is

served, an individual claim may not be withdrawn without consent of the adverse

party or leave of the Court.  The withdrawing party's failure to obtain one or the

other requires dismissal of its claim with prejudice.  *Martinez v. Regions Fin.*

*Corp.*, 2009 WL 2937102, at *2 (Del. Ch. Sept. 9, 2009).

　　　The same is true of a claim abandoned during or after trial.  *Coleman v.*

*Newborn*, 948 A.2d 422, 428 n.6 (Del. Ch. 2007).  That is because permitting a

claimant the opportunity to "reassert abandoned claims... in the future would be

manifestly unjust to Defendants."  *Endo Pharmaceuticals Inc. v. Mylan*

*Pharmaceuticals Inc.*, 2014 WL 334178, at *7 (D. Del. Jan. 28, 2014) (holding

plaintiff judicially estopped to reassert claims abandoned midway through trial).[13]

This is true "especially in cases where a party voluntarily drops a claim in a first

action, and then later seeks to maintain a separate second action on the abandoned

claim."  *Kossol v. Ashton Condominium Assoc., Inc.*, 1994 WL 10861, at *3 (Del.

Jan. 6, 1994).  Withdrawal at or after trial operates as a dismissal of the claim with

prejudice.  *Id.* at *3.

_____

　　　[13] Lyrical's request to be recognized as a 25% equity owner of Finger Lakes,
voluntarily withdrawn during trial without consent or leave of court (Opening Br.
42 n.29), must also be dismissed with prejudice.

Lyrical's contention that it withdrew the claim not because of a statute of

limitations problem, but because "Manager raised a standing objection" (Opening

Br. 1 n.2), is no excuse.  It is irrelevant because the mere assertion of an objection

to a claim does not permit withdrawal without prejudice.  More importantly, by

asserting that the Note represented a "liability to *Lyrical*," not Keswin, Lyrical

represented that it had cured any standing issue raised in Finger Lakes' pretrial

answering brief.  Lyrical should not be permitted to disavow that representation.

Lyrical now realizes that it still has a statute of limitations problem.  So, in a

game of hot potato, Lyrical wants to return the Note claim to Keswin, and force

Finger Lakes to re-litigate the Note's enforceability in another forum, where

Lyrical hopes to obtain a better result that it believes it would have gotten here.

The Court should end such gamesmanship.  Given that Lyrical—in Keswin's

presence—sought to enforce the Note as a "liability to Lyrical," the Court should

(1) accept that representation as true and hold that Lyrical owned the Note claim

during trial,[14] and (2) rule that Lyrical's subsequent abandonment of the claim after

---

[14] This result comports with the doctrine of judicial estoppel.  *See Banet v. Fonds de Regulation et de Controle Café Cacao*, 2010 WL 10669933, at *4 (Del. Ch. Mar. 12, 2010) ("Clearly, I accepted Banet's argument that LCM was the owner of the shares in the [prior] Action… His self-serving argument to the contrary now is completely unbelievable, as well as judicially estopped and barred by res judicata."); *Nutzz.com, LLC v. Vertrue Inc.*, 2006 WL 2220971, at **9-10 (Del. Ch. July 25, 2006) (agreeing that "because Nutzz previously asserted that it

trial, without leave of Court, in the face of a meritorious defense, constitutes a

dismissal with prejudice of that claim, and an admission that the Note is time-

barred.  Any lesser relief would condone Lyrical's post-trial claim splitting.

Beyond that, given that (1) Finger Lakes was forced to defend the

promissory note claim in this Court, only to have it withdrawn to avoid an adverse

ruling, and (2) must now defend the same claim a second time in New York, the

Court should award Finger Lakes its attorneys' fees for defending this claim in this

Court, and for making this portion of its post-trial argument.

## XII.  IF LYRICAL RECOVERS ON ITS COUNTERCLAIM, THE COURT SHOULD AWARD FINGER LAKES A SEPARATE JUDGMENT

If Lyrical recovers anything on its counterclaims, the award should be made

in a separate judgment that is not set off against Finger Lakes' judgment.

As discussed in Point III.A, above, Lyrical has no claim for recoupment.

Recoupment requires identity of parties and that both debts arise from the same

transaction.  *TIFD*, 883 A.2d at 859.  Here, Finger Lakes' claim seeks a

distribution from Revolabs Holdings for amounts due under the Revolabs Holdings

Agreement; the counterclaim is asserted by Lyrical based on two other supposed

agreements, the Term Sheet and the Clawback.

---

could bring its claims in this Court because they fell within the arbitration clause's
carve out….  Nutzz cannot now assert that those claims should proceed before the
arbitrator").

FILED: NEW YORK COUNTY CLERK 09/01/2015 06:53 PM INDEX NO. 156356/2015

NYSCEF DOC. NO. 108212-rdd    Doc 1-2    Filed 03/09/16    Entered 03/10/16 10:21:05    Exhibit    RECEIVED NYSCEF: 09/01/2015
document 1    Pg 235 of 282

# EXHIBIT J

Filed:  Jul 13 2015 01:53PM EDT
Transaction ID 57540704
Case No. 9742-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff and counterclaim defendant, | ) ) ) ) | |
| v. | ) ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) | |
| Defendants and counterclaim plaintiffs. | ) ) ) ) | |

**ORDER ON**
**PARTIAL MOTION TO DISMISS AND**
**PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS**

WHEREAS, on January 28, 2015, the Court held a hearing on the Defendants' Partial Motion To Dismiss The Complaint (the "Motion to Dismiss") and the Plaintiff's Motion For Partial Judgment On The Pleadings On Its Complaint And Partial Motion To Dismiss Counterclaims (the "Motion for Judgment on the Pleadings");

NOW, THEREFORE, this _____ day of _____, 2015, for the reasons stated on the record during the January 28 hearing, it is **ORDERED** as follows:

1.    The Motion for Judgment on the Pleadings is granted in part and denied in part as follows:

(a)    Judgment shall be, and hereby is, entered in favor of the Plaintiff and against Defendants, in the amount of $_____, calculated as follows:

(i)    25% of the net sales proceeds (after subtracting payments made to Finger Lakes Capital Partners, LLC and Lyrical Opportunity Partners, L.P., including payments representing a return of their capital and their preferred return that is not in dispute) that Honeoye Lake Acquisition, LLC ("HLA") received  as a result of the sale of Revolabs, Inc. ("Revolabs") ($13,775,317.77); plus

(ii)    25% of the amount of the preferential distribution made by HLA to Defendant Lyrical Opportunity Partners, L.P. ("Lyrical") referred to in paragraph 5 of the Counterclaim ($6,083,886.00);  plus

(iii)    25% of the additional interest earned by HLA through July 15, 2015 ($34,952.64); less

(iv)    Subject to counsel for HLA and Lyrical submitting an affidavit in accordance with Rule 88, 25% of the $137,043 amount paid or owing (a) by HLA to its counsel incurred defending against the Complaint through January 28, 2015, or (b) to Lyrical or its counsel for advancement of reasonable

legal fees and expenses incurred defending against the Complaint through January 28, 2015, totaling $34,260.75;

(v)    Prejudgment interest at the legal rate of 5.75%, compounding quarterly, running from March 21, 2014 until the date of this Judgment, totaling $_____.

(b)    Post-judgment interest shall accrue from the date of this Judgment, compounding quarterly, at the prevailing legal rate.

(c)    For avoidance of doubt, the legal fees and expenses referred to by subparagraph (a)(iii) above do not include any fees or expenses incurred in connection with prosecuting the Counterclaims.

(d)    Judgment further shall be, and hereby is, entered in favor of the Plaintiff and against the Defendants for 25% of the amount, net of related expenses, that HLA receives from the escrowed portion of the proceeds of the sale of Revolabs referred to in Paragraph 44 of the Complaint.

(e)    The Motion for Judgment on the Pleadings is otherwise denied.

2.    The Motion to Dismiss is denied.

3.    Count II and Count III of the Complaint are stayed until (i) the Court finally adjudicates Count I of the Complaint and the Defendants' Counterclaims, or (ii) further Order of the Court.

_____
Vice Chancellor J. Travis Laster

FILED: NEW YORK COUNTY CLERK 09/01/2015 06:53 PM   INDEX NO. 156356/2015

NYSCEF DOC. NO. 16   08212-rdd   Doc 1-2   Filed 03/09/16   Entered 03/10/16 10:21:05   Exhibit   RECEIVED NYSCEF: 09/01/2015
document 1   Pg 240 of 282

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------- x
                                 :

JEFFREY KESWIN,                  :
                                 :    Index No. 156356/2015

              Plaintiff,     :
                                 :    Mot. Seq. Nos. 001, 002

              -against-      :
                                 :

FINGER LAKES CAPITAL PARTNERS, LLC, :
V. ZUBIN MEHTA, and GREGORY SHALOV, :
                                 :

              Defendants.    :
--------------------------------------------------------------- x


### REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION TO DISMISS OR STAY THE ACTION

Plaintiff Jeffrey Keswin ("Plaintiff" or "Keswin"), by and through counsel, submits this reply in support of his motion for summary judgment in lieu of complaint against defendants Finger Lakes Capital Partners, LLC ("FLCP"), V. Zubin Mehta, and Gregory Shalov (collectively, "Defendants") to recover a past-due loan (pursuant to a promissory note (the "Note")) of $400,000, with interest, to FLCP that was guaranteed by its principals, Mehta and Shalov, and in opposition to the Defendants' cross motion to dismiss or stay this proceeding.

### ARGUMENT

Defendants Mehta and Shalov, via Defendant FLCP, obtained $400,000 from Keswin in order to satisfy a debt of an entity managed by FLCP that they had personally guaranteed. When they could not repay what they borrowed from Keswin according to its original terms, they represented in writing on three separate occasions, over a period of several years, that they would repay the note as and when they received funds via the proceeds of any of the investments funded by Keswin and/or one of the funds he manages. Now that those proceeds have finally come into

existence, the Defendants seek to disclaim their prior, written representations, and claim that the statute of limitations ran out prior to the occurrence of the condition that they agreed would trigger their payment obligation. None of their self-serving attempts to explain away their own words create a factual dispute sufficient to avoid summary judgment.[1] Indeed, they now try to twist their own words to make their reaffirmations of liability on the debt in question into reaffirmations of liability on some other, hypothetical and non-existent debt, which was to be repaid only on occurrence of an impossible condition out of funds that could never come into existence. In other words, the best defense they have been able to conjure up is that their promises to repay Keswin were illusory. They offer no explanation (other than the obvious one of an intent to defraud Keswin) of why they would have made such meaningless promises. Aside from the statute of limitations, the Defendants have provided no defenses to payment on the Note and the individual guarantees thereof.

Defendant FLCP (controlled by Mehta and Shalov) previously argued in litigation in Delaware (the "Delaware Action," to which neither Keswin nor Mehta nor Shalov were, as individuals, parties) that this matter was not properly before the Delaware court. Keswin then brought this action in this court rather than have a collateral fight over whether Delaware was the appropriate forum for adjudication of the Note. FLCP, Mehta, and Shalov now flatly contradict the arguments they made in Delaware by contending that Keswin's claim could only be brought there, unwilling to accept the result they obtained in Delaware when the claim was not pressed

---

[1] *See, e.g.*, *Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223, 231 (1978) (holding that affidavit submitted in opposition to §3213 motion was insufficient to raise a triable issue of fact as to whether note had solely been signed in a representative capacity because "only the existence of a bona fide issue raised by evidentiary facts and not one based on conclusory or irrelevant allegations will suffice to defeat summary judgment") (citations omitted); *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 553-54 (1982) (affidavit submitted in opposition to summary judgment failed to raise a triable issue of fact where it "consisted of a compendium of conclusory, self-serving and even speculative assertions").

there. Defendants simply do not wish to repay the money they borrowed, and have concocted meritless procedural and substantive objections in an effort to stave off the inevitable.

A.    This Proceeding Is Properly Before This Court

According to the Defendants, "Though Mehta, Shalov, and Keswin are not individual parties to the Delaware Action, the Delaware Action involves the same subject matter as the instant action and arises out of the same series of alleged wrongs." Defendants' Opposition Brief ("Opp. Br.") at p. 19. In order for a later-filed action to be dismissed pursuant to CPLR 3211(a)(4), there needs to be "sufficient identity as to *both* the parties and the causes of action asserted in the respective actions." *White Light Productions, Inc. v. On the Scene Productions, Inc.*, 231 A.D.2d 90, 93 (1st Dept. 1997) (emphasis added and citation omitted).

There is no dispute that Keswin, Mehta, and Shalov were not parties to the Delaware Action and, indeed, FLCP argued in Delaware that the amounts due under the Note could not be collected there precisely because Keswin (the payee) was not a party (although it was undisputed that he was affiliated with the defendant/counterclaim plaintiff Lyrical Opportunity Partners, L.P. ("Lyrical")). *See* June 22, 2015 Affidavit of Jeffrey Keswin ("Keswin Aff.") at ¶2; September 1, 2015 Affidavit of Bijan Amini ("Amini Aff.")[2] at Exh. A at p. 32 n.7 (FLCP's Pre-Trial Answering Brief). Indeed, Lyrical had not sought repayment of the Note in its counterclaims in Delaware,[3]

---

[2] Keswin submits this affidavit in order to respond to the new factual allegations made by the Defendants, rather than to provide additional grounds in support of his *prima facie* case. *See, e.g., Ticor Title Guarantee Co. v. Bajraktari*, 261 A.D.2d 156, 157 (1st Dept. 1999) ("The motion court's consideration of plaintiff's reply affidavit [on summary judgment] . . . was not improper since the reply merely responded to defendants' argument.") (citations omitted); *Ryan Mgmt. Corp. v. Cataffo*, 262 A.D.2d 628, 629 (2d Dept. 1999) ("Because the evidence submitted by the plaintiff in its reply papers was in direct response to allegations raised by the defendant in his opposition papers, it was properly considered by the court [on summary judgment].").

[3] The Counterclaims did seek amounts due under a contract between FLCP and Lyrical referred to as the "Clawback Agreement," which, if applicable, would have provided under its terms for repayment of principal (but not unpaid interest) "off the top" of proceeds from another transaction. FLCP argued that the emails referring to the loan from Keswin (Keswin Aff. at Exhs. C, D) treated the Keswin loan as outside the scope of the clawback. *See* Amini Aff. at Exh. A at pp. 31-32 (FLCP's Pre-Trial Answering Brief). Again, Lyrical acceded to FLCP's position and declined to pursue the argument that the Clawback Agreement, by its terms, applied to the Keswin loan. Neither Keswin (nor Lyrical on his behalf) ever "waived" any claim to interest, and whether a judgment for the principal amount in the

3

and those counterclaims encompass factual and legal disputes far broader than those related to the

Note.

As trial approached it seemed to Lyrical (and Keswin) that it would be more efficient as a

practical matter to adjudicate all disputes between the parties and their affiliated individuals in the

Delaware Action, but FLCP (and Mehta and Shalov) disagreed.  Rather than fight over whether

Lyrical had standing under the circumstances to assert Keswin's rights on his behalf or seek at a

late stage of the proceedings to amend the pleadings and add new parties, knowing that such an

attempt would not be consented to, Lyrical made the decision to accede to the position FLCP was

then asserting in that forum and discontinue the attempt to collect Keswin's personal debt in an

action in which he was not personally a party.[4]  Amini Aff. at Exh. C at p. 27 (Lyrical's Post-Trial

Reply Brief);[5] Mehta Aff. at Exh. I (Lyrical's Opening Post-Trial Brief).

In any event, the "first in time" rule "is a general rule, not to be applied in a mechanical

way, regardless of other considerations."  *White Light Productions*, 231 A.D.2d at 97 (quotation

and citation omitted).  Keswin is not engaged in improper forum-shopping – rather, he brought

this action in this Court only after FLCP objected to this claim being adjudicated in Delaware – it

---

Delaware Action would have implicitly waived any claim to interest is of purely theoretical interest since no such judgment is being sought or will be obtained.  While Defendant Mehta represents that Gage testified that "Keswin could not collect" the Note (Mehta Aff. at ¶19) (emphasis in original), the 30-plus pages of Gage's deposition testimony provided with Mehta's affidavit do not support Mehta's allegation, and simply provide a lengthy description of Lyrical's forbearance of its own notes against certain FLCP-related investments as well as Gage's belief that Keswin decided not to pursue his remedies under the Note because Keswin believed it would be paid once there were proceeds available to do so.  *See* Mehta Aff. at Exh. C.

[4] Defendant Mehta's affidavit further asserts that Lyrical represented to the Delaware court that the Note was an obligation to Lyrical rather than Keswin.  August 25, 2015 Affidavit of V. Zubin Mehta ("Mehta. Aff.") at ¶24.  This allegation is simply false, and Lyrical at all times represented that the Note was an obligation to Keswin and Lyrical was attempting to pursue it on Keswin's behalf.  Mehta Aff. at Exh. G at 582:5-15 (trial testimony of Gage); *id.* at Exh. F at pp. 27-28 (Lyrical's Pre-Trial Reply Brief); *id.* at Exh. E at pp. 64, 64 n.14 (Lyrical's Pre-Trial Opening Brief); Keswin Aff. at Exh. G at 291:14-292:10 (cross-examination of Mehta); September 1, 2015 Affidavit of Bijan Amini ("Amini Aff.") at Exh. B at p. 24 (Lyrical's Pre-Trial Opening Brief); *id.* at Exh. F at 46:12-24 (trial testimony of Keswin); *id.* at Exh. G at 303:4-304:14, 305:6-11 (cross-examination of Mehta), *id.* at Exh. H at 525:22-526:23 (cross-examination of Shalov).

[5] In the post-trial briefing in the Delaware Action, Lyrical used the term "Manager" to refer to FLCP.

is thus Defendants who are de facto forum-shopping by changing their tune.  They are simply

objecting to the authority of *any* court to require them to live up to their voluntarily-assumed

obligations.

B.    Each of the Three Written Reaffirmations Tolled the Statute of Limitations

As confirmed by the Defendants, under New York General Obligations Law § 17-101, an

acknowledgement must: (1) be in a writing signed by the party to be charged; (2) recognize an

existing debt of the party to be charged; (3) contain nothing inconsistent with an intention on the

part of the party to be charged to pay the debt; (4) be unconditional or be subject to a condition

which has been satisfied; and (5) be communicated to the obligee or someone acting on his behalf,

or be intended to influence the obligee's conduct.  *See* N.Y. Gen. Oblig. Law § 17-101; *Faulkner*

*v. Arista Records LLC*, 797 F. Supp. 2d 299, 312 (S.D.N.Y. 2011).

On November 21, 2006, the Defendants provided their first reaffirmation of the Note, in

an email which provided:

> The $400k loan was indeed something that you (or whatever vehicle it may be)
> gave us personally to cover our PT PG's [personal guarantees] – and this is
> something that the overall Fund (meaning all investments through FLCP/FLDP or
> the "Fund") did not need, and as a result is indeed something we have to make up
> via our carried interest. . . .
>
> [I]n no uncertain terms, we are committed to paying you back the personal loan
> regardless of what happens going forward.

Keswin Aff. at Exh. B.  This email was: (1) signed by Mehta on behalf of FLCP and Shalov, which

the Defendants do not dispute; (2) a recognition of the Note as an existing obligation; (3) consistent

with an intention to repay the Note; (4) subject to a condition that has occurred since the proceeds

from the investment have been realized;[6] and (5) sent directly to Keswin.[7]  Yet the Defendants

essentially ignore this initial reaffirmation in their opposition papers, focusing their quibbles on

the later 2009 and 2010 reaffirmations.  To obtain summary judgment, it is necessary for Keswin

only to show that at least one of the reaffirmations is sufficient to avoid the limitations period;

Defendants by contrast need to raise factual disputes as to the efficacy of all three.

On October 20, 2009 and May 24, 2010, the Defendants again reaffirmed the Note in emails

which referenced an attachment which listed the Note alongside all of FLCP's other invested

capital and provided: "Loan to [Shalov]/[Mehta] from Jeff Keswin is not included in FLCP

Investmet [sic] Portfolio Clawback and is due back to [Keswin] from [Shalov] and [Mehta] out of

their carried interest from FLCP Investment Portfolio."  *Id.* at Exhs. C, D.  This attachment was:

(1) provided with emails signed by Mehta; (2) a recognition of the Note as an existing obligation;

(3) consistent with an intention to repay the Note; (4) subject to a condition which was satisfied;

and (5) communicated to persons employed by Keswin who report directly to him and intended to

influence Keswin's conduct, which the Defendants do not dispute.

C.    The Defendants Have Raised No Triable Issues of Fact

In response to these three written reaffirmations, the Defendants assert a variety of

implausible defenses: (i) that the emails do not recognize a debt owed by FLCP and were also

---

[6] While Defendants make a brief claim that, due to the pendency of the Delaware Action, they have not yet actually received any carried interest, they (via FLCP) successfully took the position there that they were owed millions in carried interest, and the Delaware court agreed, subject only to resolution of Lyrical's counterclaims and outstanding disputes about how those counterclaims interacted with the carried interest claim by way of recoupment and/or set-off.  Amini Aff. at Exh. D at 54:17-55:17 (transcript of January 28, 2015 bench decision).  In fact, although the Court has deferred entry of judgment until the counterclaims are resolved, both parties agreed that the amount of carried interest absent counterclaims is at least $5,007,799.85, an amount more than sufficient to satisfy the amounts owing under the note Keswin seeks to enforce here.  Amini Aff. at Exh. I (FLCP's proposed order); *id.* at Exh. J (Lyrical's proposed order).
[7] The Defendants do not dispute that this email can toll the statute of limitations until the proceeds became available. *See Anonymous v. Anonymous*, 172 A.D.2d 285, 287 (1st Dept. 1991) (acknowledgment can be made before or after limitations period has expired); *Koeben v. Altchek*, 1997 WL 83290, *3 (S.D.N.Y. Feb. 26, 1997) (same); *Lorenzo v. Bussin*, 7 N.Y.2d 1039 (holding that acknowledgment tolled limitations period for duration of debtor's lifetime).

6

somehow insufficient to bind Mehta and Shalov individually; (ii) that the attachments to the 2009

and 2010 emails are not themselves separately signed; (iii) that the promise to repay Keswin was

meaningless and illusory because they stated Keswin would be repaid from funds which could

never actually exist; (iv) that Keswin did not accept the 2009 email; (v) that the attachments to the

2009 and 2010 emails only refer to the principal amount of the Note and do not mention interest;

and (vi) that the 2009 and 2010 emails were not sent directly to Keswin.  None of these purported

defenses is sufficient to avoid summary judgment.

*The Emails Recognize the Note as an Existing Obligation of All Three Defendants*

The Defendants allege that the emails only acknowledge a debt owing by Mehta and

Shalov.  Opp. Br. at 10-11.  There is no claim that the emails refer to some other, different $400,000

debt than the one evidenced by the promissory note executed by FLCP and guaranteed by Mehta

and Shalov.[8]  Since (unlike the case with many of FLCP's other obligations) they had provided

personal guarantees for this loan, it is unsurprising that they would refer to it colloquially as if it

had been a loan made directly to them, especially since the proceeds were used to satisfy another

obligation which Mehta and Shalov had personally guaranteed (thus benefitting them personally

by getting them off the hook on those guarantees).  *See* Amini Aff. at Exh. G at 193:20-194:3,

302:22-303:3 (trial testimony of Mehta); *id.* at Exh. H at 530:15-531:18 (trial testimony of Shalov).

The reaffirmations were made in emails in the Defendants' own somewhat informal words, not in

negotiated formal transactional documents.  The Defendants do not claim that they intended to

reaffirm their personal guarantees on the note but not to reaffirm FLCP's corporate liability on the

---

[8] In *Moore v. Candlewood Holdings, Inc.*, 714 F. Supp. 2d 406, 410-12 (E.D.N.Y. 2010), cited by the Defendants, the court found that a line item for "Loans to Shareholders" in a series of tax returns was insufficient to acknowledge a debt owing to a particular shareholder under a specific debt instrument, particularly where the amounts of the tax return did not correspond to the amounts under the debt instrument and could have referred to other obligations to other shareholders.  Here, no other obligation to which the reaffirmations could have referred is suggested by the Defendants.

note, and no commercially-reasonable rationale is offered for why the email should be read to refer

to anything other than the actually-existing loan and reaffirm the liability of FLCP plus the

individual guarantors.[9]  To the extent the Defendants now seek to claim that the reaffirmations,

read literally, refer to a non-existent obligation, it is impossible to discern a non-fraudulent motive

for them to have made them, and Mehta does not claim in his affidavit that his subjective intention

was to deceive Keswin into believing an existing obligation had been reaffirmed when it had not

been.  *See Faulkner*, 797 F. Supp. 2d at 312 ("In determining an acknowledgement's effectiveness

'there is no occasion for resorting to any subtle or refined distinctions contrary to ordinary business

understanding and rules of common sense.'") (quoting *Estate of Vengroski v. Garden Inn*, 114

A.D.2d 927, 201-02 (2d Dept. 1985)).

The Defendants then contradict themselves by saying that the schedules to the 2009 and

2010 emails purportedly characterizing the debt as owed by Mehta and Shalov (but not FLCP)

were attached to emails sent by FLCP (but not Mehta and Shalov).  Opp. Br. at pp. 4, 17.

Apparently they believe that this alleged mismatch magically frees all three Defendants from any

liability.  But of course the emails were sent and signed by Mehta (and cc'd to Shalov), and this is

simply another too-good-to-be-true argument suggesting that the promise to repay was illusory

and fraudulent.[10]

---

[9] It would be possible in principle to reaffirm the guarantors' obligations separately without reaffirming the principal's
obligation.  *See Am. Trading Co., Inc. v. Fish*, 42 N.Y.2d 20, 26 (1977) ("There is a very basic reason why the
guarantor should not be discharged merely because the Statute of Limitations could have been raised in an action
against the principal.  While ordinarily the liability of a guarantor will not exceed in scope that of his principal, the
guarantee is a separate undertaking and may impose lesser or even greater collateral responsibility on the guarantor.").
But here, where the guarantors were the controlling equityholders and managers of the principal, there is no reason to
construe the reaffirmations that way.  *See, e.g., Banco Do Brasil S.A. v. State of Antigua and Barbuda*, 268 A.D.2d
75, 76-77 (1st Dept. 2000) (finding that acknowledgments by guarantor Ministry of Finance of Antigua and Barbuda
reaffirmed both Ministry's guarantee and country's obligations).
[10] The Defendants do not dispute that Mehta could bind Shalov and FLCP.  *See* Amini Aff. at Exh. E at 162:4-24,
276:8-13 (deposition testimony of Shalov that Mehta had power to bind him and FLCP).  Rather, the Defendants argue
that FLCP cannot acknowledge a debt on behalf of Mehta and Shalov (Opp. Br. at 11 n.1), which ignores that Mehta
signed the emails.

*The Email Attachments Were "Signed" for Purposes of Section 17-101*

The Defendants assert that the attachments to the 2009 and 2010 emails must themselves be signed even though the emails were signed. Not only is this argument irrelevant to the 2006 email, it is contrary to binding precedent, which unsurprisingly treats enclosures to signed letters as "signed" (similarly to how statements in multi-page documents as "signed" whether or not they are on the signature page). *See Chase Manhattan Bank v. Polimeni*, 258 A.D.2d 361, 361 (1st Dept. 1999) (finding that a financial statement acknowledged a debt for §17-101 purposes because: "The record . . . establishes that defendant authorized his secretary to sign the transmittal letter covering the financial statement and to send those documents to plaintiff."). In the case cited by the Defendants, the financial statement had not even been authenticated. *Matter of Brecher*, 80 A.D.2d 583, 583 (2d Dept. 1981).

*The Defendants' Position That the Condition on Which the Reaffirmations Were Premised Could Never Occur Is Unreasonable and Contradicts Their Testimony*

According to the Defendants, "Shalov and Mehta do not have a 'carried interest' in the 'FLCP Investment Portfolio,' only [FLCP] does." Opp. Br. at p. 13. The Defendants' current argument that the words "carried interest" in the three emails is a "term of art" referring only to the funds which *FLCP* would receive from a successful investment – rather than the funds Mehta and Shalov as its controlling managing members would receive – is a distinction with no basis in the parties' understandings, ordinary business practice, or common sense. *See Faulkner*, 797 F. Supp. 2d at 312. This is especially true when, as here, the reaffirmations are contained in emails using the Defendants' own perhaps colloquial phrasing. And, again, the Defendants' current argument is not that Shalov and Mehta might have at the time of the reaffirmations expected some separate and distinct "carried interest" (*i.e.*, other than the expected flow-through of FLCP's carried interest) to arise in their favor at some point in the future that simply has not yet arisen.

Rather, the claim is that they phrased the reaffirmations to make payment conditional upon occurrence of a future event which could never under any circumstances happen, which, again, makes no sense unless they were attempting to defraud Keswin via what appeared to be a concrete promise that could be claimed after the fact to have been illusory.

In any event, the practice of Mehta and Shalov is to split proceeds received by FLCP 50/50 between themselves.  *See* Amini Aff. at Exh. H at 342:11-16 (trial testimony of Shalov).  Further, Shalov and Mehta affirmed under oath at trial that they intended to pay Keswin from their "carry" or "carried interest," meaning the funds they would receive via FLCP from the successful sale of the investment.[11]  Keswin Aff. at Exh H at 531:12-532:3 (trial testimony of Shalov that Mehta and Shalov had agreed to repay the Note from their "carry"); Amini Aff. at Exh. G at 303:4-304:14 (trial testimony of Mehta that the $400,000 loan would be repaid from the "carried interest" obtained by Mehta and Shalov via FLCP); *see also id.* at Exh. G at 240:6-17 (Mehta using term "carry" in his trial testimony to refer to amounts which he and Shalov would receive from the investment which was sold).

### *There Is No Requirement That the 2009 Email Have Been "Accepted" by Keswin*

The Defendants note that the 2009 email asked Lyrical to confirm receipt and "that this works for you," (Opp. Br. at p. 14) (emphasis removed), but the 2009 email did not condition the acknowledgment of the Note upon acceptance by Keswin or Lyrical.  Defendants cite no authority for the proposition that the 2009 email needed to be accepted by Keswin before the Note would be

---

[11] *See, e.g., Mayancela v. Almat Realty Development, LLC*, 303 A.D.2d 207, 208 (1st Dept. 2003) ("Plaintiff's attempt to create a triable issue through the submission of a self-serving, post-deposition affidavit contradicting his prior testimony was properly rejected by the motion court.") (citation omitted); *Covington v. City of N.Y.*, 119 A.D.3d 408, 409 (1st Dept. 2014) ("To the extent that [plaintiff's] affidavit contradicted her prior testimony as to the defect, it was clearly tailored to avoid the consequences of her earlier testimony and was properly disregarded by the motion court.") (citations omitted); *Colucci v. AFC Const.*, 54 A.D.3d 798, 799 (2d Dept. 2008) ("[Plaintiff's] affidavit raised only feigned issues of fact designed to avoid the consequences of his prior testimony, and was insufficient to defeat the motion for summary judgment.") (citations omitted).

reaffirmed (and make no similar claim with respect to the other two reaffirmations).   In fact, acknowledgments do not need to be accepted to be effective.   *See Faulkner*, 797 F. Supp. 2d at 315 ("Section 17-101, of course, does not give rise to a classical 'contract'; there need not be offer, acceptance, or consideration.").

*The Three Emails Reaffirmed the Entirety of the Obligations Owing Under the Note*

The Defendants allege that the Note was not acknowledged by the spreadsheets attached to the 2009 and 2010 emails because those spreadsheets "merely list[] the amount of '$400,000' without including the outstanding interest.  Opp. Br. at p. 14.  The Defendants have no response to the 2006 email, and the cases cited by the Defendants have no bearing on the facts herein.  In *Moore*, the purported acknowledgement of the debt did not refer to the specific obligation or even correspond to the amount owing for that obligation.  *Moore*, 714 F. Supp. 2d at 410-12.  Here, the spreadsheets do not represent that the $400,000 principal is the total amount that could ever be due and owing on the Note; in fact, none of the amounts listed in the spreadsheets include interest.  *See* Keswin Aff. at Exhs. C, D.  Regardless, the spreadsheets both additionally include a footnote stating the Note will be repaid without including any sort of caveat for interest.  Likewise, in *Metwaly v. Int'l Business Machines Corp.*, 97 A.D.3d 414, 515 (1st Dept. 2012), the debt which was purportedly reaffirmed had no provision for interest.  The Note has an express provision for interest.  Keswin Aff. at Exh. A.  Moreover, Defendants cite no authority that the obligation to pay interest must be separately or explicitly reaffirmed.

*There Is No Dispute That All Three Emails Were Intended to Induce Reliance by Keswin*

While the Defendants assert that the 2009 and 2010 emails were not sent directly to Keswin, they do not deny that the 2006 email was sent to him, that the recipients of the 2009 and 2010 emails worked for and reported to Keswin, and that they intended to cause Keswin not to

pursue his remedies under the Note via their acknowledgments of the debt.  As conceded by the

Defendants, an acknowledgment must be either sent to the obligee and/or his agent *or* be intended

to influence his conduct.  Opp. Br. at 9, 15; *Faulkner*, 797 F. Supp. 2d at 312.  The Defendants do

not challenge that the recipients of the 2009 and 2010 emails were Keswin's agents, and there is

no reason the acknowledgments would have been sent to Keswin's employees but for their

relationship with Keswin.  In any event, the 2006 email was sent directly to Keswin, and all three

emails were calculated to cause Keswin to defer pursuing the amounts owing under the Note until

one of the investments had a successful outcome and funds would be available to pay the Note.

Moreover, Defendants offer no alternative explanation of why the reaffirmations would have been

made other than to induce reliance by Keswin and no such explanation can be hypothesized from

the record.  Mehta, who would necessarily possess knowledge of his own subjective intent in

sending the emails, makes no claim in his affidavit of any contrary intent.

D.    No Discovery Is Needed and the Motion Was Properly Brought Pursuant to C.P.L.R. §3213

     The Defendants do not explain (Opp. Br. at 20) how discovery could possibly give them a

further evidentiary basis for opposing summary judgment they do not currently possess.  None of

the four categories they suggest make any sense.  They obviously do not need discovery into what

positions were taken in the pleadings and briefs in the Delaware Action, nor do they need discovery

into what their own intent was in sending the emails, or whether they have received carried

interest.[12]  *See, e.g., Banco Do Brasil S.A. v. State of Antigua and Barbuda*, 268 A.D.2d 75, 78 (1st

Dept. 2000) ("[T]here is no merit to defendants' contention that their motion to dismiss should

---

[12] The claim that they need discovery to determine whether "Lyrical ever confirmed that the spreadsheet worked" is puzzling.  If it is a claim that Lyrical was required to send an email responding to the "if you could please confirm receipt and that this works for you" language in the 2009 email for the acknowledgement of the debt in that email to be valid, that is a meritless legal claim, and there is no dispute requiring discovery as to whether such a "confirmation" was sent.  In any event, the 2009 email is one of three separate acknowledgments, and Defendants would need to show a need for discovery related to all of them.

have been held in abeyance for disclosure on the issue of whether their letter imported an intention to repay.  Defendants do not need to discover their own intention.").

C.P.L.R. §3213 allows a party to proceed by summary judgment in lieu of complaint where there is a written instrument demonstrating an obligation to pay a sum certain at a specified date or in installments.  *See Maglich v. Saxe, Bacon & Bolan, P.C.*, 97 A.D.2d 19, 22 (1st Dept. 1983).  The Defendants somewhat bizarrely complain that the face amount of the Note is $1 million but Keswin only seeks repayment of $400,000 in principal.  They do not, however, claim that there is any factual dispute that $400,000 is (subject to their statute of limitations defense) the principal amount outstanding under the Note.[13]  There is thus no need for this Court to evaluate any extrinsic evidence to establish that undisputed fact, no need for discovery on the exact amount due (the Defendants likewise do not challenge Keswin's arithmetic regarding the amount of interest that has accrued), and no reason (other than the Defendants' desire to delay for delay's own sake) to construe §3213 to require a separate, subsequent summary judgment motion to be made as would have been the case had Keswin proceeded by summons and complaint.[14]

---

[13] In fact, FLCP represented in the Delaware Action that: "While the face amount of the note is $1 million, the parties agree that FLCP only drew down $400,000."  Amini Aff. at Exh. A at p. 31 (FLCP's Pre-Trial Answering Brief).

[14] *See, e.g., Istituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc.*, 47 F.R.D. 310, 315 (S.D.N.Y. 1969) (no bar to use of §3213 summary procedure against guarantor when less than full contemplated amount of loan had been funded but there was no dispute about the specific amount that had been funded).  The cases cited by the Defendants are not to the contrary.  In *Ian Woodner Family Collection, Inc. v. Abaris Books, Ltd.*, 284 A.D.2d 163, 164 (1st Dept. 2001), the payments due under the promissory note could only be determined with reference to "an accelerating schedule of percentages of the revenues received by defendant publishers from sales and any other source" and the court could not even determine without resort to extrinsic evidence whether the defendants had defaulted.  The facts of *Beal Bank v. Melville Magnetic Resonance Imaging, P.C.*, 270 A.D.2d 440 (2d Dept. 2000) are not provided in the decision, but the appellate reply brief available via Westlaw, 2000 WL 34551054, discloses that the parties were arguing about whether extrinsic parol evidence could be used in a §3213 proceeding to vary the terms of the agreement therein.

13

## <u>CONCLUSION</u>

For the foregoing reasons, Keswin respectfully requests that his motion for summary

judgment in lieu of complaint be granted and the Defendants' cross-motion denied.

Dated: New York, New York
September 2, 2015

<b>STORCH AMINI & MUNVES PC</b>

By:    /s/ Bijan Amini
       Bijan Amini
       John W. Brewer
       Jaime Leggett
       2 Grand Central Tower
       140 East 45th Street, 25th Floor
       New York, NY 10017
       (212) 490-4100

       *Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEFFREY KESWIN,                                :

                                               :      Index No. 156356/2015
                     Plaintiff,                :
                                               :      Motions #001 and #002
          -against-                            :
                                               :
FINGER LAKES CAPITAL PARTNERS, LLC,            :
V. ZUBIN MEHTA, and GREGORY SHALOV,            :
                                               :
                     Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

### MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT AND IN SUPPORT OF CROSS-MOTION BY DEFENDANTS TO DISMISS OR STAY THE ACTION

---

Lee S. Shalov
Chester R. Ostrowski
MCLAUGHLIN & STERN, LLP
260 Madison Ave.
New York, NY 10016
(212) 448-1100

*Attorneys for Defendants Finger Lakes
Capital Partners LLC, V. Zubin Mehta,
and Gregory Shalov*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF MATERIAL FACTS ............................................................... 3

        A. Keswin Lends A Different Amount Than Is Shown On The Face Of The Note  3

        B. Finger Lakes Sends An Email To Lyrical's CFO That Does Not Reference

        The Note ........................................................................................... 4

        C. The Unsigned Spreadsheet Does Not Acknowledge A Debt By Finger Lakes... 5

        D. Keswin Fails to Sue Within The Statute Of Limitations ..................................... 6

        E. The Enforceability Of The Note Is Sub Judice In The Delaware Action ............ 6

ARGUMENT ..................................................................................................... 7

   I.  PLAINTIFF'S CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS.............. 8

   II. THE COURT SHOULD REJECT PLAINTIFF'S EFFORT TO RESUSCITATE HIS

   TIME-BARRED CLAIM UNDER SECTION 17-101 ......................................... 8

        A. The Emails And The Spreadsheet Do Not Constitute An Acknowledgment of

        Debt By The Debtor, Finger Lakes ..................................................... 10

        B. The Emails, Spreadsheet, and Transcripts All Fail To Satisfy The Signature

        Requirements Of Section 17-101 ....................................................... 12

        C. At Most, The Emails And Spreadsheet Represent An Intent To Repay The

        Loan Upon Occurance Of An Event That Has Not Occurred And Never Will ..... 13

        D. The Spreadsheet Does Not Acknowledge The Total Debt Keswin Seeks To

        Recover .......................................................................................... 14

        E. Finger Lakes Sent The October 20, 2009 Email to Gage In His Capacity As

        Chief Financial Officer Of Lyrical, Not To Keswin .............................. 15

        F. The Unsigned Spreadsheet Was NEver Communicated to Keswin.................. 16

G. The May 2010 Copy of the 2009 Email Sent To Lyrical Controller Is

Insufficient.............................................................................................................. 17

III. THE COURT SHOULD DISMISS OR STAY THIS ACTION PENDING THE

OUTCOME OF THE DELAWARE LITIGATION............................................................ 17

IV. MATERIAL ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT

IN FAVOR OF THE PLAINTIFF ...................................................................................... 20

CONCLUSION........................................................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Beal Bank v. Melville Magnetic Resonance Imaging, P.C.*, 270 A.D.2d 440, 704 N.Y.S.2d 647 (2d Dep't 2000) ................................................................................................................ 21

*Bild v. Konig*, No. 09-cv-5576 (ARR), 2011 WL 666259 (E.D.N.Y. Feb. 14, 2011) ................. 10

*Centaur, N.V. v. William Lowe, Inc.*, No. 82 Civ. 2429, 1983 U.S. Dist. Lexis 20238 (S.D.N.Y. Jan. 6, 1983) ................................................................................................................ 15

*Chase Manhattan Bank v. CDC Financial Corp.*, 54 Conn. App. 705, 736 A.2d 938 ................ 11

*Cherico, Cherico & Assocs. v. Midollo*, 67 A.D.3d 622 , 886 N.Y.S.2d 914 (2d Dep't 1997) .... 18

*Compania de Inversiones de Engergia S.A. v. AEI*, 80 A.D.3d 533, 915 N.Y.S.2d 546 (1st Dep't 2011) ......................................................................................................................... 9

*Erdheim v. Gelfman*, 303 A.D.2d 714, 757 N.Y.S.2d 320 (2d Dep't 2003) ................................ 12

*Faulkner v. Arista Records LLC*, 797 F.Supp.2d 299 (S.D.N.Y. 2011) ............................... passim

*Hebrew Institute for Deaf & Exceptional Children v. Kahana*, 57 A.D.3d 734, 870 N.Y.S.2d 85 (2d Dep't 2008) .................................................................................................................. 8

*Ian Woodner Family Collection, Inc. v. Abaris Books, Ltd.*, 284 A.D.2d 163, 726 N.Y.S.2d 420 (1st Dep't 2001) ............................................................................................................ 21

*In re Brill*, 318 B.R. (Bankr. S.D.N.Y. 2004) ............................................................................ 13

*Lynford v. Williams*, 34 A.D.3d 761, 826 N.Y.S.2d 335(2d Dep't 2006) ................................... 15

*Matter of Brecher*, 80 A.D.2d 583 (2d Dep't 1981) ................................................................... 12

*Metwaly v. Int'l Business Machines Corp.*, 97 A.D.3d 514, 949 N.Y.S.2d 57 (1st Dep't 2012) . 14

*Miwon, U.S.A. v. Crawford*, 629 F. Supp. 153 (S.D.N.Y. 1985) ................................................. 12

*Moore v. Candlewood Holdings, Inc.*, 714 F.Supp.2d 406 (E.D.N.Y. 2010) ............. 11, 14, 15, 17

*Park Assocs. v. Crescent Park Assocs., Inc.*, 159 A.D.2d 460, 552 N.Y.S.2d 314 (2d Dep't 1990)
.................................................................................................................................... 11

*Santiago v. Joyce*, 127 A.D.3d 954, 7 N.Y.S.3d 403(2d Dep't 2015) ........................................... 7

*Schaller v. Vacco*, 241 A.D.2d 663, 659 N.Y.S.2d 587 (3d Dep't 1997) .................................... 18

*Schmidt v. Merchants Despatch Transp. Co. Felli*, 270 N.Y. 287 (1936) .................................... 2

*Seattle Pacific Industries, Inc. v. Golden Valley Realty Assocs.*, 54 A.D. 3d 930, 864 N.Y.S.2d
500 (2d Dep't 2008) ................................................................................................................ 20

*Syncora Guarantee, Inc. v. J.P. Morgan Securities LLC*, 110 A.D.3d 87, 970 N.Y.S.2d 526 (1st
Dep't 2013) ....................................................................................................................... 18, 19

*UMLIC VP, LLC v. Mellace*, 19 A.D.3d 684, 799 N.Y.S.2d 61 (2d Dep't 2005) ......................... 8

*Vega v. Restani Constr. Corp*, 18 N.Y.3d 499 (2012) .................................................................. 7

*Voss v. Netherlands Ins. Co.*, 22 N.Y.3d 728 (2014) ................................................................... 7

*White Light Productions, Inc. v. On the Scene Productions, Inc.*, 231 A.D.2d 90, 660 N.Y.S.2d
568 (1st Dep't 1997) .............................................................................................................. 18

## Statutes

New York's General Obligations Law ("Section 17-101") ................................................... passim

## Rules

CPLR § 213(2) ...................................................................................................................... 1, 8

CPLR § 3211(a)(4) ....................................................................................................... 1, 3, 17, 18

CPLR § 3211(a)(5) ............................................................................................................. 1, 8, 15

CPLR § 3212(b) ........................................................................................................................ 20

N.Y. U.C.C. § 3-122 .................................................................................................................. 8

iv

Defendants Finger Lakes Capital Partners LLC ("Finger Lakes"), V. Zubin Mehta ("Mehta"), and Gregory Shalov ("Shalov") (collectively, "Defendants") respectfully submit this memorandum of law in opposition to the motion for summary judgment in lieu of complaint (the "Motion") filed by Plaintiff Jeffrey Keswin ("Keswin" or "Plaintiff") and in support of Defendants' cross-motion to dismiss this action as time-barred pursuant to CPLR  3211(a)(5) or under the "first-in-time" rule set forth in CPLR § 3211(a)(4) or, in the alternative, to stay this action pursuant to § 3211(a)(4) (the "Cross-Motion").

## PRELIMINARY STATEMENT

Almost nine years after he made a $400,000 loan to Finger Lakes (the "Loan") and accepted a one year promissory note (the "Note") from Finger Lakes (together with a guaranty of performance by Shalov and Mehta), Plaintiff belatedly filed this action claiming the Note is in default and demanding immediate payment.  Plaintiff admits his action is time-barred under CPLR § 213(2), but attempts to excuse his tardiness by relying on § 17-101 of New York's General Obligations Law ("Section 17-101").  Under that section and interpretive case law, the time to file an otherwise stale claim may be tolled in narrow circumstances; specifically, when the party obtaining the loan unconditionally "acknowledge[s]" or "promise[s]" in a "signed writing" to repay its indebtedness.

As the undisputed facts in this case show, these narrow circumstances do _not_ exist here, thus necessitating dismissal of the action as a matter of law.  In particular:

- **The writing referencing a debt cannot be "unsigned," even if it is attached to another writing that is signed**.  Here, the only reference to a loan from Plaintiff appears in a spreadsheet attached to an email written by Mehta (solely in his capacity as a Managing Member of Finger Lakes) in 2009.  The spreadsheet, however, was _never_ signed by anyone, much less Defendants.  Likewise, transcripts from Mehta's and Shalov's depositions in a related Delaware action (the "Delaware Action") were not signed, nor do they constitute "writings" for purposes of Section 17-101 under controlling authority.

1

- **The writing must acknowledge a debt of the party to be charged, not a debt of its guarantors.**  Here, not only is the spreadsheet unsigned, it references a purported loan to Mehta and Shalov personally, <u>not</u> a loan to Finger Lakes, which is the party to whom Keswin loaned the money and the party which is the sole "Debtor" under the Note.

- **The acknowledgement or promise must not be inconsistent with the intention of the party to be charged to pay it.**  Here, any acknowledgement or promise by Finger Lakes to pay the Note, assuming for this purpose only that the spreadsheet contained an acknowledgement or promise by Finger Lakes, <u>was</u> inconsistent with Finger Lakes' intention to pay it, because the spreadsheet identifies Shalov and Mehta as the only parties intending to pay, <u>not</u> Finger Lakes.

- **The writing referencing a debt must be sent to plaintiff or someone acting on his behalf or intended to influence plaintiff's actions.**  Here, the writing was sent to Ted Gage ("Gage") in his capacity as Chief Financial Officer of Lyrical Opportunity Partners, L.P. ("Lyrical"), not to Keswin.  Moreover, Keswin admitted in the Delaware Action that he never read the spreadsheet or the relevant footnotes, much less relied on the document in assessing whether to seek payment of the Note from Finger Lakes.

- **The writing referencing a debt must represent an unconditional and unqualified promise to pay, and if repayment is conditioned on a future event, the plaintiff must show the event has occurred**.  Here, the single potential reference to the Loan in the spreadsheet suggests it will be repaid, if at all, only when Mehta and Shalov receive a "carried interest" out of the five equity investments managed by Finger Lakes.  That condition has <u>not</u> been fulfilled and can never be fulfilled.

- **The writing referencing a debt must reflect the entire amount of the debt, including unpaid interest**.  Here, the spreadsheet identified only the original amount Keswin loaned to Finger Lakes almost nine years ago, <u>not</u> the amount of the indebtedness claimed by Keswin to be outstanding, <u>i.e.</u>, the original principal amount of the Loan plus accrued interest (which today far exceeds that original principal amount).

- **The writing referencing a debt must represent an "acknowledgement" or "promise" the plaintiff accepts or, at the very least, does not reject**.  Here, Mehta's email attaching the spreadsheet requested that Keswin's company, Lyrical, confirm its acceptance of the spreadsheet as reflecting their agreements.  Not only did Lyrical refuse to confirm, but it asserted claims against Finger Lakes in the Delaware Action as if those agreements never existed.

As the New York Court of Appeals long ago made clear, the statute of limitations is intended to "outlaw[]"stale claims even if it causes "hardship."  *See Schmidt v. Merchants Despatch Transp. Co. Felli*, 270 N.Y. 287, 302 (1936).  Keswin's claim is precisely such a stale claim, and his efforts to invoke Section 17-101 to resuscitate it are unavailing for a panoply of

2

reasons either viewed alone and certainly when considered collectively.

At the very least, the Court should dismiss the action under the "first-in-time" rule set forth in CPLR § 3211(a)(4). As described in the accompanying Mehta affidavit (the "Mehta Aff."), the Delaware Action involves substantially the same parties and transactions and is now awaiting decision after trial. Indeed, on at least three different occasions in the Delaware Action, Lyrical and Keswin have asserted that either one or both of them are entitled to payment of the Note which Defendants opposed on statute of limitations and other grounds. Accordingly, Keswin's untimely claim in this case (which is merely a transparent attempt to secure a more favorable forum), should be dismissed in its entirety or, at very least, stayed pending the outcome of the Delaware Action.

For these reasons, as set forth in greater detail below, Defendants respectfully request that the Court deny Plaintiff's Motion and grant Defendants' Cross-Motion.

## STATEMENT OF MATERIAL FACTS

Pursuant to Justice Ostrager's individual part rules, Defendants provide the following statement of material facts:

### A. Keswin Lends A Different Amount Than Is Shown On The Face Of The Note.

On or about August 1, 2006, Finger Lakes delivered the Note to Keswin. Mehta Aff. ¶ 2. The Note states on its face a principal amount of $1 million and purports to bear interest at the rate of 20% per annum. *See* June 25, 2015 Affidavit of Jeffrey Keswin (the "Keswin Aff."), Ex. A. Finger Lakes is the sole "Debtor" under the Note. *Id.* Shalov and Mehta signed the Note solely as guarantors, not as borrowers. *Id.*

At the time the Note was executed, Keswin loaned Finger Lakes $400,000, not the $1 million stated as the face amount of the Note. *Id.* ¶ 4. As the wire transfer confirmation attached

3

as Exhibit A to the Keswin Affidavit demonstrates, the $400,000 was wired to the bank account

of Finger Lakes, not the bank account of Mehta or the bank account of Shalov.  *Id.*, Ex. A.

**B.      Finger Lakes Sends An Email To Lyrical's
         CFO That Does Not Reference The Note.**

On October 20, 2009, Finger Lakes sent an email to Gage in his capacity Lyrical's Chief

Financial Officer, not to Keswin.  *See* Mehta Aff. ¶ 4; Keswin Aff. ¶ 11, Ex. C.  The email

discusses various investments involving Finger Lakes and Lyrical, but does not reference the Note

in its text.  *See* Keswin Aff. Ex. C.

The email describes the status of those investments and attaches a "spreadsheet" of Finger

Lakes' "portfolio."  *See id.*  In relevant part, the email states:

> As a further basis for this, please see the attached spreadsheet that
> describes our current portfolio.  Lastly, if you could please confirm
> receipt and that this works for you, that would be great.

*See id.*

The spreadsheet: (1) listed the amount invested by Lyrical in each of five

equity investment vehicles; (2) stated that Finger Lakes' "carried interest" in those five equity

investment vehicles were subject to a potential "clawback"; i.e., a method of deducting from the

profits derived by Lyrical from any of those equity investments the losses, if any, sustained by

Lyrical on account of any of the other of those equity investments before a determination of the

amount of Finger Lakes' "carried interest"; (3) listed the amounts loaned by Lyrical to certain of

those equity investment vehicles, as well as the amount loaned by a Lyrical affiliate to one debt

investment vehicle; (4) stated that losses, if any, sustained by Lyrical (or its affiliate) on  account

of the loans set forth in (3) above were not part of the "clawback"; and (5) listed separately under

the heading "Other" a purported $400,000 loan from Keswin to Shalov and Mehta personally,

while stating that that loan would be repaid from the "carried interest" proceeds received by Shalov

and Mehta personally from Lyrical's equity investments.  *Id.* Neither Gage nor Lyrical ever

confirmed that "this" -- the contents of the spreadsheet -- worked for Gage or for Lyrical (much

less for Keswin personally).  Mehta Aff. ¶ 9.

Keswin admitted in the Delaware Action he never read the footnotes in the

spreadsheet.  Mehta Aff. ¶ 20, Ex. D.  Consequently, Keswin never relied on the footnotes -- or,

for that matter, the spreadsheet itself -- because it would be impossible to receive the spreadsheet

and not see it had footnotes.

**C.      The Unsigned Spreadsheet Does Not
          Acknowledge A Debt By Finger Lakes.**

The spreadsheet is unsigned.  *See* Keswin Aff. Ex. C.  In a line item (entitled "Other") and

in footnote "(e)", the document does refer to a "Jeff Keswin Loan to GS/ZM" in the amount of

"$400,000."  Mehta Aff. ¶¶ 7-8.  That description, however (as well as the text of footnote (e)),

does not match Keswin's personal loan to Finger Lakes for which he received the Note.

*Id.*  Instead, footnote (e) refers to a "[l]oan to GS/ZM."  *Id.* ¶ 8.  However, the Note Keswin seeks

to enforce has nothing to do with a loan to "GS/ZM" (*i.e.*, a loan to Mehta and Shalov).  Rather,

Keswin seeks to enforce a Note from Finger Lakes, which is identified in the Note as the sole

"Debtor."  *See* Keswin Aff. Ex. A.

The spreadsheet also does not acknowledge any obligation to pay interest on the Note.  *See*

Keswin Aff. Ex. C.  It lists only an amount of $400,000, even though substantial interest on that

amount has purportedly accrued and Keswin now demands payment of that interest in his prayer

for relief.  *See id.*

Nor does the spreadsheet contain an unconditional acknowledgment by Finger Lakes of

indebtedness to Keswin on account of the Loan, the Note or anything else.  *See id*; Mehta Aff. ¶¶

10-11.  Instead, footnote (e) reads: "Loan to GS/ZM from Jeff Keswin is not included in FLCP

5

Investment Portfolio and is due back to JK from GS and ZM out of their carried interest in FLCP

Investment Portfolio." *See id.*  That is, Finger Lakes did not agree there was a debt due and owing

unconditionally.  Rather, Finger Lakes stated that the "[l]oan to GS/ZM . . . is due back to JK

[Keswin] from GS [Shalov] and ZM [Mehta] out of their carried interest in FLCP Investment

Portfolio"; thus, no carried interest, no repayment.

Neither Gage nor Lyrical confirmed that this proposal "works" (nor did Keswin).

Moreover, Finger Lakes has not received any proceeds from a "carried interest" in the "FLCP

Investment Portfolio," nor for that matter has either Mehta or Shalov.  *See* Mehta Aff. ¶¶ 11-12,

Ex. A (noting that only Finger Lakes has carried interest, not Mehta or Shalov individually).

**D.**  **Keswin Fails to Sue Within The Statute Of Limitations.**

By its terms, the Note matured on August 1, 2007, <u>i.e.</u>, one year after issuance.  Keswin

Aff. Ex. A § 1.1.  Keswin did not bring suit until June 24, 2015, well more than six years after the

Note matured.

**E.**  **The Enforceability Of The Note Is Sub Judice In The Delaware Action.**

In August 2014, Lyrical brought counterclaims against Finger Lakes in the Delaware

Action.  As part of those counterclaims, Lyrical asserted a right to payment "for amounts due under

the Note."  Keswin Aff. ¶¶ 2, 16; Mehta Aff. ¶¶ 16-17.  Lyrical also sought and conducted pre-

trial discovery regarding the Note, including questioning Mehta and Shalov during depositions and

requesting and obtaining documents.  Mehta Aff. ¶ 18.

A two-day trial was then conducted before Vice Chancellor Laster of the Delaware

Chancery Court on June 15 and 16, 2015.  *Id.*  Lyrical's Chief Investment Officer entered into

evidence in the trial a demonstrative exhibit and testified that the exhibit accurately sets forth the

amounts due to Lyrical from Finger Lakes.  *Id.* ¶ 24, Exs. G-H.  The exhibit states categorically

that principal and interest due to be paid under the Note is payable to Lyrical, not Keswin, yet Keswin is suing Finger Lakes for payment of that same Note in this action.  *Id.*

After the trial was completed, Lyrical did a complete about-face, seeking to withdraw its claim against Finger Lakes under the Note in the Delaware Action.  *See* Mehta Aff. ¶ 27, Ex. I at 1 n.1.  Finger Lakes, having been put to considerable time, effort and expense to litigate the matter in Delaware through pre-trial and trial, has opposed that withdrawal.  *Id.* ¶ 28, Ex. J.

The Delaware Action -- including Defendants' opposition to Lyrical's withdrawal request -- is now *sub judice*.  *Id.* ¶ 29.

## ARGUMENT

"On a motion for summary judgment, the moving party (here, Keswin) has the burden to establish a *prima facie* showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact."  *Voss v. Netherlands Ins. Co.*, 22 N.Y.3d 728, 734 (2014).  'If the moving party fails to meet this initial burden, summary judgment must be denied regardless of the sufficiency of the opposing papers."  *Id.*  "In other words, the burden does not shift to the nonmoving party to persuade the court against summary judgment."  *Id.*; *see also Vega v. Restani Constr. Corp*, 18 N.Y.3d 499, 503 (2012) (same).

Only if the *prima facie* showing is made does the burden shift to the nonmoving party "to establish the existence of material issues of fact which require a trial of the action."  *Id.*  In any event, "the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be resolved in favor of the nonmoving party."  *Santiago v. Joyce*, 127 A.D.3d 954, 954, 7 N.Y.S.3d 403, 404 (2d Dep't 2015) (citations omitted).

## POINT I

## <u>PLAINTIFF'S CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS</u>

The Court should deny Plaintiff's Motion and dismiss this action pursuant to CPLR § 3211(a)(5) because it is time-barred.  In his Affidavit, Keswin admits the Note on which he sues was "due and payable" not later than "July 31, 2007."  Keswin Aff. ¶ 8.  Assuming he has any claim under the Note, that claim accrued not later than August 1, 2007, the day after payment became due.  N.Y. U.C.C. § 3-122(1(a) ("A cause of action against a maker or an acceptor accrues (a) in the case of a time instrument on the day after maturity").  Under CPLR § 213(2), any claim based on a contractual obligation, such as a promissory note, must be brought within six years of the date of accrual.  Consequently, Plaintiff's claim expired on August 1, 2013.

Plaintiff, however, commenced this action in July 2015 -- two years too late.  Accordingly, his claim against Finger Lakes should be dismissed.  *See*, *e.g.*, *UMLIC VP, LLC v. Mellace*, 19 A.D.3d 684, 684-85, 799 N.Y.S.2d 61, 62 (2d Dep't 2005) (dismissing action brought under promissory note because "plaintiff failed to timely commence this action within the applicable six-year limitations period").  Nor can Plaintiff sue the guarantors of the Note, Shalov and Mehta.  Keswin's right to sue these guarantors for payment accrued on the same date -- August 1, 2007 -- and the six year statute to sue on this contractual claim expired on August 1, 2013 as well.  *See* CPLR 213(2) (setting the six-year rule).

## POINT II

## THE COURT SHOULD REJECT PLAINTIFF'S EFFORT TO <u>RESUSCITATE HIS TIME-BARRED CLAIM UNDER SECTION 17-101</u>

Where, as here, a *prima facie* case is established that the time in which to sue has expired, "the burden then shifts to [Plaintiff] to 'aver evidentiary facts establishing that the case falls within an exception to the [s]tatute of [l]imitations.'"  *Hebrew Institute for Deaf & Exceptional Children*

8

*v. Kahana*, 57 A.D.3d 734, 734, 870 N.Y.S.2d 85, 86 (2d Dep't 2008).  Aware his claim is time-barred on its face, Keswin attempts to squeeze the action into an exception to this rule provided in Section 17-101.  That statute, in relevant part, provides that:

> An acknowledgement or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules other than an action for the recovery of real property.

N.Y. Gen. Oblig. Law § 17-101.

This statute imposes multiple requirements, which courts interpret strictly and enforce rigorously.  Among other things, the "acknowledgment" or "promise" must: (1) be in a writing signed by the party to be charged; (2) recognize an existing debt of the "party to be charged" (not someone else); (3) contain nothing inconsistent with the intention on the part of the party to be charged to pay it; and (4) be unqualified and unconditional.  *See Faulkner v. Arista Records LLC*, 797 F.Supp.2d 299, 312 (S.D.N.Y. 2011); *Compania de Inversiones de Energia S.A. v. AEI*, 80 A.D.3d 533, 533, 915 N.Y.S.2d 546, 546-47 (1st Dep't 2011) ("In order to constitute an acknowledgment of a debt under GOL § 17-101, a writing must recognize an existing debt and must contain nothing inconsistent with an intention on the part of the debtor to pay it").  Furthermore, "the acknowledgement must have been communicated to the plaintiff or someone acting on his behalf, or intended to influence the plaintiff's conduct."  *Faulkner*, 797 F. Supp.2d at 312.

Here, Keswin contends that two emails dated October 20, 2009 and May 24, 2010 (and an unsigned spreadsheet attached to those emails) (collectively, unless otherwise indicated, the "Emails") satisfy these requirements.  *See* Pl. Br. at 7-8.  As shown below, Plaintiff's contention is meritless.

A.    **The Emails And The Spreadsheet Do Not Constitute An
Acknowledgment Of Debt By The Debtor, Finger Lakes.**

Based upon Keswin's own recitation of the facts, the "debtor party" under the Note -- and,

therefore, the "party to be charged" under Section 17-101 -- is Finger Lakes.  *See* Keswin Aff. Ex.

A.  However, that entity is not referred to in any writing as owing a debt to Keswin.   Of itself, this

deficiency mandates denial of Plaintiff's Motion.

To establish an acknowledgment or promise sufficient to satisfy Section 17-101, Keswin

must proffer a writing signed by Finger Lakes, recognizing an existing debt owed by Finger Lakes,

and containing "nothing inconsistent with an intention on the part of Finger Lakes to pay

it."  *Faulkner*, 797 F.Supp.2d at 312 (emphasis added); *see also Bild v. Konig*, No. 09-cv-5576

(ARR), 2011 WL 666259, at *4 (E.D.N.Y. Feb. 14, 2011) ("[I]t is the timeliness of Plaintiff's

claims against Weider, not Konig, which he attempts to revive by Section 17-101.  Thus, any

acknowledgment for this purpose must be signed by Weider, not Konig, and contain an

unconditional promise to pay by Weider, not Konig.").  Plaintiff, however, has failed to satisfy

that burden.

On its face, the Emails contain no acknowledgment of Finger Lakes' alleged debt to

Keswin under the Note.  *See* Keswin Aff. Ex. C.  Nor, for that matter, does the spreadsheet.  *Id.*

Instead, the spreadsheet refers only a "Loan to GS/ZM."  *Id.*  Similarly, footnote (e) states that the

"Loan to GS/ZM from Jeff Keswin . . . is due back to JK from GS and ZM out of their carried

interest from Finger Lakes Investment Portfolio."  *Id.*  Thus, the unambiguous language of the

spreadsheet does not acknowledge a Finger Lakes' indebtedness that Keswin seeks to enforce.

Whether Finger Lakes meant to refer to the Note Keswin now seeks to enforce rather than

10

some loan to Mehta and Shalov is totally irrelevant.[1]  To avoid the statute of limitations under

Section § 17-101, strict compliance is required: the plaintiff must show that the writing, by its own

terms, acknowledged the specific debt plaintiff seeks to enforce.  *See Faulkner*, 797 F.Supp.2d at

312; *Bild v. Konig*, 2011 WL 666259, at *4.  Keswin cannot do so.

The absence of any written mention of Finger Lakes is not a technical glitch.  It affects the

fundamental validity of the writing proffered to toll the statute of limitations.  *Moore v.*

*Candlewood Holdings, Inc.*, 714 F.Supp.2d 406, 411-12 (E.D.N.Y. 2010), is directly on point and

dispositive of this action.

In *Moore*, the writing which plaintiff claimed to constitute the relevant acknowledgment

said there were "loans from shareholders," but did not identify which shareholder was the

lender.  The plaintiff argued that defendant's listing was "meant to" refer to plaintiff based on what

defendant must have known.  However, the Court rejected that argument because any reliance on

unwritten understandings "is inconsistent with the requirements of [section 17-101] that a debt

must be acknowledged in a writing" sufficient to make clear who specifically owes what to

whom.  *Moore*, 714 F. Supp. at 411.

For this reason alone, Keswin's Motion must be denied and his claim must be dismissed

as a matter of law.

---

[1]      As a matter of law, Finger Lakes -- as the debtor under the Note -- cannot acknowledge a debt
on behalf of Mehta and Shalov as guarantors.  *See, e.g.*, *Park Assocs. v. Crescent Park Assocs., Inc.*,
159 A.D.2d 460, 462, 552 N.Y.S.2d 314, 315-16 (2d Dep't 1990) (dismissing complaint against
individual defendant guarantors because acknowledgment of promissory note by corporate defendant
did not extend statute of limitations as to the note's guarantors absent clear indication that corporate
defendant was acting as their agent); *see also Chase Manhattan Bank v. CDC Financial Corp.*, 54
Conn. App. 705, 707-08, 736 A.2d 938, 939-40 (Conn. App. 1999) (recognizing that, under New York
law, "[a]cknowledgment of the debt by the borrower does not extend the statute of limitation period as
to the guarantors 'absent some clear indication that [the borrower] was acting as the agent of the
guarantors'").

**B.     The Emails, Spreadsheet, and Transcripts All Fail To
<u>Satisfy The Signature Requirements Of Section 17-101.</u>**

The spreadsheet -- the only writing even referencing a "loan" -- is unsigned, a fact Keswin

does not dispute.  This is particularly significant because the texts of the Emails themselves (which

are signed electronically) make no reference to the Loan or the Note.   Under New York law, the

actual writing on which a plaintiff relies to invoke Section 17-101 must be signed (here, the

spreadsheet): it is not sufficient for another document (here, the Emails) attaching the writing to

be signed.  *See Matter of Brecher*, 80 A.D.2d 583, 583 (2d Dep't 1981) (finding that statute of

limitations is not tolled by recitation of debt in a financial statement because "the fact that the

portion which refers to their debt is unsigned, mandates the conclusion that it does not meet the

requirements of section 17-101 of the General Obligations Law").

In addition, to the extent Keswin argues that the deposition and trial transcripts annexed to

the Keswin Affidavit satisfy the "signed writing" requirement of § 17-101, his argument is

similarly without merit.  New York courts have held that a transcription -- even when signed --

fails to satisfy the requirements for tolling the statute of limitations under 17-101.  *See Erdheim v.

Gelfman*, 303 A.D.2d 714, 757 N.Y.S.2d 320 (2d Dep't 2003) (finding transcript of discussion in

which plaintiff allegedly acknowledged debt "fails, as a matter of law, to satisfy the requirement

for tolling the statute"); *see also Miwon, U.S.A. v. Crawford*, 629 F. Supp. 153, 156-59 (S.D.N.Y.

1985) (finding that statements in signed deposition transcript and trial testimony did not toll statute

of limitations under provisions of § 17-101).   And even were transcripts deemed adequate

"writings" under New York law (and they are not), the ones relied upon by Keswin here are <u>not</u>

signed by Mehta or Shalov; accordingly, they have no probative value whatsoever.

Because the signature requirements of Section 17-101 are not satisfied, the Motion must

be denied and Keswin's claim dismissed as a matter of law.

C.     **At Most, The Emails And Spreadsheet Represent An**
       **Intent To Repay The Loan Upon Occurrence Of An**
       **Event That Has Not Occurred And Never Will.**

Under New York law, an acknowledgement or promise must either be unconditional, or, if

it is conditioned on a future event, the plaintiff must prove the event has occurred.  Indeed, even

an express acknowledgement of a debt and an affirmative promise to pay it not sufficient to invoke

Section 17-101 if attached to a condition that has not taken place.  *In re Brill*, 318 B.R. at 54

(Bankr. S.D.N.Y. 2004) (debtor's statement, "I will no matter what happens give your money

back," held not sufficient for purposes of Section 17-101 when conditioned on a transaction that

did not occur).

At most, the Emails and spreadsheet relied on by Keswin reference a potential payment

that is expressly conditioned on a future event; specifically, the receipt by "GS" (Shalov) and

"ZM" (Mehta) out of "their carried interest from the FLCP Investment Portfolio."  *See* Keswin

Aff. Ex. C, footnote (e).   Of course, Shalov and Mehta do not have "a carried interest" in the

"FLCP Investment Portfolio," only Finger Lakes does.  Mehta Aff. ¶¶ 11-12, Ex. A.  Thus, the

condition attached to the purported "acknowledgement" or "promise" contained in the spreadsheet

will never occur.

Nor has Finger Lakes received any proceeds from its "carried interest" in the "FLCP

Investment Portfolio, which is now in dispute in the Delaware Action.  Mehta Aff. ¶¶ 11-

12.   Indeed, Finger Lakes has not received a penny of the "carried interest" distribution it is

owed.  *Id*.  Thus, the unqualified assertion in Keswin's supporting memorandum of law that this

event "has now happened" is both factually unsubstantiated and demonstrably wrong.

Moreover, the textual language in the Emails (that do not even reference the Loan or the

Note and are legally insufficient on this basis alone) can only be interpreted as a request for a

confirmation from Lyrical that the spreadsheet works as setting forth the existing agreement between Lyrical and Finger Lakes, not an "acknowledgement" or "promise" to pay as required under Section 17-101.  As Mehta concluded in the October 20, 2009 email: "if you could please confirm receipt <u>and that this works for you</u> that would be great, otherwise . . . ."  *See* Keswin Aff. Ex. C (emphasis added).  Not only did Lyrical fail to "confirm . . . that this works for you," Lyrical <u>rejected</u> the spreadsheet altogether by the assertion of its counterclaims in the Delaware Action.  Having rejected request for confirmation, Keswin cannot now use the Emails to invoke Section 17-101 and say he relied on them in any way.

**D.**     **The Spreadsheet Does Not Acknowledge**
           **The Total Debt Keswin Seeks To Recover.**

Section 17-101 is inapplicable for additional reasons as well.  The spreadsheet nowhere contains an acknowledgment of any obligation to repay the amount then due under the Note.   Instead, the document merely lists the amount of "$400,000" (Keswin Aff. Ex. C), even though the Note requires Finger Lakes "to pay interest in respect of the unpaid principal amount of this Note at a rate per annum equal to the lesser of 20% and the Maximum Rate."  *Id*. Ex A.

This pronounced failure to include a statement of accrued interest itself renders a "writing" insufficient under section 17-101 as an acknowledgment of a debt.  Again, *Moore* is dispositive:

> The second reason that the Court finds the tax returns to be insufficient to restart the limitations period is that the total amount listed for 'loans from shareholders' on the 2004 tax return is *less* than what [defendant] would have owed to the plaintiff under the Promissory Note at that time.  Calculating interest at the annual rate of 9%, as set forth in the Promissory Note, the total amount owed to the plaintiff under the Promissory Note at the beginning of 2004 was $987,141.13. However, the total amount listed under "loans from shareholders" for that time is only $972,208.

*Moore v. Candlewood Holdings, Inc.*, 714 F.Supp.2d 406, 411-12 (E.D.N.Y. 2010); *see also*

*Metwaly v. Int'l Business Machines Corp.*, 97 A.D.3d 514, 515, 949 N.Y.S.2d 57, 58 (1st Dep't

14

2012) (finding that plaintiff's claim was properly dismissed as time-barred where alleged acknowledgment under § 17-101 made "no mention of interest or an obligation to pay interest").

Notably, in *Moore*, an unstated shortfall of only $15,000 on an approximate $1,000,000 obligation was found to be fatal to the plaintiff's reliance on Section 17-101.  Here, interest owed on the Note at the time of the first email exceeded $240,000, monies nowhere referenced in the Emails or the spreadsheet but now claimed by Keswin in this lawsuit.  *See* Pl. Br. at 1 (seeking "to recover a loan of $400,000, <u>with interest</u>" [emphasis added]).  Again, this infirmity requires denial of the Motion and dismissal of Keswin's claim under CPLR § 3211(a)(5).

**E.     Finger Lakes Sent The October 20, 2009 Email To Gage In His <u>Capacity As Chief Financial Officer Of Lyrical, Not To Keswin.</u>**

As Plaintiff's own cited authority makes clear, a debtor's acknowledgment "must have been communicated to the plaintiff or someone acting on his behalf," or have been "intended to influence the plaintiff's conduct."  *Faulkner*, 797 F.Supp.2d at 312 (emphasis added) (cited at Pl. Br. at 7-8).  That requirement has a lengthy pedigree.  *Lynford v. Williams*, 34 A.D.3d 761, 762-63, 826 N.Y.S.2d 335, 337 (2d Dep't 2006) (finding that statute of limitations was not tolled under § 17-101 where it was "undisputed that [the alleged acknowledgments] <u>were neither communicated to the plaintiff or anyone on his behalf</u>, nor intended to influence the plaintiff's conduct in any manner") (emphasis added); *Centaur, N.V. v. William Lowe, Inc.*, No. 82 Civ. 2429, 1983 U.S. Dist. Lexis 20238, at *10 (S.D.N.Y. Jan. 6, 1983) ("Although acknowledgement of a debt generally acts to revive the statutory period and extend an obligor's liability for another six years, to extend the obligation, <u>that acknowledgement must be communicated to the obligee</u>") (emphasis added and citations removed).  Here the email was sent to Ted Gage, Lyrical's Chief Financial Officer (with no cc: to Keswin) and, as the email states, was sent to Gage to summarize the contents of a recent meeting between Gage and Mehta and to outline steps going

forward.  *See* Keswin Aff. Ex C.   But even assuming the October 20, 2009 email was communicated to Keswin (which it was not), that email makes no reference in its text to any Finger Lakes' indebtedness to Keswin.   On the contrary, it discusses "key developments" with regard to companies in Finger Lakes' "investment portfolio."  *Id.*  It then goes on for two pages to detail such developments.  The email, in its conclusion, states that Defendants are "going to do everything in our power to ensure we get [Lyrical] and Jeff a strong overall return on the Finger Lakes Investment portfolio."  *Id.*  However, a "strong return" on an "investment portfolio" has nothing to do with any personal Keswin loan.  Nor does it have anything to do with an intent to repay a loan.  The email, therefore, on its face does not constitute an acknowledgment of indebtedness, much less an intent to pay it.

## F.    The Unsigned Spreadsheet Was Never Communicated to Keswin.

As discussed above, the October 20, 2009 email attached the financial spreadsheet with a line-item referring to "Jeff Keswin Loan to GS/ZM" and the amount of "400,000.00"   Keswin Aff. Ex. C.  In footnote (e), the spreadsheet reads: "Loan to GS/ZM from Jeff Keswin is not included in Finger Lakes Investment Portfolio Clawback and is due back to JK from GS and ZM out of their carried interest from Finger Lakes Investment Portfolio."  *Id.* fn. (e).  In the Delaware Action, however, Keswin testified he never saw the footnote, and if he had he would never had agreed to it.

> A.    So what I was going to say is this e-mail, this schedule, is a copy of the previous one, except in this case, Finger Lakes – or I'll say Zubin – has inserted all of these footnotes that weren't extant in the first one.
>
> Q.    Uh-huh. Right.
>
> A.    <u>So I know that I never saw these footnotes or reviewed these footnotes prior to this litigation.</u>

16

\*\*\*

Q.      Both you and --

A.      <u>I did not -- I never saw these notes, and I never agreed to
        these notes</u>.

Mehta Aff. ¶¶ 20-21, Ex. D at 102-03 (Keswin cross-examination).

Under similar circumstances, such a failure to have seen the supposed acknowledgment

has been held to bar any attempt to toll the statute of limitations: "[t]he first problem the plaintiff

faced in relying on the tax returns as an acknowledgment of the Promissory Note is that she admits

that she never saw them." *Moore*, 714 F.Supp.2d at 411.    Accordingly, the alleged

acknowledgment did not satisfy the requirement that the writing "must be communicated to the

lender to restart the limitations period." *Id.*

**G.      The May 2010 Copy of the 2009 Email
         Sent To Lyrical Controller Is Insufficient**.

The email dated May 24, 2010 from Finger Lakes to Deserio (Keswin Aff. Ex. D) says

nothing about the Keswin Loan at all.  It is a copy of the October 20, 2009 Email attaching the

same unsigned spreadsheet sent to Lyrical's then-assistant controller.  Keswin Aff. ¶ 12.  Keswin

does not testify he ever saw this email (he did not), and, of course, he never saw the spreadsheet.

On this basis alone, Keswin cannot invoke Section 17-101 and his claim should be

dismissed as a matter of law.

**POINT III**

**THE COURT SHOULD DISMISS OR STAY THIS ACTION
PENDING THE OUTCOME OF THE DELAWARE LITIGATION**

CPLR Rule 3211(a)(4) provides that "[a] party may move for judgment dismissing one or

more causes of action asserted against him on the ground that . . . there is another action pending

between the same parties for the same cause of action in a court of any state of the United States;

17

the court need not dismiss upon this ground but may make such order as justice requires." N.Y.

C.P.L.R. 3211(a)(4). New York courts generally follow the so-called "first-in-time" rule set forth

in  3211(a)(4), recognizing that "the court which has first taken jurisdiction is the one in which the

matter should be determined and it is a violation of the rules of comity to interfere." *Syncora*

*Guarantee, Inc. v. J.P. Morgan Securities LLC*, 110 A.D.3d 87, 95, 970 N.Y.S.2d 526, 532 (1st

Dep't 2013).

    To satisfy the "same parties" requirement of CPLR 3211(a)(4), there must be "sufficient

identity" as to the parties involved. *White Light Productions, Inc. v. On the Scene Productions,*

*Inc.*, 231 A.D.2d 90, 93-94, 660 N.Y.S.2d 568, 571 (1st Dep't 1997) (citations omitted) (finding

that "same parties" requirement satisfied where New York action named two individual defendants

and corporate partner controlled by them and first-filed California action named corporate partner

alone). "Indeed, substantial, not complete, identity is all that is required to invoke CPLR

3211(a)(4)." *Syncora Guarantee*, 970 N.Y.S.2d at 532 (rejecting plaintiff's argument that "the

absence of one common defendant across the two actions is inconsistent with application of the

first-in-time rule" and concluding that motion court erred in defendant's motion to dismiss under

§ 3211(a)(4)).

    With respect to the subject matter of the actions, the relief sought must be either "the same

or substantially the same." *White Light Productions*, 660 N.Y.S.2d at 571 (citations omitted). "It

is not necessary that the 'precise legal theories presented in the first action also be presented in the

second action.'" *Syncora Guarantee*, 970 N.Y.S.2d at 533 (quoting *Cherico, Cherico & Assocs.*

*v. Midollo*, 67 A.D.3d 622, 622, 886 N.Y.S.2d 914, 915 (2d Dep't 1997)); *see also Schaller v.*

*Vacco*, 241 A.D.2d 663, 663, 659 N.Y.S.2d 587, 588 (3d Dep't 1997)) (dismissing second-filed

action as duplicative "although the precise legal theories" presented were different from those

18

presented in first-filed action).  "Rather, '[t]he critical element is that both suits arise out of the same subject matter or series of alleged wrongs.'"  *Syncora Guarantee*, 970 N.Y.S.2d at 533.  "Thus, where a plaintiff seeks the same damages for the same alleged injuries relating to the same transaction, a court may [hold] that the parties have 'substantially similar' identities for purposes of the first-in-time rule."  *Id.* at 532.

Application of these factors warrants the Court's dismissal of Keswin's belatedly filed action.  Though Mehta, Shalov, and Keswin are not individual parties to the Delaware Action, the Delaware Action involves the same subject matter as the instant action and arises out of the same series of alleged wrongs.  *See* Keswin Aff. ¶¶ 14-17; Mehta Aff. ¶¶ 16-29.  Any argument to the contrary by Plaintiff would be clearly without merit given Lyrical's recognition of the potential for "double exposure" and Plaintiff's own admission that, although he is "not personally a party to [the Delaware Action], some of [his] personal investments are the subject thereof."  Mehta Aff. ¶¶ 22-23, Ex. E at 64-65 n.14; Keswin Aff. ¶ 15.  Accordingly, the Court should dismiss this action in favor of the first-filed action in the Delaware Action.  In the alternative, it should stay this action pending the outcome of the Delaware Action.

The Court should dismiss or stay this action for another reason.  In the Delaware Action, Lyrical has taken the position that it had <u>forgiven</u> all the interest on the Note.  Mehta Aff. ¶¶ 22-23, Ex. E at 64-65 n.14 (noting that Plaintiff makes "no claim . . . for the very substantial amount of unpaid interest in arrears, only the lost principal amount of the loan").  It would be grossly unfair and perverse to permit Keswin to walk away from that representation in the Delaware Action and seek interest from Defendants in this action.  It also makes little sense to have the Court act on the papers submitted in that action (and subsequent conduct by the parties) only to ignore that conduct

19

and start afresh here.  For this reason as well, the Court should grant Defendants' Cross-Motion to dismiss or stay this action.

## POINT IV

### MATERIAL ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

Under CPLR 3212(b), a Court should deny a motion for summary judgment if the non-movant shows facts "sufficient to require a trial of any issue of fact."   Here, even if the Court fails to grant Defendants' Cross-Motion to dismiss on statute of limitations grounds, it should nonetheless find that the record contains genuine issues of material fact precluding summary judgment in Plaintiff's favor.

In particular, further discovery would be necessary to determine whether (i) Lyrical ever confirmed that the spreadsheet worked; (ii) the Emails from Finger Lakes to Lyrical employees were intended to, and did, influence Plaintiff's conduct; (iii) Finger Lakes, Mehta or Shalov received any "carried interest" proceeds; and (iv) interest was forgiven in the Delaware action or whether Keswin should be estopped for asserting a claim for interest.  Thus, while there are multiple reasons why Keswin's claim should be dismissed as a matter of law, there are, at the very least, disputed factual issues that compel denial of Keswin's Motion.  *See*, *e.g.*, *Faulkner*, 797 F.Supp.2d at 313-14 (finding genuine issues of fact as to whether email constituted valid acknowledgement under § 17-101); *Seattle Pacific Industries, Inc. v. Golden Valley Realty Assocs.*, 54 A.D. 3d 930, 932, 864 N.Y.S.2d 500, 502 (2d Dep't 2008) (finding summary judgment on statute of limitations issue was precluded where it could not be determined from record whether documents constituted an acknowledgment under § 17-101).

In addition, when suit is brought under CPLR 3213, the plaintiff's right to judgment must appear on the face of the instrument the plaintiff seeks to enforce.  Where the Court must resort to

extrinsic evidence to determine the nature of the payment obligation, the streamlined procedure of CPLR 3213 is unavailable. *See Ian Woodner Family Collection, Inc. v. Abaris Books, Ltd.*, 284 A.D.2d 163, 164, 726 N.Y.S.2d 420, 421 (1st Dep't 2001) (denying CPLR 3213 motion where, as here, "extrinsic evidence is required to determine" the alleged amount due); *Beal Bank v. Melville Magnetic Resonance Imaging, P.C.*, 270 A.D.2d 440, 440-41, 704 N.Y.S.2d 647, 648 (2d Dep't 2000) (holding that "since outside proof was required to determine the sum due upon the promissory note at issue in the event of default, the granting of the plaintiff's motion for summary judgment in lieu of complaint was inappropriate). Here, while the face of the Note is for $1 million, it is undisputed that Keswin never issued any personal loan to Finger Lakes in that amount. Rather, Keswin relies on documents *outside* the face of this Note to show that he loaned $400,000 to Finger Lakes. *See* Keswin Aff., Ex. A. For this additional reason, Plaintiff's Motion should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the entry of an Order: (i) denying Plaintiff's Motion in its entirety; (ii) dismissing this action as time-barred pursuant to CPLR § 3211(a)(5) or the first-in-time rule set forth in CPLR § 3211(a)(4), or, alternatively, staying this action pending the outcome of the Delaware Action; and (iii) granting such other and further relief as the Court deems just and proper.

Dated:   New York, New York
            August 25, 2015

21

Respectfully submitted,

Lee S. Shalov
Chester R. Ostrowski
McLAUGHLIN & STERN, LLP
260 Madison Ave.
New York, NY 10016
(212) 448-1100

*Attorneys for Defendants Finger Lakes
Capital Partners LLC, V. Zubin Mehta,
and Gregory Shalov*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEFFREY KESWIN,                                    :

                                                   :    Index No. 156356/2015
                        Plaintiff,                 :

                                                   :    Motion #002
          -against-                                :

                                                   :
FINGER LAKES CAPITAL PARTNERS, LLC,                :
V. ZUBIN MEHTA, and GREGORY SHALOV,                :

                                                   :
                        Defendants.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF CROSS-MOTION BY DEFENDANTS
## TO DISMISS OR STAY THE ACTION

PLEASE TAKE NOTICE that, upon the affirmation of V. Zubin Mehta and the

memorandum of law filed herewith, defendants Finger Lakes Capital Partners, LLC, V. Zubin

Mehta, and Gregory Shalov (collectively, "Defendants") shall cross-move this Court, before the

Honorable Barry R. Ostrager, J.S.C., at the Courthouse located at 60 Centre Street, New York,

New York 10007, at 9:30 a.m. on September 2, 2015, or as soon thereafter as counsel may be

heard, for an Order: (i) dismissing this action as time-barred pursuant to CPLR § 3211(a)(5) and/or

under the "first-in-time" rule set forth in CPLR § 3211(a)(4) or, in the alternative, staying this

action pursuant to § 3211(a)(4); and (ii) awarding Defendants such other and further relief as the

Court deems just and proper.

Dated: New York, New York
       August 25, 2015

Respectfully submitted,

Lee S. Shalov
Chester R. Ostrowski
MCLAUGHLIN & STERN, LLP
260 Madison Ave.
New York, NY 10016
(212) 448-1100

*Attorneys for Defendants Finger Lakes
Capital Partners LLC, V. Zubin Mehta,
and Gregory Shalov*

TO:    Bijan Amini, Esq.
       Jaime Leggett, Esq.
       **Storch Amini & Munves P.C.**
       2 Grand Central Tower
       140 East 45th Street, 25th Floor
       New York, New York 10017
       *Attorneys for Plaintiff
       Jeffrey Keswin*

2